UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SCOTT EARLEY,                           CASE NO. 00-6104-CIV-ZLOCH

      Plaintiff,                      MAGISTRATE JUDGE SELTZER

v.

SHERIFF OF BROWARD COUNTY,
FLORIDA,

      Defendant.

_____/

## PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

Plaintiff, SCOTT EARLEY (hereinafter Earley), pursuant to Rule 56, Federal

Rules of Civil Procedure, and Local Rule 7.5, files his Response and Memorandum of

Law in Opposition to Defendant SHERIFF OF BROWARD COUNTY, FLORIDA

(hereinafter "Sheriff"), Motion for Summary Judgment and Memorandum of Law in

Support, and states:

### I. RESPONSE

1.    Defendant Sheriff's Motion for Summary Judgment is inappropriate as

discovery is still open and Plaintiff Earley has yet to complete discovery.

2.    Defendant Sheriff for purposes of its Motion for Summary Judgment

does not contest the factual allegations of Plaintiff's Complaint.

3.    Plaintiff's Complaint adequately alleges the violations of Earley's

1

Constitutional rights pursuant to 42 U.S.C. § 1983, therefore rendering entry of
Summary Judgment inappropriate.

4.    The evidence in the record supports Earley's contention of the Sheriff's
deliberate indifference sufficient to raise a genuine issue of material fact as to his
claim for violation of his Constitutional rights pursuant to the Eighth Amendment.

5.    The evidence in the record supports Earley's contention that the Sheriff
acted with the requisite intent to deprive Earley of his necessary medical attention as
a form of punishment in violation of his Constitutional due process rights.

6.    The Ninth Amendment is applicable to this case.

7.    The Sheriff is the proper party in this matter, and is subject to suit.

## II. STANDARD OF REVIEW

The standard for summary judgment is an exacting one; in deciding the
motion, the Court must consider all of the evidence in the most favorable light for
the non-moving party and against the moving party.  Papers supporting the movant
are most closely scrutinized, whereas the opponent's are "indulgently treated." *Austin
v. Bell*, 938 F.Supp. 1308 (M.D.. Tenn. 1996), *aff'd in part, rev. in part*, 126 F.3d 843.
Courts are vested with wide latitude in determining whether the entry of summary
judgment is proper in a given case.  Although the Court has no discretion in granting
the motion, the Court does have discretion in denying the motion.  That is, even in a

2

Scott Earley v. Sheriff of Broward County, Florida
Case No. 00-6104-CIV-ZLOCH

case where a party has technically discharged his burden of establishing the right to

summary judgment, the Court, if it feels that the better course would still be to

proceed to full trial, can deny the motion. *E.g., Becerra v. Asher*, 921 F.Supp. 1538

(S.D. Tex. 1996), *affirmed*, 105 F.3d 1042.

## III. MEMORANDUM OF LAW

### A. The Sheriff's Grounds for Entry of Summary Judgment are Inappropriate

The Sheriff, in support of its Motion for Summary Judgment attempts to have

this Court enter final summary judgement on its behalf based apparently on an

alleged failure by the Plaintiff to "make the requisite allegations to state an Eighth

Amendment violation..."[1] It is axiomatic that Fed.R.Civ.P., Rule 8 requires only a

"notice" pleading standard. It is not necessary to plead any facts. *See, e.g., Palmer v.

Board of Education of Community Unit School District 201-U*, 46 F.3d 682, 688 (7th

Cir.1995). Nor do the pleadings even need to identify any particular legal theory

under which recovery is sought. *See, e.g., Crull v. GEM Insurance Co.*, 58 F.3d 1386

(9th Cir.1995). Under the Federal Rules, the purpose of pleading is simply to "give the

defendant fair notice of what the plaintiff's claim is and the grounds upon which it

rests," not to state in detail the facts underlying a complaint. *Conley v. Gibson*, 355

---

[1]Motion for Summary Judgment and Memorandum of Law in Support (hereinafter "Sheriff's Motion"), pg. 5, ¶2.

3

Scott Earley v. Sheriff of Broward County, Florida
Case No. 00-6104-CIV-ZLOCH

U.S. 41, 47, 78 S.Ct. 99, 102-03, 2 L.Ed.2d 80 (1957); *see Sinclair v. Kleindienst*, 711

F.2d 291, 293 (D.C.Cir.1983). The Federal Rules establish a regime in which

"simplified" pleadings provide notice of the nature of claims, allowing parties later "to

disclose more precisely the basis of both claim and defense and to define more

narrowly the disputed facts and issues" through "the liberal opportunity for discovery

and other pretrial procedures established by the Rules." *Conley,* 355 U.S. at 47-48 &

n. 9, 78 S.Ct. at 102-03 & n. 9. A complaint, in other words, need not allege all that

a plaintiff must eventually prove. *Atchinson v. District of Columbia,* 73 F.3d 418, 421-

422 (D.C.Cir.1996).

Summary Judgment may be proper when, after an adequate period for

discovery, one party is unable to show a genuine issue as to a material fact. *See*

*Vaughn v. United States Small Business Admin.*, 65 F.3d 1322, 1325 n. 1 (6th

Cir.1995)(defendant's summary judgment motion cannot ordinarily be considered

until the plaintiff has had the opportunity to conduct discovery). The discovery cut-

off in this case in not until April of 2001. Plaintiff is just now propounding the

discovery and preparing to take the depositions necessary to prove his case. As such,

in the case at bar, summary judgment consideration is clearly inappropriate and

premature, and should be denied.

However, regardless of the timing of Defendant's Motion, a cursory review of

4

the Plaintiff's Complaint demonstrates that he has in fact properly and adequately

alleged his claim for deprivation of his Constitutional rights pursuant to § 1983, and

the applicable amendments.

### 1. Eighth Amendment

To establish a claim for denial of medical care, a prisoner needs to prove that

officials showed deliberate indifference to his or her serious medical needs. *Estelle v.*

*Gamble*, 439 U.S. 97 (1976). The primary case on this issue is the Supreme Court's

decision in *Estelle v. Gamble*, 439 U.S. 97 (1976). *Estelle* is cited by almost every case

discussing prisoners and medical treatment, and is in fact cited by the Sheriff in its

Motion for Summary Judgment.

*Estelle* sets the standards as far as medical treatment to prisoners within the

context of the Eighth Amendment. In *Estelle*, the Supreme Court explained its

rational behind the standards when it stated that:

> the government has an obligation to provide medical care for those
> whom it is punishing by incarceration. An inmate must rely on prison
> authorities to treat his medical needs; if the authorities fail to do so,
> those needs will not be met... [T]he denial of medical care may result in
> pain and suffering which no one suggests would serve any penological
> purpose. The infliction of such unnecessary suffering is inconsistent with
> contemporary standards of decency as manifested in modern legislation
> codifying the common-law view that "it is but just that the public be
> required to care for the prisoner, who cannot by reason of the
> deprivation of his liberty, care for himself." Id. at 103-104.

5

Scott Earley v. Sheriff of Broward County, Florida
Case No. 00-6104-CIV-ZLOCH

Defendant Sheriff argues in its Motion that a plaintiff must show an "unnecessary and wanton infliction of pain."[2] The Supreme Court in *Estelle* declared that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eight Amendment. Id. at 104. The Eleventh Circuit has consistently held that knowledge of a need for medical care and intentional refusal to provide that care constitutes deliberate indifference. Cite to *Carswell v. Bay County*, 854 F.2d 454 (11th Cir. 1988).

As such, Earley must show that the Sheriff knew of his need for medical care, and that it intentionally refused to provide that care. Contrary to the Sheriff's contention in its Motion, Earley properly alleged that the Sheriff knew of his serious medical condition,[3] and of the minimal efforts it would take to satisfy his needs,[4] and that these needs were intentionally ignored.[5] More than just mere allegations, these contentions are borne out by evidence in the record. In his answers to interrogatories, Earley states that the sentencing judge was informed of his condition and needs,[6] that

---

[2]Sheriff's Motion, pg. 3, ¶3.

[3]Complaint, ¶6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16.

[4]Complaint, ¶8, 9, 10, 11, 12, 13, 14, 15, 16.

[5]Complaint, ¶9, 10, 11, 12, 13, 15, 16.

[6]Plaintiff's Answers to Defendant's Interrogatories (hereinafter "Answers to Interrogatories"), number 23 (attached hereto as exhibit "A").

6

Scott Earley v. Sheriff of Broward County, Florida
Case No. 00-6104-CIV-ZLOCH

his doctor sent the Defendant a letter detailing his medical condition, and special needs and treatment,[7] that he informed Defendant of his condition and needs,[8] and that these were deliberately ignored.[9] These facts are all once again borne out in Earley's deposition transcript.[10] As such, contrary to the Sheriff's contentions in his Motion, not only did Earley properly allege his § 1983 action, the record is replete with material facts to support his claims, making it clear that not only is summary judgment inappropriate, but that Earley has met his evidentiary burden of establishing "deliberate indifference."

In *Weeks v. Chaboudy*, 985 F.2d 185 (6th Cir. 1993), a case which dealt with a paralyzed prisoner, deliberate indifference was found on facts much less compelling then those in the case at bar. In *Weeks*, the prison doctor knew of the prisoner's paraplegia, knew that wheelchair's where not permitted in the cellblock, but refused to admit the prisoner to the infirmary where the wheelchair could be used. Additionally, the prisoner was not bathed or given a hospital mattress for days. The court found that the doctor had violated the eight amendment. In the case at bar, the

---

[7]Answers to Interrogatories, numbers 23, and 27.

[8]Answers to Interrogatories, numbers 23, and 31.

[9]Answers to Interrogatories, numbers 23, 30, 31, 34, 35.

[10]Deposition of Scott Earley (attached hereto as Exhibit "B").

7

Scott Earley v. Sheriff of Broward County, Florida
Case No. 00-6104-CIV-ZLOCH

detention center staff clearly knew of Earley's condition and special needs, being informed repeatedly, yet intentionally refused to provide Earley with treatment. They did not provide him with his medications;[11] did not allow him to catherize as needed;[12] did not allow him to use his own tube, but gave him a catheter tube which was too large and unlubricated;[13] did not provide him with the air mattress he requires for his decubitus ulcers;[14] did not bath him and left him lying in his own feces.[15]

The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference. *See Robinson v. Moreland*, 655 F.2d 887 (8th Cir.1981). *In Ramos v. Lam*, 639 F.2d 559, 575 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). The facts in the record cited above indicates that Earley has in fact, demonstrated deliberate indifference on the part of the Sheriff.

### 2. Due Process

---

[11]Earley Deposition, pg. 35, lines 9-17.

[12]Earley Deposition, pg. 25.

[13]Earley Deposition, pg. 35, lines 18-25.

[14]Earley Deposition, pg. 36, lines 1-7.

[15]Earley Deposition, pg. 38, lines 6-11.

8

Scott Earley v. Sheriff of Broward County, Florida
Case No. 00-6104-CIV-ZLOCH

The Sheriff argues that Earley's claims for deprivation of his constitutional due process rights are insufficient because the Complaint sounds solely in negligence which does not constitute the requisite intent.[16] However, Earley has not only clearly demonstrated ample evidence to establish deliberate indifference, but also that his constitutional due process rights were violated and that he was deprived of his "liberty" interest in freedom from bodily injury, see *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). The facts in the record cited above show that when Earley complained to the prison officials of his needs for medical care and the lack of said care,[17] he was brought up for disciplinary proceedings, written up pursuant to the Sheriff's procedures, and deliberately placed in solitary confinement without medical treatment as punishment for his alleged transgressions.[18]

Because context is important, whether an official's actions shock the conscience is analyzed along a "culpability spectrum." *County of Sacremento v. Lewis*, 523 U.S. 833, at 849, 118 S.Ct. 1708, 118 S.Ct. at 1718. As the Sheriff correctly states, negligence is "categorically beneath the threshold" and will never qualify as conscience shocking.

---

[16]Sheriff's Motion, pg. 5.

[17]Earley Deposition, pg. 35, lines 9-17.

[18]Answers to Interrogatories, numbers 23.

9

*Lewis,* 523 U.S. 833. The spectrum begins above that level, and in "some

circumstances conduct that is deliberately indifferent will shock the conscience."

*Nicini v. Morra,* 212 F.3d 798, 810 (3d Cir.2000). But in other circumstances, a

higher degree of culpability will be required. The two ends of the culpability

spectrum, in terms of both law and fact, can be defined as follows: "deliberate

indifference" when deliberation is "practical" and "purpose to cause harm" when

instantaneous decisions and immediate judgments are required. *Leddy v. Township of*

*Lower Merion,* 114 F.Supp.2d 372 (E.D.Pa. Sep 22, 2000). This is true, at least in part,

because "[a]s the very term 'deliberate indifference' implies, the standard is sensibly

employed only when actual deliberation is practical." *Lewis* at 849, 118 S.Ct. at 1718.

In the case at bar, the deprivation of medical treatment was meted out as a deliberate

form of punishment in unhurried conditions, which constitutes sufficient evidence of

the requisite intent for a claim of due process violation, precluding the entry of

summary judgment.

### 3. Ninth Amendment

The ninth amendment to the Constitution provides: "[t]he enumeration in the

Constitution, of certain rights, shall not be construed to deny or disparage others

retained by the people." To the extent that the Bill of Rights is applicable to the

States under the Fourteenth Amendment, the principles embodied in the Ninth

10

Scott Earley v. Sheriff of Broward County, Florida
Case No. 00-6104-CIV-ZLOCH

Amendment are applicable as well. *Massachusetts v. Upton*,

466 U.S. 727, at 738, (concurring opinion). In adopting the Ninth Amendment, the

states recognized that the people possess "fundamental rights" not explicitly set forth

in the Bill of Rights and that those fundamental rights are enforceable under the due

process clause of the fourteenth amendment, *see, e.g., Griswold v. Connecticut,* 381 U.S.

479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). As such, Earley is merely

attempting to preserve his constitutional rights not specifically enumerated.

### 4. Respondeat Superior

The Sheriff maintains that the entry of summary judgment is appropriate

because "Earley does not allege that the Sheriff instituted procedures that were

violative of Earley's constitutional rights or was personally aware of any practices that

did so."[19] A government agency is liable "when execution of a government's policy or

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be

said to represent official policy, inflicts injury..." *Monell v. Dept. of Social Services,* 436

U.S. 658 (1978). A prisoner may prove the custom or policy by showing a pattern of

unconstitutional acts of low-level employees or the delegation or final policymaking

authority from one official to another and the ratification of a subordinate's actions

by a final policymaker. *Mandel v. Doe,* 888 F.2d 783, 791 (11th Cir. 1989). in

---

[19]Sheriff's Motion, pg. 7.

11

Scott Earley v. Sheriff of Broward County, Florida
Case No. 00-6104-CIV-ZLOCH

*Mandel*, a prisoner brought a 1983 civil rights claim alleging he was injured by a
physician assistant's deliberate indifference to his serious medical needs. The prisoner
injured his leg while performing road side tasks and was denied x-rays and other
treatment despite his repeated requests. In *Mandel*, the court found that the
physician's assistant was a policymaker; therefore, it imposed liability upon the
governmental agency.

As stated above, a complaint need not allege all that a plaintiff must eventually
prove. *Atchinson v. District of Columbia*, 73 F.3d 418, 421-422 (D.C.Cir.1996). Earley
has stated that the Sheriff, his agents and employees, had knowledge of his condition,
had a duty to deliver said care, and breached said duty.[20] Through discovery, Earley
will be able to exactly ascertain the relationship between the Sheriff and its agents
and employees, what the policies or customs in place were, and whether the
individuals who refused him medical treatment were acting pursuant to policy, were
acting as a policymaker, or both. As such, it is apparent that summary judgment
consideration is not only premature, but inappropriate at this time.

### 5. Sovereign Immunity

Defendant's contention as to the Sheriff's Eleventh Amendment Immunity is
clearly erroneous. The Sheriff of Broward County is an independently elected,

---

[20]Complaint, ¶16.

12

Scott Earley v. Sheriff of Broward County, Florida
Case No. 00-6104-CIV-ZLOCH

separate county constitutional officer, and an agency of the state, subject to suit.
*Murphy v. Mack,* 358 So.2d 822 (Fla. 1978). The Sheriff of Broward County is the
chief correctional officer of the Broward County Correctional System. Broward
County Code, § 18-01. The chief correctional officer is responsible for the operation
and maintenance of the county jails. §951.061, Fla. Stat. (1997). Included in the
chief correctional officer's duties is the duty to furnish prisoners with medical
attention in accordance with promulgated standards. See §951.061, Fla. Stat. (1997);
See also *Feldman v. Brescher,* 561 So.2d 1271 (Fla. 4th DCA 1990); *Hospital Bd. of
Directors of Lee County v. Drukis,* 426 So.2d 50 (Fla. 2nd DCA 1982); 1972
Op.Att'y.Gen.Fla. 075-194 (July 8, 1975).

As such, the Sheriff is the proper party in this matter, and summary judgment
based on Eleventh Amendment immunity is improper and should be denied.

## IV. CONCLUSION

For the reasons discussed fully above, Defendant Sheriff is not entitled to
summary judgment on any of the grounds cited, and said motion should be denied.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was
furnished by U.S. mail to Greg A. Toomey, Esq., Bunnel, Woulfe, Kirschbaum,
Keller, Cohen & McIntyre, P.A., Attorneys for Defendant, 888 East Las Olas

13

Scott Earley v. Sheriff of Broward County, Florida
Case No. 00-6104-CIV-ZLOCH

Boulevard, Suite 400, Fort Lauderdale, FL 33303-0340 this 27th day of November,

2000.

HIGH, STACK, PALAHACH
& CRUANES
2655 LeJeune Road, Suite 1108
Coral Gables, Florida 33134
Telephone No. (305) 443-3329
Facsimile No. (305) 443-0850

By: _____
Carlos Cruanes
Florida Bar No.0121940

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SCOTT EARLEY,                                    CASE NO. 00-6104-CIV-ZLOCH

            Plaintiff,                           MAGISTRATE JUDGE SELTZER

v.

SHERIFF OF BROWARD COUNTY,
FLORIDA.

            Defendant.

_____/

### PLAINTIFF'S NOTICE OF SERVICE
### OF ANSWERS TO DEFENDANT'S INTERROGATORIES

Plaintiff, Scott Earley, hereby gives notice of service of his original answers to Defendant's

General Liability Interrogatories numbered 1 - 37 propounded on June 2, 2000.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by U.S.

mail to Alan C. Anchell, Esq., Bunnel, Woulfe, Kirschbaum, Keller, Cohen & McIntyre, P.A.,

Attorneys for Defendant, 888 East Las Olas Boulevard, Suite 400, Fort Lauderdale, FL 33303-0340

this ____ day of July, 2000.

                          HIGH, STACK, PALAHACH
                          & CRUANES
                          3929 Ponce de Leon Boulevard
                          Coral Gables, Florida 33134
                          Telephone: (305) 443-3529

                          By: _____
                              Carlos Cruanes
                              Florida Bar No 0121940

1

EXHIBIT "A"

ANSWERS TO GENERAL LIABILITY INTERROGATORIES

1.    Scott Raymond Earley
     590 NW 66 Avenue
     Plantation, Florida 33317
     Date of Birth:     2-16-72
     Social Security No.:  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
     Driver's License No.: E640796720560
     No Spouse
     Single
     Never been married
     No children

2.    12/1997 - 3/1998     Internet Global Communications
                               On-Line Talk Show Host
                               $300.00 per week
                               Immediate Supervisor -Stephen Bauer
                               No contact information available

     8/1997 - 12/1997     Alton Entertainment, Miami Beach, Florida
                               Associate Producer
                               $600.00 per week
                               Immediate Supervisor -Michael McMoore

     6/1997 - 8/1997     Five Star Productions, Delray Beach, Florida
                               Associate Producer
                               $500.00 per week
                               Immediate Supervisor - Laura Bailey
                               Owner - Scott Wooley

     8/1996 - 8/1997     TV Innovations, Fort Lauderdale, Florida
                               Associate Producer
                               $400.00 per week
                               Immediate Supervisor - Patti Elliott
                               Owner - Ron Godfrey

     1/1996 - 8/1996     Information Television Network, Boca Raton, Florida
                               Associate Producer
                               $400.00 per week
                               Immediate Supervisor - John Santicerma

     4/1995-12/1995     Grantal, Inc., Fort Lauderdale, FL
                               Cold Caller

2

$200.00 per week
Immediate Supervisor - Scott Udine

11/1994 - 4/1995    Prudential Securities, Plantation, Florida
Cold Caller
$200.00 per week
Immediate Supervisor - Michael Cohen

3/1993 - 11/1994    PCM Securities, Fort Lauderdale, FL
Cold Caller
$200.00 per week
Immediate Supervisor - Richard Ginsburg
Owner - Donald O'Shey

The rest of my time I was in school at Broward Community College.

3.    Graduated Cooper City High School with Diploma in 1990
Went to Broward Community College but did not earn a degree major Theatre.
Went to Johnson and Lipman training center for Series 7 Licence to become a stockbroker

4.    I did not consume alcohol or take drugs or medication because I was in the custody of
Broward County Jail.

5.    No crime or conviction

6.    Car accident on 3-15-98. Severed spinal cord and was paralyzed from the waist down.
Dislocated hip and shattered femur bone.

7.    Dr. Arlene Richards
4100 South Hospital Drive
Suite 300
Plantation, Florida 33317
954-797-0601

Carl Henry Health South Rehab Center

Dr. Jeffrey Marks
7390 N.W. 5th Street
Plantation, Florida 33317
954-587-7010

8.    Medicaid from May, 1998 only

3

9     Yes, paralyzed from the waist down which produced back pain and eating disorders.

10.    Toe nails were bleeding because I was not provided with circulation socks and left barefoot. Stomach pains, chest pain when breathing, blood in urine, urinary tract infection, pain in lower back, ulcer on sacrum open and bleeding. I had a decubitus ulcer on my sacral opening, which with constant treatment had been reduced to a sacrum grade 1 when I entered the detention facility. Because of the lack of medical treatment, it turned into a grade 4 by the time I was released. I also suffered a relapse in my mental adjustment to my paralysis, and to my desire to go on.

11.    Yes.

    My treating physician was:
    Dr Arlene Richards
    4100 South Hospital Drive
    Suite 300
    Plantation, Florida 33317
    954-797-0601

12.    Dr Arlene Richards
    4100 South Hospital Drive
    Suite 300
    Plantation, Florida 33317
    954-797-0601
    Approximately $530.00
    General practitioner.

    Plantation Hospital
    401 N W. 42 Avenue
    Plantation, Florida 33317
    Total charges unknown.
    Treated for chest / abdominal pains, urinary tract infection, and sacral decubitus ulcer.

13    I am a paraplegic and will continue to receive medical treatment for the rest of my life. My condition and injuries were worsened due to the lack of medical attention while I was incarcerated. I will continue to see my primary care physician, Dr. Arlene Richards, and any other health care providers as they become necessary. Their names are unknown at this time

14.    I have never served in the military service.

15    Geico Insurance Company
    4295 Ocmulgee East Boulevard
    Macon, GA 31295-0001
    Bodily injury liability claim made for automobile accident which occurred on March 15, 1998.

4

Agency for Health Care Administration
Medicaid Third Party Liability
P.O. Box 12900
Tallahassee, FL 32317-2900
Claim for medical expenses resulting from an automobile accident which occurred on March

15, 1998.

16.    Not applicable.

17.    Not applicable.

18.    None.

19.    Patsy White
       590 N.W. 66 Avenue
       Plantation, FL 33317

       Michael J. Earley
       5631 G. S.W. 11 Street
       Margate, FL 33068

       Chris Pare
       North Broward Detention Center
       1550 N.W. 30th Avenue
       Pompano Beach, Florida

       Dr. Arlene Richards
       4100 South Hospital Drive
       Suite 300
       Plantation, Florida 33317

20.    None

21.    None

22.    Unknown at this time

23.    On or about February 16, 1999, I was, as a result of misdemeanor proceedings, confined in
the North Broward Detention Facility, located in Broward County, and operated by the Sheriff of
Broward County to serve a sentence of ten days. The Court chose this facility because it allegedly

5

Scott Earley v. Sheriff of Broward County, Florida
CASE NO. 00-6104-CIV-ZLOCH

could accommodate my condition.

Defendant's agents at the facility were well aware of my condition. Aside from the obvious nature of my condition, prior to my incarceration, my mother, Patsy White, made it very clear to Judge Trachman of my medical condition and of my special medical needs. At my sentencing hearing on January 25, 1999, the judge stated that I would be treated as if I were in a medical facility and that all my special needs for my injuries would be taken care of. On February 8, 2000, eight days prior to my incarceration, my doctor, Dr Mack, wrote a list of prescriptions and of my special needs and faxed it twice to the infirmary at the North Broward County Detention Facility.

The nature of my condition renders me unable to care for myself. I was routinely "parked" and forgotten; I am supposed to catheterize every five to six hours with my own catheterization materials, but instead was only allowed to catheterize twice a day, and with the wrong size tubing with no lubrication. As to my bowel needs, I need to be put on my side and cleaned once I am done. This was not done, and I remained in my own feces for quite some time. As a result, I developed severe decubitus ulcer infections.

I repeatedly complained as my condition worsened, and was simply ignored and told to shut up. When I insisted, disciplinary actions were taken against me and I was placed in isolation.

Upon the arrival of my scheduled release date February 26, 1999, agents of the Defendant, took me outside and left me there alone in fifty degree weather, to await my mother, in a pair of shorts and a shirt.

24.    No

25.    No

26.    Judge Lisa Trachman
       Date of sentencing - 1-25-99.

27.    Aside from the obvious nature of my condition, prior to my incarceration, my mother, Patsy White, made it very clear to Judge Trachman of my medical condition and of my special medical needs. At my sentencing hearing on January 25, 1999, the judge stated that I would be treated as if I were in a medical facility and that all my special needs for my injuries would be taken care of. On February 8, 2000, eight days prior to my incarceration, my doctor, Dr. Mack, wrote a list of prescriptions and of my special needs and faxed it twice to the infirmary at the North Broward County Detention Facility.

28.    Chris Pare
       North Broward Detention Center
       1550 N.W. 30th Avenue
       Pompano Beach, Florida

6

Several other guards whose names will be ascertained through discovery.

29.   Yes, I had a decubitus ulcer on my sacral opening, sacrum grade 1 when I entered the detention facility. It turned into grade 4 by the time I was released.

30.   I am paralyzed from the waist down and therefore I need assistance for bowel and urinary needs. I need to catheterize every five to six hours, and as to my bowel needs, I need to be put on my side and cleaned once I am done. While at the North Broward Detention Facility, these needs were ignored and caused my decubitus ulcer to become infected.

31.   On February 22, 2000, I was formally disciplined (see documents attached to Request for Production request #13) for refusing to stop pressing the medical assistance button because I needed my catheterization materials, and was refused. I am supposed to catheterize every five to six hours, but instead was only allowed to catheterize twice a day, and with the wrong size tubing with no lubrication. As a result, I was left in isolation, barefoot, my medical needs ignored.

32.   The names of the individual guards will be ascertained through discovery.

33.   I was released in a pair of shorts and a shirt in the early morning hours of February 26, 2000, and left in the parking lot of the facility in fifty degree weather to wait for my mother to pick me up. I was transported at 3:00 a.m. directly to the emergency room at Plantation Hospital by my mother, Patsy White.

34.   Plaintiff is paralyzed from the waist down and is unable to care for his medical, bowel and urinary needs. The Defendant failed to provide Plaintiff with proper medical care and attention, as detailed in the instructions sent by Dr. Marks.

35.   The standard as set forth in the United States Supreme Court in Estelle v. Gamble 439 U.S. 97 (1976), is that "deliberate indifference to the serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment whether the indifference is manifested by prison doctors...or by prison guards..."

36.   See the answers above.

37.   See the answers above.

HIGH, STACK, PALAHACH & CRUANES, ATTORNEYS AT LAW, 2655 LEJEUNE ROAD, SUITE 1108, CORAL GABLES, FLORIDA 33134

## GENERAL LIABILITY INTERROGATORIES
## TO PLAINTIFF SCOTT EARLEY

**In accordance with Rule 1.340(e) of the Fla. R. Civ. P., sufficient space has been provided after each interrogatory for the answer to be inserted. However, if more space is needed, you should append the answer to the interrogatory, making reference to such attachment in the space provided for the answer. The Rule does not provide for placing all the answers on a single, separate page.**

(If answering for another person or entity, answer with respect to that person or entity, unless otherwise stated.)

1.    State your full name, any other names by which you have been known, your age, present address, date of birth, social security number, driver's license number, the name and address of your present spouse, periods of all marriages, and if you have children, their names, current addresses and ages.

2.    List the names, business addresses, dates of employment, and rates of pay regarding all employers, including self-employment, for whom you have worked in the past ten (10) years, stating your job title and the name of your supervisor.

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

3. Describe your education and also special training and experience for work in business or profession listing the names and addresses of all schools, colleges and occupational programs attended, and as to each, give the dates of attendance and any diplomas or degree you earned.

4. Did you consume any alcoholic beverages or take any drugs or medications within 12 hours before the time of the incident described in the complaint? If so, state the type and amount of alcoholic beverages, drugs, or medication which were consumed, and when and where you consumed them; and if you have ever been a habitual user of alcohol or drugs, give the nature and date of such use, and if you received treatment for drug addiction or alcoholism. give the date of all such treatment, and the names and addresses of the persons and entities rendering such treatment.

5. Have you ever been convicted of a crime. other than any juvenile adjudication, which under the law under which you were convicted was punishable by death or imprisonment in excess of 1 year, or that involved dishonesty or a false statement regardless of the punishment? If so, state as to each conviction the specific crime and the date and place of conviction.

BUNNELL. WOULFE, KIRSCHBAUM. KELLER. COHEN & McINTYRE, P.A.. PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

6.  List all accidents and personal injuries of any kind that you suffered before or since the happening of the incident or accident which is the subject of this litigation, and as to each such accident or injury state the names and addresses of any other parties involved, date, time, place and nature of the accident or injury, the names and addresses of the health care providers (including but not limited to physicians, chiropractors, podiatrists, dentists, psychologists, visiting nurses, hospitals, clinics and ambulatory care centers) involved in your care, treatment or examination, the names and addresses of insurance companies and agencies and adjusting offices involved, and if suit was filed or a compensation claim made, the date of the suit or claim and the court or tribunal in which it was filed.

7.  State the names and addresses of all health care providers (including but not limited to physicians, chiropractors, podiatrists, dentists, psychologists, visiting nurses, hospitals, clinics and ambulatory care centers) involved in your care, treatment or examination during the 10 years preceding the accident or incident which is the subject of this litigation, and as to each state the date and nature of the ailment, injury, illness or other reason for which care, treatment or examination was required and the nature of any operations performed.

8.  State the names and addresses of all insurance carriers or other entities with whom you have had any medical, hospital or disability coverage in the past 10 years and as to each, state the policy number, the type of coverage provided, the dates of coverage, if canceled the reason for cancellation, and the date, nature and claim number of all claims filed.

4

9.    Were you suffering from physical infirmity, disability, or sickness at the time of the incident described in the complaint? If so, what was the nature of the infirmity, disability, or sickness?

10.    Describe each injury for which you are claiming damages in this litigation specifying the part of your body that was injured, the nature of the injury, and as to any injuries you contend are permanent, the effects on you that you claim are permanent.

11.    Have you ever had an injury or medical problem with the same part of your body that you described and referred to in your answer to Interrogatory No. 10? If so, describe any and all treatment, the name and address of who provided the treatment, the dates of treatment and the results.

5

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

12. List the names and addresses of each health care provider (including but not limited to physicians, chiropractors, podiatrists, dentists, psychologists, visiting nurses, hospitals, clinics, and ambulatory care centers) who has been involved in your care, treatment or examination since the accident or incident which is the subject of this litigation and as to each, state the dates and nature of the care, treatment and examination, the amount of all charges incurred, all disability ratings given, and state whether you are claiming that such care, treatment or examination was necessitated by the accident or incident which is the subject of this litigation.

13. If it will be necessary for you to have any future treatment by reason of the accident or incident which is the subject of this litigation, state the future medical treatment you will need and the names and addresses of the health care providers you expect to render such treatment.

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

14.    If you have ever served in the military forces of any country or if you have ever been treated at any service related medical facility, please state the branches in which you served, the dates of your service, your rank upon discharge, the nature of discharge (honorable, dishonorable, medical, etc.) where you were last stationed, the name and address of all medical facilities in which you were examined, treated or confined, the date of each examination, treatment or confinement and date and description of all service connected disabilities together with the percentage of disability and dollar amount of disability payments received.

15.    Please identify all claims by you for personal injuries (in court or directly with an insurance company or individual) and claims under worker's compensation, unemployment compensation, Medicaid, welfare, food stamps, HRS and Social Security Disability benefits, that you have ever made, including the date of each claim and the name and address of individual/agency with whom it was made.

16.    List all activities which you engaged in prior to the accident or incident which is the subject of this litigation which you contend you are either not able to do because of the incident or accident or are able to do less frequently or well and as to each indicate that frequency with which you did the activity prior to and since the accident or incident.

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

17.    If you claim to have lost wages or other income as a result of the accident or incident which is the subject of this litigation, state as to each the nature of the wages or income lost, the amount lost, the period during which it was lost, the dates of any lost time from work, and the names and addresses of the persons and entities that would have otherwise paid you the wages or other income.

18.    If you claim expense or loss not otherwise listed in the answers to these interrogatories, state the date on which each such expense and loss was incurred, the amount of each expense and loss and the name, address and phone number of any person or entity with whom any such expense was incurred.

19.    State the names, addresses and phone numbers of all persons (other than experts) believed by you or known by you or your attorney to have any knowledge pertaining to any of the issues which are the subject of this litigation, and specify the subject matter about which the witness has knowledge.

8

20.  State whether you or your attorneys have any written or recorded statements of any persons (not expert) including any defendant in this litigation and, if so, state as to each the name, address and phone number of the person giving the statement; the date the statement was obtained, the name, address and phone number of the person who obtained it, and whether it is written or recorded.

21.  If you overheard any statements or conversations by any defendants, or any representative of any defendants, or any other persons regarding the accident or incident which is the subject of this litigation, state as to each the name, address and phone number of the person making such statement, the capacity or relationship of the person, (bystander, agent of a party, employee of a party, etc.) making such statement, and the names, address and phone numbers of any other persons present at the time of such statement.

22.  Do you intend to call any expert witnesses at the trial of this case? If so, identify each witness; describe his qualifications as an expert; state the subject matter upon which he is expected to testify; state the substance of the   facts and opinions to which he is expected to testify and give a summary of the grounds for each opinion.

9

23. State in detail exactly how the incident alleged in the Complaint occurred, how you contend the Defendants violated your civil rights and/or maliciously prosecuted or falsely imprisoned or arrested you, and all facts which support these contentions and include all actions taken by you to prevent the incidents.

24. Have you made an agreement with anyone that would limit the party's liability to anyone for any of the damages sued upon in this case? If so, state the terms of the agreement and the parties to it.

25. Please state if you have ever been a party, either plaintiff or defendant, in a lawsuit other than the present matter, and, if so, state whether you were plaintiff or defendant, the nature of the action, and the date and court in which such suit was filed.

..

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

26.    State the name of the Judge who sentenced Plaintiff to the North Broward Detention Facility and provide the date of sentencing.

27.    State the factual basis of your assertion in Paragraph 7 of Amended Complaint, and state the nature of the condition of which Defendant was allegedly aware.

28.    State the identities of each of Defendant's agents you claim were told of the specials needs of the Plaintiff, as alleged in Paragraph 8 of Plaintiff's Amended Complaint.

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

29.   State whether Plaintiff had any decubitus ulcers on his body at the time he entered the North Broward Detention Facility. If any decubitus ulcers existed, state the location of each ulcer and the grade of each ulcer.

30.   Specifically state the bowel and urinary needs of the Plaintiff at the time he was incarcerated at the North Broward Detention Facility.

31.   State what disciplinary actions were alleged taken against Plaintiff as a result of his pleas for medical assistance as referenced in Paragraph 10 of Plaintiff's Amended Complaint.

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

32.    Identify each individual who was told of Plaintiff's medical complaints and identify
       which individuals told Plaintiff to "shut up" in response to Plaintiff's Complaints.

33.    Upon Plaintiff's release from the North Broward Detention Facility, explain how
       Plaintiff was transported from the facility, providing the name and address of the
       person who transported him.

34.    State with specificity how Defendant failed to provide Plaintiff with necessary and
       adequate medical care as alleged in Paragraphs 12 and 13 of Plaintiff's Amended
       Complaint.

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

35.    State in detail the standards for delivery of medical care for an inmate in a County
       facility as referenced in Paragraph 14 of Plaintiff's Amended Complaint.

36.    State the factual basis for the allegation contained in Paragraph 16 of the Amended
       Complaint.

37.    State the factual basis for the allegation contained in Paragraph 17 of the Plaintiff's
       Amended Complaint.

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

SCOTT EARLEY

STATE OF Florida          )
                          ) ss:
COUNTY OF Miami-Dade      )

SCOTT EARLEY, being duly sworn upon oath deposes and says that he is the Plaintiff in the aforementioned case. and that the foregoing answers to Interrogatories are true and correct to the best of his knowledge. information, and belief.

The foregoing instrument was acknowledged before me this 12 day of June 2000, by Scott Scarley (who is (personally known to me)(or who has produced)_____ (as identification) and who (did/did not) take an oath.

Notary Public, State of Florida
at Large
(Signature of Notary)

Linda J. Foytik

(Name of Notary Typed.
Printed or Stamped)

_____

(Commission Number)

OFFICIAL NOTARY SEAL
LINDA J FOYTIK
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC613305
MY COMMISSION EXP. JAN. 13,2001

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  00-6104-CIV-ZLOCH
MAGISTRATE JUDGE SELTZER

SCOTT EARLEY,

     Plaintiffs,

vs.

SHERIFF OF BROWARD COUNTY,
FLORIDA

     Defendants.

_____/

590 NW 66th Avenue
Plantation, FL 33317
November 7, 2000
9:30 a.m.

DEPOSITION OF SCOTT EARLEY

     Taken before EVELIN SIERRA, Court Reporter,
and Notary Public, in and for the State of Florida, at
Large, pursuant to a Notice of Taking Deposition.

**EXHIBIT "B"**

KLEIN, BURY & ASSOCIATES, INC.

1

2    APPEARANCES:

3        Carlos Cruanes, Esquire
         appearing on behalf of the Plaintiff.
4
         BUNNEL, WOULFE, et al.
5        Gregg A. Toomey, Esquire
         appearing on behalf of the Defendant.
6

7                        - - - - -

8
     WITNESS                    DIRECT    CROSS
9
     SCOTT EARLEY
10     by: Mr. Toomey              3

11                       - - - - -

12

13   DEFENDANT'S EXHIBITS FOR IDENTIFICATION:

14   1 - Log for Scott's Incarceration

15   CERTIFIED QUESTIONS:  NONE

16                       - - - - -

17

18

19

20

21

22

23

24

25


                KLEIN, BURY & ASSOCIATES, INC.

```
 1    Thereupon:

 2                    SCOTT EARLEY

 3    was called as a witness and having been first duly

 4    sworn, was examined, testified, and stated as follows:

 5            THE WITNESS:  I do.

 6                    DIRECT EXAMINATION

 7    BY MR. TOOMEY:

 8        Q.   Please state your name for the record?

 9        A.   Scott Earley.

10        Q.   Spell your name, please.

11        A.   E-A-R-L-E-Y.

12        Q.   And do you have a middle name, Scott?

13        A.   Yes, I do.  Raymond.

14        Q.   I am going to ask you a series of questions

15    pursuant to my notice of deposition.  I ask that if

16    you don't understand any of my questions, please ask

17    me to rephrase it, and I will be happen to rephrase if

18    you ask me to.

19            If you answer my questions without asking me

20    to rephrase, I will assume that you understood my

21    question, and the answer you give was to my question.

22            What is your current residential address?

23        A.   590 NW 66 Avenue.

24        Q.   And is that where we are today?

25        A.   Yes.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1      Q.   Who owns this home?

 2      A.   John White and Patricia White.

 3      Q.   Is Patricia White your mother?

 4      A.   Yes.

 5      Q.   What is your relationship with John White?

 6      A.   He's my stepfather.

 7      Q.   Who is your birth father?

 8      A.   Michael James Earley.

 9      Q.   Is Michael James Earley located in this

10   area?

11      A.   No.  He is located in Miami Springs,

12   Florida.

13      Q.   Do you happen to know his address?

14      A.   I don't.  I know it is located in Virginia

15   Gardens.

16      Q.   What is your social security number?

17      A.   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.

18      Q.   Your date of birth?

19      A.   February 16, 1972.

20      Q.   Are you currently employed?

21      A.   No, I am not.

22      Q.   When was the last time you were employed?

23      A.   March 15, 1998.

24      Q.   And by whom were you employed at that time?

25      A.   Internet Global Communications.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        Q.    Internet?

 2        A.    Yes.

 3        Q.    What is your position with Internet Global?

 4        A.    Internet talk show host.

 5        Q.    What does an internet talk show host do?

 6        A.    It's a talk show host that is mainly on the

 7   Internet.  It is not broadcast on television.

 8        Q.    How does that work?

 9        A.    It works -- I can't tell you the exact

10   technical, but it works through video going into the

11   computer video camera, and I had a microphone, a head

12   set microphone on.

13              What we would do is, we would broadcast on

14   the Internet through Broadband through different clubs

15   in Fort Lauderdale and South Beach.

16        Q.    What is the business address of Internet

17   Global Communication?

18        A.    I believe they went out of business.

19        Q.    Do you know when they went out of business?

20        A.    I believe it was October or November of

21   1998.

22        Q.    Who was your supervisor at Internet Global

23   Communications?

24        A.    Steven Halpern.

25        Q.    Do you know the location of Mr. Halpern?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.   No, I do not.  I do understand that he still
 2   runs Dick De'Vince's (phonetic spelling) club, but I
 3   don't know where their facility is.
 4        Q.   And what was your rate of pay when you were
 5   working for Internet Communications?
 6        A.   I was doing $100 a show.
 7        Q.   How many shows would you do in an average
 8   week?
 9        A.   Three to four.  It depends on the week.
10        Q.   Okay.  That employment ended in March of
11   1998?
12        A.   Correct.
13        Q.   Where did you work before that?
14        A.   I worked at Alton Entertainment in Miami
15   Beach, Florida.
16        Q.   What was your position there?
17        A.   I was associate producer for the television
18   show Crook and Chase.
19        Q.   What were you doing as an associate
20   producer?
21        A.   I would look at different technologies that
22   were out, that were coming out, and I would make five
23   to ten minute segments on the Crook and Chase Show,
24   and then I would call the company that was making this
25   particular technology, and try to get sponsorship from
```

```
 1    the company for that five to ten minute segment.

 2         Q.   Is that the country music show?

 3         A.   Yes.  It is a talk show.  It was a morning

 4    talk show, I believe on TNT.

 5         Q.   What kind of technologies are we talking

 6    about here?

 7         A.   Like every day household products

 8    technologies, new business that would come out or new

 9    household appliances.

10         Q.   This is something that the talk show host

11    would talk about?

12         A.   Yes.

13         Q.   And what was your remuneration for that

14    employment?

15         A.   I received $600 dollars a week.

16         Q.   And who was your supervisor there?

17         A.   I can't remember.

18         Q.   Does Alton Entertainment still exist to your

19    knowledge?

20         A.   I believe so.

21         Q.   And how long were you employed by Alton

22    Entertainment?

23         A.   Six months.

24         Q.   Did that employment end as a result of --

25    you went to Internet Global Communications after some
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1    period --

 2         A.    Correct.

 3         Q.    Wait for me to finish my question.

 4               Was it some period of time before you

 5    changed jobs?

 6         A.    There was a two-week lull.

 7         Q.    Okay.  We'll do one more.  Prior to Alton

 8    Entertainment, where did you work?

 9         A.    Five Star Productions in Delray Beach.

10         Q.    What was your position there?

11         A.    Associate producer.

12         Q.    What were your duties?

13         A.    Same.  I just worked on a different show

14    called Today's Environment, and also Parenting in the

15    Nineties.  I worked on two shows.

16         Q.    What was your rate of pay there?

17         A.    $400 a week.

18         Q.    How long were you employed by Five Star

19    Productions?

20         A.    That was another six months.

21         Q.    And the name of your supervisor there?

22         A.    Laura Bailey.

23         Q.    Do you know the whereabouts of Ms. Bailey?

24         A.    She is still in Delray Beach.

25         Q.    Is she still employed by Five Star
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1    Productions, to your knowledge?

 2         A.    Yes, sir.

 3         Q.    Let's talk about your education.  Where did

 4    you go to high school?

 5         A.    Cooper City High School in Florida.

 6         Q.    You graduated from Cooper City?

 7         A.    Correct.

 8         Q.    And after you graduated from Cooper City you

 9    attended college?

10         A.    I attended community college, but I did not

11    receive a degree.

12         Q.    Where did you attend community college?

13         A.    Broward Community College.

14         Q.    What were you studying?

15         A.    My major was theater.  My minor was

16    management.

17         Q.    How long were you attending Broward

18    Community College?

19         A.    On and off for about a year and a half.

20         Q.    Do you have any other post secondary

21    education?

22         A.    I'm not really sure.  I guess this would be

23    technical.  I went to Johnson Littman for the Series

24    Seven test.

25         Q.    What is the Series Seven test?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    A test to get your license to become an

 2    investment advisor.

 3        Q.    Did you get that license?

 4        A.    No, I did not.

 5        Q.    How long did you attend Johnson and Littman?

 6        A.    Two months.

 7        Q.    Why did you leave?

 8        A.    It wasn't that I left.  It was a two-month

 9    course.

10        Q.    So you completed the course?

11        A.    I completed the course, and I took the test,

12    and I failed.

13        Q.    You have to wait for me to finish my

14    question?

15        A.    I apologize.

16        Q.    I understand everybody in the room

17    understands what we are doing, but the court reporter

18    cannot take both of us down at the same time.

19        A.    I apologize once again.

20        Q.    That's okay.  When did you take your Series

21    Seven test?

22        A.    I took it three times.  I don't know the

23    exact dates.  I know they were in the years of '92 or

24    '93.

25        Q.    You studied for the Series Seven test, but
```

KLEIN, BURY & ASSOCIATES, INC.

1    somehow you ended up in television work?

2        A.    Yes.

3        Q.    Tell me how that happened?

4        A.    Well, right after I would say my bartending

5    experience one of my friends allowed me the chance of

6    becoming a stockbroker, and I would first have to

7    become a cold caller for a security firm called TCMS

8    Securities, this is back in September of '92.

9            So I went in there and I became a cold

10   caller, and I had to be a cold caller for three

11   months, before they gave me the opportunity to go to

12   Johnson and Littman to take my Series Seven test, and

13   I was with TCMS Securities.

14           Then I went to Gruntle (spelled

15   phonetically).    After Gruntle I went to Prudential,

16   after Prudential, I went back to Gruntle.    This was in

17   a span of maybe three years, and then I was also

18   interested in theater and television and I was looking

19   in the paper one day, and there was an advertisement

20   for associate producer for an independent television

21   production company, and I was just sick and tired of

22   the stock business and being a cold caller earning

23   $250 a week.

24           So I just decided to take a chance and

25   applied for the associate producer job.    That is how I

1    got into television.

2         Q.   You said you had experience as a bartender.

3    Where did you bartend?

4         A.   Higgy's (spelled phonetically).

5         Q.   I am sorry?

6         A.   Higgy's Cafe, old Marqui's place from the

7    Dolphins.  I also bartended in TGI Friday in Pembroke

8    Pines, and -- anywhere else?  I'm trying to remember.

9    In Kahoots.

10        Q.   When did you work in In Kahoots?

11        A.   I believe I worked there on and off from the

12   years of '92 to '94.

13        Q.   Okay.  Scott, tell us how it is that you

14   came to be paralyzed?

15        A.   On 3/15/98 I was in a car accident, which

16   resulted in the flip over of my vehicle, and it

17   ejected me out of the vehicle.  When paramedics

18   arrived on the scene they found that my spinal column

19   was sticking out of the skin, and my left leg was

20   wrapped around my neck.

21             As a result, I received a T12/L1 incomplete

22   injury, a dislocated left hip, and a shatter right

23   femur bone.

24        Q.   When you say you had an incomplete injury,

25   what does that mean?

KLEIN, BURY & ASSOCIATES, INC.

1        A.    There are two types of spinal cord injuries,

2    there is incomplete and complete.  Incomplete means

3    that there are some abrasions.  A complete injury

4    means that the spinal cord is completely severed.

5        Q.    I assume you were taken from the accident

6    scene to the hospital, is that correct?

7        A.    North Broward General Hospital.

8        Q.    Where did that accident occur?

9        A.    It occurred on 95 near Copans Road on the

10    ramp.

11        Q.    Was this a roll over accident, is that what

12    you said?

13        A.    Yes, it was.

14        Q.    Any other vehicles involved?

15        A.    One other vehicle.

16        Q.    Do you know who the driver of that vehicle

17    was?

18        A.    I cannot recall his name.

19        Q.    Were you arrested as a result of that

20    accident?

21        A.    I was not arrested, but I was charged.

22        Q.    What were you charged with?

23        A.    DUI.

24        Q.    How long were you in North Broward General

25    Hospital?

KLEIN, BURY & ASSOCIATES, INC.

1      A.    From March until I think it was June,

2    beginning of June. Oh, no, I apologize, it is the end

3    of April I was there til.

4      Q.    From March until the end of April?

5      A.    Yes, sir.   March 15 to the end of April.

6      Q.    Okay.   Who were -- who were your treating

7    physicians while you were at North Broward General

8    Hospital?

9      A.    I cannot recall those names.

10     Q.    All right.   You said you were charged with

11   DUI in that accident, is that correct?

12     A.    Correct.

13     Q.    What was the outcome of those proceedings?

14     A.    The DUI proceedings?

15     Q.    Yes, sir.

16     A.    I was sentenced to probation, ten days in an

17   institution and I believe some fines and retribution.

18     Q.    You were sentenced to probation for what

19   period of time?

20     A.    I believe six months.   Six, seven months, I

21   am not sure of the date.

22     Q.    You were detained in a facility?

23     A.    I was in the facility for ten days.

24     Q.    What facility was that?

25     A.    The Broward County Jail.

KLEIN, BURY & ASSOCIATES, INC.

```
 1        Q.    Which one?

 2        A.    I believe the one in Pompano.

 3        Q.    The North Broward Detention Facility?

 4        A.    The North Broward Detention Facility,

 5   correct, sir.

 6        Q.    You said you were ordered to make

 7   restitution, is that correct?

 8        A.    Yes, sir.

 9        Q.    Did you make that restitution?

10        A.    Yes, sir.

11        Q.    Is this your first DUI arrest?

12        A.    No, sir.

13        Q.    When were your other DUI arrests?

14        A.    I had a DUI arrest in '92.  In September of

15   '92.

16        Q.    Where was that?

17        A.    That was in the Keys.  Mile marker 92.

18        Q.    Any others?

19        A.    No.

20        Q.    Okay.  So on what date did you enter the

21   North Broward Detention Facility?

22        A.    February 16, 1999.

23        Q.    What date were you released, if you know?

24        A.    I don't.  I don't remember.

25        Q.    What was your sentence?
```

KLEIN, BURY & ASSOCIATES, INC.

16

```
 1        A.   Ten days.

 2        Q.   And is it likely you were released?

 3        A.   I can probably count on my fingers but --

 4        Q.   Okay.  It is not really important.  It is in

 5   the records.

 6             At the time you were admitted to North

 7   Broward Detention Facility, were you under the care of

 8   a physician?

 9        A.   Yes, I was.

10        Q.   Who was that physician?

11        A.   Arlene Richards, and Dr. Mack.

12        Q.   Do you know Dr. Mack's first name?

13        A.   Kenneth.

14        Q.   Are those two physicians partners?

15        A.   Yes, they are--

16        Q.   And when--

17        A.   -- and when one doctor is not in, the other

18   one is on call.

19        Q.   Do you know what those physicians'

20   specialties are?

21        A.   I believe they are general practitioners.  I

22   also believe Kenneth Mack is internal medicine.

23        Q.   Had you seen any other physicians on a

24   regular basis at the time?

25        A.   At the time I was seeing a urologist
```

KLEIN, BURY & ASSOCIATES, INC.

 1   Dr. Jeffrey Mark.  I am sorry, Dr. Jeffrey Marks.

 2        Q.    Do you know where Dr. Macks' office is?

 3        A.    It's on fifth street here in Plantation.   I

 4   don't know the exact address.

 5        Q.    Where you seeing any other physicians at the

 6   time?

 7        A.    No, sir.

 8        Q.    Were you receiving physical therapy at that

 9   time?

10        A.    Yes, sir.

11        Q.    And who were you receiving physical therapy

12   from?

13        A.    Healthsouth Sunrise Rehabilitation Center.

14        Q.    And would you go to Healthsouth or would

15   they come to you?

16        A.    No, I would go there.

17        Q.    Were you seeing any other health care

18   providers in the period say a year before your

19   incarceration?

20        A.    I was being seen by -- a home health care

21   nurse would come in every day, and I guess just take

22   care of my bowel program and my wound and everything.

23        Q.    Who was the home health care provider, do

24   you remember?

25        A.    I don't remember.

KLEIN, BURY & ASSOCIATES, INC.

```
 1        Q.    Do you still have somebody seeing you for

 2   home health care?

 3        A.    I have -- on November 16, I will have home

 4   health care for like three or four days since my

 5   caregiver will be gone on vacation.

 6        Q.    And who will that be provided by?

 7        A.    The folder is right over there.  Home Health

 8   Corporation of America.

 9        Q.    Where are they located?

10        A.    I believe Fort Lauderdale.

11        Q.    Back to Dr. Richards, and is it Richards or

12   Richard?

13        A.    Richards.

14        Q.    Back to Richards and Dr. Mack.  For what

15   ailments were you seeing those two physicians?

16        A.    Not really ailments, just I wanted them as

17   general practitioners, just someone that I can go to,

18   you know, if I had any problems or anything.  Because

19   before the accident I didn't have a doctor, and I knew

20   after the accident that I would need to go to the

21   doctor quite often because of my condition.

22        Q.    If you remember, prior to your

23   incarceration, when was the last time you saw either

24   Dr. Richards or Dr. Mack?

25        A.    A week prior, I believe.
```

KLEIN, BURY & ASSOCIATES, INC.

1        Q.    And what was that for?

2        A.    That was for the incarceration.  I had to

3    get all of my medications, and all of my special needs

4    faxed over to the Broward County Detention facility so

5    I went in to see Dr. Kenneth Mack to have that done.

6        Q.    Did Dr. Mack perform a physical examination

7    at that time?

8        A.    Yes, he did at that time.

9        Q.    When you saw Dr. Mack prior to your

10   incarceration, did he make any findings of any sort or

11   did he just perform a physical examination and provide

12   the meds?

13       A.    Exactly.  He performed the physical

14   examinations and just, you know, just to make a list

15   of all the special needs and all the special

16   medications that I needed, and that is what we

17   consulted on that day as I recall.

18       Q.    But he didn't actually treat you for

19   anything, is that correct?

20       A.    No, sir.

21       Q.    In your complaint you say that when you

22   entered the Broward County Jail system, you had a

23   grade one decubitus, is that correct?

24       A.    I had grade one ulcers on my sacrum.

25       Q.    How do you know it was a grade one ulcer?

 1          A.    That is what was told to me by Dr. Mack.

 2          Q.    When did Dr. Mack tell you that?

 3          A.    During the physical examination the week

 4     prior to my incarceration.

 5          Q.    When you entered the Broward County Jail

 6     system did you make the jail authorities aware that

 7     you had had what you call a grade one sacral ulcer?

 8          A.    Yes, and also my doctors as well.  He,

 9     Dr. Mack, faxed some papers including my special needs

10     as well as what was wrong with me including the wound.

11          Q.    How do you know Dr. Mack faxed papers

12     regarding your special needs especially in regards to

13     the sacral ulcer?

14          A.    He told me and also my mother that he did.

15          Q.    Do you have any documentation regarding what

16     Dr. Mack faxed?

17          A.    I don't.

18          Q.    Other than what Dr. Mack told you regarding

19     a grade one sacral ulcer, is there any documentation

20     that shows that -- strike it.

21                With the exception of what Dr. Mack told you

22     regarding the grade one ulcer, is there any

23     documentation that shows that you had a grade one

24     sacral ulcer at the time you entered the jail system?

25          A.    I believe it is in my medical records

KLEIN, BURY & ASSOCIATES, INC.

 1    Dr. Mack, every time he sees me, writes down and

 2    updates my record.  I believe it is in my medical

 3    record.

 4         Q.    Would it surprised you to find that the

 5    medical records upon your entry to the Broward County

 6    Jail system shows that you had a grade three sacral

 7    ulcer on entry to the jail system?

 8         A.    No, it would not surprise me at all.

 9         Q.    Why would it not surprise you?

10         A.    Because I really cannot recall exactly what

11    Dr. Mack told me.

12         Q.    So you are not sure it was a grade one when

13    you entered the jail system, is that correct?

14         A.    That is correct.

15         Q.    While you were incarcerated in the North

16    Broward Detention facility were you seen by health

17    care providers?

18         A.    In the facility?  No, I wasn't.

19         Q.    You were never seen by a physician's

20    assistant or any nursing staff at any time, is that

21    your testimony?

22         A.    The first couple of days, no I was not.

23         Q.    That is not what I asked you, sir.

24               During your incarceration, during the whole

25    incarceration.

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    During the whole incarceration I was visited
 2   by a nurse maybe twice.
 3        Q.    Were you taking medication when you entered
 4   the Broward County Jail system?
 5        A.    Yes, I was.
 6        Q.    What were those medications?
 7        A.    Pancrease for -- I believe they removed my
 8   pancreas in November of '98, and ever since then I
 9   have been on the medication Pancrease, and I was
10   taking Backtofin for my back.  It was used to calm
11   down muscle spasms.
12        Q.    Those are the only medications you were
13   taking?
14        A.    Yes.
15        Q.    Do you recall being given a chest x-ray
16   while you were in the Broward County Jail system?
17        A.    No, I do not.
18        Q.    You do not recall being given a chest x-ray
19   on the 25th of February 1999, is that correct?
20        A.    That is correct.
21              MR. TOOMEY:  Let's go off the record.
22              (Off-the-record discussion.)
23              MR. TOOMEY:  We can go back on.
24   BY MR. TOOMEY:
25        Q.    In your complaint you state on paragraph 12
```

KLEIN, BURY & ASSOCIATES, INC.

1    that the act of the defendants in this case violated

2    your constitutional rights.

3         How do you claim that the actions of the

4    sheriff's office violated your constitutional rights?

5    A.    Well, it is my belief that not being given

6    my medication or the proper utensils I would say such

7    as catheters et cetera in form of a -- it was just in

8    a form as a punishment as I saw it.  And when I asked

9    for it, I was punished further.

10    Q.    When you say it was in the form of a

11    punishment, how do you know that?

12    A.    Well, the actions of the guards just

13    warranted -- I mean it just showed me that I was

14    punished, that it was punishment.

15         I can give you an example.  When I was

16    freezing cold, when I first got into the North

17    Detention Center, I was freezing cold and I guess I

18    wanted to get familiar with my surroundings, so I had

19    a blanket on my legs while I was in my wheelchair so I

20    can get some -- I wanted to get familiar with my

21    surroundings.  I decided to come out with the blanket

22    on.

23         The guard informed me that I could not have

24    a blanket on while I was out of my cell.  So I said

25    okay.  I went back into my cell, the TV was on in this

KLEIN, BURY & ASSOCIATES, INC.

 1    room, there was a room with six cells in the room was

 2    a table, a TV.  I was in the far cell, and the TV was

 3    on.  So I had the blanket on, and there was a doorway.

 4    I was -- the doorway was maybe over my right leg, and

 5    I was -- three quarters of my body was in the cell,

 6    and from my right leg on was out of the cell, and my

 7    blanket was still on my legs because I was freezing

 8    cold.

 9         That is when the guard came around and

10    actually physically turned me around and pushed me and

11    said, you cannot have it outside.  And I was not

12    outside.  And that is when everything started taking

13    place.

14         Q.   I don't understand.  In your mind, how does

15    that equate to punishment?

16         A.   Well, that incident just snowballed into

17    other incidents.  They were -- I just I guess out of

18    anger and out of fear as well as the overall, the

19    other emotions that were going through me at the time

20    I just was steadfast, I was steaming.

21         I think I made a comment or two out loud not

22    directly to anybody, just generalizing, and I guess

23    I'm trying to recall here, I needed to cath myself

24    because at the time I didn't have any catheter tubes

25    in my cell, and after that -- it was right after that

1    incident in fact that I pushed the emergency button.

2              I said I need a catheter.  I need to cath

3    myself, because at the time I had not cath'd myself

4    for six hours, and I usually cath myself every four

5    hours.

6              I knew my bladder was getting extended so I

7    needed to cath myself, and because the incident just

8    occurred, I assumed that the guards were just thinking

9    that I wanted to get attention, which I wasn't.

10             I needed to get the catheterization tube so

11   I can relieve myself.  And they wouldn't, they said

12   we'll get it to you.  We'll get it to you.  Fifteen

13   minutes went by, we will get it to you.  I pressed the

14   emergency button, again we'll get it to you.  We'll

15   get it to you.

16             I pressed the emergency button again within

17   an hour and a half, I pushed the emergency buttons

18   four times, and I still didn't get a catheterization

19   tube.

20             I believe on the fifth time they said

21   everybody was in lock down in this cell.  Everybody

22   was against me because I wanted to get a

23   catheterization tube.  That is how I see it as a form

24   of punishment.

25        Q.   I still don't understand.  Why was it

KLEIN, BURY & ASSOCIATES, INC.

1    punishment?

2              MR. CRUANES:  Objection, asked and answered.

3              MR. TOOMEY:  He has not answered my

4         question.

5              MR. CRUANES:  He has to his ability.  If you

6         continue to ask, you will get the same answer.

7    BY MR. TOOMEY:

8         Q.   Did anybody ever tell you you were being

9    punished for catheterization material?

10        A.   I believe nobody comes out and says you are

11   being -- somebody does not come out and say, I am

12   punishing you for this.

13        Q.   So the perception, it was your perception

14   that you were being punished, is that correct?

15        A.   Yes.

16        Q.   By the way, do you recall seeing a request

17   to produce propounded by my office in this case

18   wherein we asked for income tax records?

19        A.   I did not see that request.

20        Q.   I'm going to represent to you that in June

21   of this year my office, Mr. Anchel, of my office,

22   propounded a request to produce, which is income tax

23   forms for the years 1987 through the present and your

24   answer was that you did not have any such forms.

25              Was there some reason that you don't have

```
 1   income tax or payroll records for those years even

 2   though you were working?

 3        A.   I don't have any information for you at this

 4   moment.

 5        Q.   But you were employed, right?

 6        A.   Yes, I was.

 7        Q.   Also that request to produce, there are some

 8   photographs -- well, first pursuant to that request to

 9   produce my office received a document entitled, Logs

10   for Incarceration.  Is that a document that you

11   recreated?

12        A.   My mother created this document.

13        Q.   Can I see it?  The third notation on that

14   list says that a picture was taken of your sacral

15   ulcer, is that correct?

16        A.   Could you tell me the exact date on which

17   this --

18        Q.   I am asking you to identify what it says

19   actually.

20        A.   I --

21        Q.   Does it say when the picture was taken?

22             MR. CRUANES:  February 15, is that what you

23        mean?

24             MR. TOOMEY:  Yes, sir.

25             THE WITNESS:  Yes.
```

KLEIN, BURY & ASSOCIATES, INC.

1    BY MR. TOOMEY:

2        Q.    Who took that picture, if you know?

3        A.    I believe it was the nurse at doctor --

4    nurse's office.  I am not sure about that.

5        Q.    Who would know?

6        A.    Dr. Mack.

7        Q.    If I show you a series of pictures do you

8    think you know which one was the pictures taken on

9    February 15?

10       A.    No.

11       Q.    There is also on that list, further on the

12   list, there is a notation that another photograph was

13   taken, do you see that?  I think it is dated 26th of

14   February?

15       A.    Yes, I'm getting -- yes, I see that.

16       Q.    Do you recall who took that photograph?

17       A.    I think my mother did.

18       Q.    If I show you the same series of

19   photographs, do you think you can pick the right one

20   out?

21       A.    Yes.  I'm recalling a different picture.  I

22   am recalling a picture of me in a wheelchair.  I can't

23   really identify which picture was taken of my wound.

24       Q.    But your mother took that picture, correct,

25   the second picture?

KLEIN, BURY & ASSOCIATES, INC.

1       A.   Yes.   I believe so.   I am not really sure.

2    The picture I was talking about was the one with me

3    sitting in a wheelchair that my mother took as soon as

4    I was released.   That is the one that I was recalling.

5       Q.   Okay.   Sometime upon your release from jail

6    you sought treatment from Plantation General Hospital,

7    is that correct?

8       A.   Yes, that is correct.

9       Q.   Is that on the same date you were released?

10      A.   Yes, it is.

11      Q.   Why is it that you went to Plantation

12   General?

13      A.   My doctor's office is located near

14   Plantation General Hospital.

15      Q.   Which doctor is that?

16      A.   Dr. Arlene Richards and Dr. Kenneth Mack.

17      Q.   Did you contact either of those physicians

18   before you went to Plantation General?

19      A.   No, I did not.   It was early in the morning

20   and their offices were not open.

21      Q.   How did you arrive at Plantation General?

22      A.   My mother brought me there directly from the

23   North Broward Detention facility.

24      Q.   If you recall, which physicians did you see

25   at Plantation General Hospital?

KLEIN, BURY & ASSOCIATES, INC.

```
 1      A.    I do not recall.

 2      Q.    What were you seeking treatment for when you

 3  entered Plantation General Hospital?

 4      A.    I had a very bad stomach ache as well as my

 5  urine was dark amber, almost a reddish yellow color,

 6  and I was worried that I had contracted a UTI.

 7      Q.    What is a UTI?

 8      A.    Urinary tract infection.

 9      Q.    Why were you worried that you had contracted

10  a urinary tract infection?

11      A.    Because of a lack of my bladder release as

12  well as the unsanitary ways that I was I guess forced

13  to catheterize myself.

14      Q.    How long were you at Plantation General?

15      A.    I don't recall.  It was only for -- it

16  was -- I don't recall the hours, but I know it was

17  only half a day.

18      Q.    When you left Plantation General, were you

19  given any instructions by the doctors there?

20      A.    I guess, I don't recall that.  I don't

21  recall that at all.

22      Q.    Sometime subsequent to being released from

23  Plantation General, did you see your doctors?

24      A.    Yes, I did.  I saw -- I don't recall which

25  one I saw, but I believe it was Dr. Arlene Richards,
```

KLEIN, BURY & ASSOCIATES, INC.

1    but I don't know for sure.

2        Q.    Do you continue to see Dr. Arlene Richards?

3        A.    Yes, I do.

4        Q.    At present have you seen any other

5    physicians?

6        A.    Dr. Jeffrey Marks.

7        Q.    While you were at Plantation General, did

8    you receive treatment for the decubitus ulcer?

9        A.    Yes, I did.

10       Q.    What was that treatment?

11       A.    They cleaned it out after they hosed me

12   down.  They cleaned it out and they proceeded to put a

13   wet dry bandage on there, which consists of Calistat,

14   I believe, saline solution, and a four by four pad and

15   some bandages.

16       Q.    Following your release from Plantation

17   General, did you seek additional treatment for the

18   sacral ulcer?

19       A.    Yes, I did.  I went to Dr. Richards to see

20   what could be done, and I believe she put me on a new

21   regiment of taking care of it with some Intrasite

22   Jell, some more Calistat, saline solution, and new

23   bandages I believe, I am not sure what kind.

24       Q.    Did Dr. Richards' treatment ease the

25   problem?

KLEIN, BURY & ASSOCIATES, INC.

```
1      A.    No, it's still there.

2      Q.    You still have a sacral ulcer?

3      A.    Yes, I do.

4      Q.    Prior to being admitted to the Broward

5    County Jail, how long had you suffered from decubitus

6    ulcers?

7      A.    I believe since my accident on March 15, but

8    they were on my feet, and my heels and I think there

9    was one back there too, I can't recall.

10     Q.    You did have --

11     A.    A sacral ulcer.

12     Q.    -- a sacral decubitus ulcer on your entry to

13   the jail, correct?

14     A.    Yes.

15     Q.    How long had that been there?

16     A.    That I can't recall.  I thought it was there

17   for maybe four or five months, but I can't recall the

18   exact time.

19     Q.    Okay.  Were you receiving treatment for the

20   sacral ulcer before you went into jail?

21     A.    Yes, before I went into incarceration.

22     Q.    Was that treatment from Richards or Mack?

23     A.    It was from a combination of Dr. Richards,

24   Marks, and Dr -- I believe Dr. Kenneth Mark helped me

25   out on that too.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1                    It depends on which physician I was seeing

 2     at the time I was going in for the doctor's visit.

 3          Q.   Are you currently taking any medication?

 4          A.   Yes, I am taking Pancrease, and Backtofin.

 5          Q.   Anything else?

 6          A.   That's all.

 7          Q.   I just wanted to make sure that I have the

 8     right records from the state in this case.

 9               Your middle name you said before is Raymond,

10     is that correct?

11          A.   Correct.

12          Q.   Is there some reason that the criminal

13     records would show your middle name as Michael, or as

14     Scott M. Earley?

15          A.   No, I don't know why that would happen.

16               My brother's middle name is Michael.

17          Q.   Well, let's make sure.  What is your date of

18     birth?

19          A.   2/16/72.

20          Q.   You went to jail on your birthday?

21          A.   Yes, I did.

22          Q.   When you saw your physicians after being

23     released from the North Broward Detention facility,

24     have any of your physicians told you that your

25     condition was worsened while you were in the jail?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1       A.    Yes.

 2       Q.    Which doctor was that?

 3       A.    Arlene Richards.

 4       Q.    What did she tell you?

 5       A.    Well, she said that the wound had -- she

 6   said that it grew bigger, and it was red.  I guess the

 7   circle was larger.  I didn't see it myself, but that

 8   is what she told me.

 9             And she said that I lost a lot of weight.  I

10   am not sure about the exact amount, how much I lost,

11   but I lost a lot of weight, and a lot of muscle which

12   in turn hurt me in my rehab.

13       Q.    Did Dr. Richards tell you anything else

14   specifically about your decubitus ulcer?

15       A.    Not that I can recall.

16       Q.    I am sorry if I asked you this before, but

17   we know that you had a decubitus ulcer when you

18   entered the Broward County Jail system.  Prior to that

19   particular ulcer at that particular time, had you ever

20   had a sacral decubitus ulcer before?

21       A.    No.

22       Q.    At that time you had been paralyzed for

23   approximately a year, less than a year, ten months?

24       A.    Less than a year, yeah.

25       Q.    And your paralysis is related to the charge
```

1    for which you were incarcerated during this particular

2    incarceration, is that correct, from the accident you

3    were talking about?  The accident and this

4    incarceration were related, is that correct?

5         A.    Correct.

6         Q.    Other than the other day that we spoke

7    about, have you ever been arrested for anything else?

8         A.    No, sir.

9         Q.    You stated in your complaint that the

10    Broward Sheriff's Office prevented you from receiving

11    adequate medical care.  Tell me how that occurred.

12         A.    Well, I didn't receive my medications, and

13    when I did receive medications it was not the correct

14    one.

15              They substituted Mylanta for my Pancrease

16    medicine which is like, you know, apples and oranges.

17    It is totally two different medications.

18              They didn't provide me with a sterile

19    atmosphere for me to cath myself, and relieve my

20    bladder.  I was only receiving a tube, and the tube

21    that I did receive was not the right size.

22              I didn't receive any cleaning -- any

23    Betadine, I believe that is what the liquid is called,

24    or any type of lubrication, KY Jelly as well for my

25    special needs.

```
 1              The sleeping facility that I was in was a
 2    steel cot with about an inch and a half thick
 3    mattress, which is, I don't know, implorable I guess
 4    with my particular special needs, especially when
 5    across the way I saw perfectly good hospital beds not
 6    being used at all.  No one was in these hospital beds,
 7    and I just found it outrageous.
 8         Q.   Okay.  Let me be more specific.  Your
 9    complaint says that you were prevented from receiving
10    adequate medical care.
11         A.   Uh-huh.
12         Q.   It sounds to me from what you just said that
13    you received medical care, but you think it was the
14    wrong medical care, is that correct?
15         A.   It was not the medical care that could
16    upkeep my special needs, which means that, you know,
17    there are certain things that certain people need,
18    certain medications, certain types of supplies that
19    are proper, and I didn't receive that.
20         Q.   All right.  Let me see if I can clear it up.
21    You are not saying that you didn't receive any medical
22    care, you are saying that the medical care that you
23    received was improper, correct?
24         A.   Correct.
25         Q.   In the ten days that you were in the North
```

```
 1    Broward Detention Center, did you write any

 2    grievances?

 3         A.   No.

 4         Q.   Who did you speak to while you were

 5    incarcerated regarding your complaints of inadequate

 6    medical care?

 7         A.   My mother is the only person that I could

 8    rely on to call the right people since I only had a

 9    limited amount of phone use.

10         Q.   Who did you speak to in the jail, if anyone?

11         A.   In the jail?  No one.

12         Q.   Okay.  You say in your complaint that upon

13    your release you were quote -- not quote, parked by

14    the side of the road in mid 40s degree weather.

15         A.   Yes.

16         Q.   Tell me about that.

17         A.   They woke me up at I would say about three

18    o'clock in the morning, told me to get all my stuff

19    together, and that I was being released.

20              So I got all my stuff together, everything

21    that I had, and I proceeded to, I guess, the desk

22    where they release people.

23              I stayed there for about maybe 20, 25

24    minutes, then they shuffled maybe about four or five

25    of us into a room and they said get changed into your
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1   regular street clothes.

 2           Well, I could not get changed because I was

 3   so weak, and not being able to eat and I had lost so

 4   much weight.  I could not dress myself even before the

 5   incarceration.  I could not dress myself.

 6           So I asked for help from anyone that could

 7   help me out, but they saw that I was soiled, and they

 8   could smell that I was soiled because I was not

 9   changed or anything during the incarceration, and

10   because they saw that I was soiled, no one would help

11   me.

12           So I had to struggle to rip the orange pants

13   off of my legs, and of course I took the shirt off

14   with no problem, and I looked for my clothes.

15           And for some unknown reason it seemed

16   because I was the last one in the place that my

17   clothes were missing.  So they gave me some left over,

18   a left over shirt, and some shorts that were not mine

19   that I did not own, and I did not have any circulation

20   stockings as well because they misplaced that as well.

21           So I rolled out, and I asked if there was

22   anywhere inside that I could make a phone call and

23   they told me no that you would have to make a phone

24   call outside.

25           They shuffled me outside.  I made my phone
```

KLEIN, BURY & ASSOCIATES, INC.

1    call, and it was a very cold night.  I don't know if

2    it was 40 degrees or if it was 50 degrees, I know that

3    it was very cold, and I called my mother who was maybe

4    just getting -- as soon as I called her she woke up,

5    so she was not up already.

6            And she was about maybe 45, 40 minutes drive

7    out from getting dressed, and going out there and

8    everything like that so it was about a 45 minute wait,

9    and I was in shorts and a short shirt, short sleeve

10   shirt with no circulation stockings to keep me warm,

11   just sitting out there in a parking lot with no one

12   around, no one in sight, no officers, no security

13   guards outside.  I was just in the parking lot by

14   myself.

15        Q.   Okay.  Okay.  Following being left in the

16   parking lot as you say, did you receive any medical

17   attention related to being outside in the cold?

18        A.   No, I didn't suffer from any hypothermia or

19   anything.

20        Q.   Let me see if I have this right.  You had no

21   conversations with anyone working at the jail

22   regarding your request for medical attention?

23        A.   Well, I had requested such as pushing the

24   emergency button, and asking for my medications as

25   well as I believe I was rolled into the nurse's

```
 1    station that was there, and I talked to a couple of

 2    nurses there about getting my proper medication as

 3    well as the stomach aches and the ulcers -- I was

 4    bleeding, and I was soiled so I did talk to a couple

 5    of nurses at the nurse's station there.

 6         Q.    When did you talk to the nurses?

 7         A.    Probably about a day or two after I was in

 8    the North Broward facility.

 9         Q.    Is it your testimony that that is the only

10    time that you had contact with any health care

11    providers at the jail?

12         A.    At the North Broward facility, yes.

13              At the downtown facility I did talk to the

14    nurse there, but I only spent one night there and she

15    was, she planned on helping me, but then I was

16    transferred to North, to the North Broward facility.

17         Q.    What do you mean when you say she planned on

18    helping you?

19         A.    Well, she was very cooperative in trying to

20    find out what the facts were for my medications and my

21    supplies, and she was very helpful. I remember that

22    clearly.

23              In fact, the people at the downtown Broward

24    facility were very nice to me, and throughout my

25    incarceration I wished I was at the downtown facility
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1   instead of the North Broward facility.

 2        Q.   Would it surprise you to find, Scott, that

 3   the medical records show that your decubitus ulcer was

 4   stage three upon presentation to the North Broward

 5   Detention Center, and also stage three at Plantation

 6   General Hospital upon your release?

 7        A.   No.   Because as you told me earlier that

 8   Dr. Mack said it was a grade three.   So I am assuming

 9   that the jail would say the same thing.

10        Q.   When -- sorry strike that.

11             Prior to the car accident that we spoke of

12   earlier, did you have any other medical problems?

13        A.   No.   Just a case of pneumonia back in '96,

14   and that's about it.   Nothing really serious.

15             MR. TOOMEY:   Off the record.

16             (Off the record discussion.)

17             MR. TOOMEY:   Let's go back.

18   BY MR. TOOMEY:

19        Q.   Scott, since your accident, have your

20   doctors told you that your injuries are permanent?

21        A.   Yes, sir.   Dr. Jeffrey Canter who was my

22   neurosurgeon.

23        Q.   When did you last see Dr. Canter?

24        A.   October of '98.

25             MR. TOOMEY:   I think I'm done.   I know I am
```

KLEIN, BURY & ASSOCIATES, INC.

1    done.   Let me take a few minutes, and go over my

2    notes.   I'm done.

3        (Thereupon, Defendant's Exhibit 1 was marked

4    for identification.)

5        (Thereupon, the deposition concluded at

6    approximately 10:15 a.m.)        .

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KLEIN, BURY & ASSOCIATES, INC.

```
 1

 2
    STATE OF FLORIDA   )
 3                     )
    COUNTY OF BROWARD  )
 4

 5

 6

 7          I, EVELIN SIERRA, Court Reporter, certify that

 8     I was authorized to and did stenographically report

 9     the foregoing proceedings and that the transcript is

10     a true and complete record of my stenographic notes.

11          DATED this 23rd day of November, 2000.

12

13

14
                       ------------------------------
15                       EVELIN SIERRA, Court Reporter
                         and Notary Public, State of
16                       Florida at Large.

17

18

19

20

21

22

23

24

25
```

KLEIN, BURY & ASSOCIATES, INC.