UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SCOTT EARLEY,                                   CASE NO. 00-6104-CIV-ZLOCH

                    Plaintiff,                  MAGISTRATE JUDGE SELTZER

v.

SHERIFF OF BROWARD COUNTY,
FLORIDA,

                    Defendant.

_____/

## NOTICE OF FILING DEPOSITIONS OF SCOTT EARLEY, PATSY WHITE, AND ANSWERS TO INTERROGATORIES

NOTICE IS HEREBY GIVEN of the filing of the Depositions of Scott Earley, Patsy White,

and Answers to Interrogatories, in support of Plaintiff's Response and Memorandum of Law in

Opposition to Defendant's Motion for Summary Judgement.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by U.S.

mail to Alan C. Anchell, Esq., Bunnel, Woulfe, Kirschbaum, Keller, Cohen & McIntyre, P.A.,

Attorneys for Defendant, 888 East Las Olas Boulevard, Suite 400, Fort Lauderdale, FL 33303-0340

this _____ day of January 30, 2001.

                            HIGH, STACK, PALAHACH
                            & CRUANES
                            2655 LeJeune Road, Suite 1108
                            Coral Gables, Florida 33134
                            Telephone: (305) 443-3329

                            By:
                                Carlos Cruanes
                                Florida Bar No.0121940

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  00-6104-CIV-ZLOCH
MAGISTRATE JUDGE SELTZER

SCOTT EARLEY,

    Plaintiffs,

vs.

SHERIFF OF BROWARD COUNTY,
FLORIDA

    Defendants.

_____/

590 NW 66th Avenue
Plantation, FL 33317
November 7, 2000
9:30 a.m.

### DEPOSITION OF SCOTT EARLEY

    Taken before EVELIN SIERRA, Court Reporter,
and Notary Public, in and for the State of Florida, at
Large, pursuant to a Notice of Taking Deposition.

KLEIN, BURY & ASSOCIATES, INC.

```
 1

 2    APPEARANCES:

 3          Carlos Cruanes, Esquire
                appearing on behalf of the Plaintiff.
 4
          BUNNEL, WOULFE, et al.
 5          Gregg A. Toomey, Esquire
                appearing on behalf of the Defendant.
 6

 7                              - - - - -

 8
      WITNESS                           DIRECT    CROSS
 9
      SCOTT EARLEY
10      by: Mr. Toomey                     3

11                              - - - - -

12

13    DEFENDANT'S EXHIBITS FOR IDENTIFICATION:

14    1 - Log for Scott's Incarceration

15    CERTIFIED QUESTIONS:  NONE

16                              - - - - -

17

18

19

20

21

22

23

24

25
```

```
 1    Thereupon:

 2                      SCOTT EARLEY

 3    was called as a witness and having been first duly

 4    sworn, was examined, testified, and stated as follows:

 5              THE WITNESS:  I do.

 6                      DIRECT EXAMINATION

 7    BY MR. TOOMEY:

 8         Q.   Please state your name for the record?

 9         A.   Scott Earley.

10         Q.   Spell your name, please.

11         A.   E-A-R-L-E-Y.

12         Q.   And do you have a middle name, Scott?

13         A.   Yes, I do.  Raymond.

14         Q.   I am going to ask you a series of questions

15    pursuant to my notice of deposition.  I ask that if

16    you don't understand any of my questions, please ask

17    me to rephrase it, and I will be happen to rephrase if

18    you ask me to.

19              If you answer my questions without asking me

20    to rephrase, I will assume that you understood my

21    question, and the answer you give was to my question.

22              What is your current residential address?

23         A.   590 NW 66 Avenue.

24         Q.   And is that where we are today?

25         A.   Yes.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1      Q.   Who owns this home?

 2      A.   John White and Patricia White.

 3      Q.   Is Patricia White your mother?

 4      A.   Yes.

 5      Q.   What is your relationship with John White?

 6      A.   He's my stepfather.

 7      Q.   Who is your birth father?

 8      A.   Michael James Earley.

 9      Q.   Is Michael James Earley located in this

10   area?

11      A.   No.  He is located in Miami Springs,

12   Florida.

13      Q.   Do you happen to know his address?

14      A.   I don't.  I know it is located in Virginia

15   Gardens.

16      Q.   What is your social security number?

17      A.   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.

18      Q.   Your date of birth?

19      A.   February 16, 1972.

20      Q.   Are you currently employed?

21      A.   No, I am not.

22      Q.   When was the last time you were employed?

23      A.   March 15, 1998.

24      Q.   And by whom were you employed at that time?

25      A.   Internet Global Communications.
```

 1    Q.    Internet?

 2    A.    Yes.

 3    Q.    What is your position with Internet Global?

 4    A.    Internet talk show host.

 5    Q.    What does an internet talk show host do?

 6    A.    It's a talk show host that is mainly on the

 7    Internet.  It is not broadcast on television.

 8    Q.    How does that work?

 9    A.    It works -- I can't tell you the exact

10    technical, but it works through video going into the

11    computer video camera, and I had a microphone, a head

12    set microphone on.

13          What we would do is, we would broadcast on

14    the Internet through Broadband through different clubs

15    in Fort Lauderdale and South Beach.

16    Q.    What is the business address of Internet

17    Global Communication?

18    A.    I believe they went out of business.

19    Q.    Do you know when they went out of business?

20    A.    I believe it was October or November of

21    1998.

22    Q.    Who was your supervisor at Internet Global

23    Communications?

24    A.    Steven Halpern.

25    Q.    Do you know the location of Mr. Halpern?

     1          A.    No, I do not.  I do understand that he still

     2     runs Dick De'Vince's (phonetic spelling) club, but I

     3     don't know where their facility is.

     4          Q.    And what was your rate of pay when you were

     5     working for Internet Communications?

     6          A.    I was doing $100 a show.

     7          Q.    How many shows would you do in an average

     8     week?

     9          A.    Three to four.  It depends on the week.

    10          Q.    Okay.  That employment ended in March of

    11     1998?

    12          A.    Correct.

    13          Q.    Where did you work before that?

    14          A.    I worked at Alton Entertainment in Miami

    15     Beach, Florida.

    16          Q.    What was your position there?

    17          A.    I was associate producer for the television

    18     show Crook and Chase.

    19          Q.    What were you doing as an associate

    20     producer?

    21          A.    I would look at different technologies that

    22     were out, that were coming out, and I would make five

    23     to ten minute segments on the Crook and Chase Show,

    24     and then I would call the company that was making this

    25     particular technology, and try to get sponsorship from

```
 1    the company for that five to ten minute segment.

 2         Q.   Is that the country music show?

 3         A.   Yes.  It is a talk show.  It was a morning

 4    talk show, I believe on TNT.

 5         Q.   What kind of technologies are we talking

 6    about here?

 7         A.   Like every day household products

 8    technologies, new business that would come out or new

 9    household appliances.

10         Q.   This is something that the talk show host

11    would talk about?

12         A.   Yes.

13         Q.   And what was your remuneration for that

14    employment?

15         A.   I received $600 dollars a week.

16         Q.   And who was your supervisor there?

17         A.   I can't remember.

18         Q.   Does Alton Entertainment still exist to your

19    knowledge?

20         A.   I believe so.

21         Q.   And how long were you employed by Alton

22    Entertainment?

23         A.   Six months.

24         Q.   Did that employment end as a result of --

25    you went to Internet Global Communications after some
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1   period --

 2        A.   Correct.

 3        Q.   Wait for me to finish my question.

 4             Was it some period of time before you

 5   changed jobs?

 6        A.   There was a two-week lull.

 7        Q.   Okay.  We'll do one more.  Prior to Alton

 8   Entertainment, where did you work?

 9        A.   Five Star Productions in Delray Beach.

10        Q.   What was your position there?

11        A.   Associate producer.

12        Q.   What were your duties?

13        A.   Same.  I just worked on a different show

14   called Today's Environment, and also Parenting in the

15   Nineties.  I worked on two shows.

16        Q.   What was your rate of pay there?

17        A.   $400 a week.

18        Q.   How long were you employed by Five Star

19   Productions?

20        A.   That was another six months.

21        Q.   And the name of your supervisor there?

22        A.   Laura Bailey.

23        Q.   Do you know the whereabouts of Ms. Bailey?

24        A.   She is still in Delray Beach.

25        Q.   Is she still employed by Five Star
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1    Productions, to your knowledge?

 2         A.    Yes, sir.

 3         Q.    Let's talk about your education.  Where did

 4    you go to high school?

 5         A.    Cooper City High School in Florida.

 6         Q.    You graduated from Cooper City?

 7         A.    Correct.

 8         Q.    And after you graduated from Cooper City you

 9    attended college?

10         A.    I attended community college, but I did not

11    receive a degree.

12         Q.    Where did you attend community college?

13         A.    Broward Community College.

14         Q.    What were you studying?

15         A.    My major was theater.  My minor was

16    management.

17         Q.    How long were you attending Broward

18    Community College?

19         A.    On and off for about a year and a half.

20         Q.    Do you have any other post secondary

21    education?

22         A.    I'm not really sure.  I guess this would be

23    technical.  I went to Johnson Littman for the Series

24    Seven test.

25         Q.    What is the Series Seven test?
```

1          A.    A test to get your license to become an

2     investment advisor.

3          Q.    Did you get that license?

4          A.    No, I did not.

5          Q.    How long did you attend Johnson and Littman?

6          A.    Two months.

7          Q.    Why did you leave?

8          A.    It wasn't that I left.  It was a two-month

9     course.

10         Q.    So you completed the course?

11         A.    I completed the course, and I took the test,

12    and I failed.

13         Q.    You have to wait for me to finish my

14    question?

15         A.    I apologize.

16         Q.    I understand everybody in the room

17    understands what we are doing, but the court reporter

18    cannot take both of us down at the same time.

19         A.    I apologize once again.

20         Q.    That's okay.  When did you take your Series

21    Seven test?

22         A.    I took it three times.  I don't know the

23    exact dates.  I know they were in the years of '92 or

24    '93.

25         Q.    You studied for the Series Seven test, but

KLEIN, BURY & ASSOCIATES, INC.

1    somehow you ended up in television work?

2        A.    Yes.

3        Q.    Tell me how that happened?

4        A.    Well, right after I would say my bartending

5    experience one of my friends allowed me the chance of

6    becoming a stockbroker, and I would first have to

7    become a cold caller for a security firm called TCMS

8    Securities, this is back in September of '92.

9            So I went in there and I became a cold

10   caller, and I had to be a cold caller for three

11   months, before they gave me the opportunity to go to

12   Johnson and Littman to take my Series Seven test, and

13   I was with TCMS Securities.

14           Then I went to Gruntle (spelled

15   phonetically).  After Gruntle I went to Prudential,

16   after Prudential, I went back to Gruntle.  This was in

17   a span of maybe three years, and then I was also

18   interested in theater and television and I was looking

19   in the paper one day, and there was an advertisement

20   for associate producer for an independent television

21   production company, and I was just sick and tired of

22   the stock business and being a cold caller earning

23   $250 a week.

24           So I just decided to take a chance and

25   applied for the associate producer job.  That is how I

KLEIN, BURY & ASSOCIATES, INC.

1    got into television.

2         Q.   You said you had experience as a bartender.

3    Where did you bartend?

4         A.   Higgy's (spelled phonetically).

5         Q.   I am sorry?

6         A.   Higgy's Cafe, old Marqui's place from the

7    Dolphins.  I also bartended in TGI Friday in Pembroke

8    Pines, and -- anywhere else?  I'm trying to remember.

9    In Kahoots.

10        Q.   When did you work in In Kahoots?

11        A.   I believe I worked there on and off from the

12   years of '92 to '94.

13        Q.   Okay.  Scott, tell us how it is that you

14   came to be paralyzed?

15        A.   On 3/15/98 I was in a car accident, which

16   resulted in the flip over of my vehicle, and it

17   ejected me out of the vehicle.  When paramedics

18   arrived on the scene they found that my spinal column

19   was sticking out of the skin, and my left leg was

20   wrapped around my neck.

21             As a result, I received a T12/L1 incomplete

22   injury, a dislocated left hip, and a shatter right

23   femur bone.

24        Q.   When you say you had an incomplete injury,

25   what does that mean?

KLEIN, BURY & ASSOCIATES, INC.

```
 1          A.    There are two types of spinal cord injuries,

 2    there is incomplete and complete.  Incomplete means

 3    that there are some abrasions.  A complete injury

 4    means that the spinal cord is completely severed.

 5          Q.    I assume you were taken from the accident

 6    scene to the hospital, is that correct?

 7          A.    North Broward General Hospital.

 8          Q.    Where did that accident occur?

 9          A.    It occurred on 95 near Copans Road on the

10    ramp.

11          Q.    Was this a roll over accident, is that what

12    you said?

13          A.    Yes, it was.

14          Q.    Any other vehicles involved?

15          A.    One other vehicle.

16          Q.    Do you know who the driver of that vehicle

17    was?

18          A.    I cannot recall his name.

19          Q.    Were you arrested as a result of that

20    accident?

21          A.    I was not arrested, but I was charged.

22          Q.    What were you charged with?

23          A.    DUI.

24          Q.    How long were you in North Broward General

25    Hospital?
```

```
 1        A.    From March until I think it was June,

 2   beginning of June.  Oh, no, I apologize, it is the end

 3   of April I was there til.

 4        Q.    From March until the end of April?

 5        A.    Yes, sir.  March 15 to the end of April.

 6        Q.    Okay.  Who were -- who were your treating

 7   physicians while you were at North Broward General

 8   Hospital?

 9        A.    I cannot recall those names.

10        Q.    All right.  You said you were charged with

11   DUI in that accident, is that correct?

12        A.    Correct.

13        Q.    What was the outcome of those proceedings?

14        A.    The DUI proceedings?

15        Q.    Yes, sir.

16        A.    I was sentenced to probation, ten days in an

17   institution and I believe some fines and retribution.

18        Q.    You were sentenced to probation for what

19   period of time?

20        A.    I believe six months.  Six, seven months, I

21   am not sure of the date.

22        Q.    You were detained in a facility?

23        A.    I was in the facility for ten days.

24        Q.    What facility was that?

25        A.    The Broward County Jail.
```

1      Q.   Which one?

2      A.   I believe the one in Pompano.

3      Q.   The North Broward Detention Facility?

4      A.   The North Broward Detention Facility,

5   correct, sir.

6      Q.   You said you were ordered to make

7   restitution, is that correct?

8      A.   Yes, sir.

9      Q.   Did you make that restitution?

10     A.   Yes, sir.

11     Q.   Is this your first DUI arrest?

12     A.   No, sir.

13     Q.   When were your other DUI arrests?

14     A.   I had a DUI arrest in '92.  In September of

15   '92.

16     Q.   Where was that?

17     A.   That was in the Keys.  Mile marker 92.

18     Q.   Any others?

19     A.   No.

20     Q.   Okay.  So on what date did you enter the

21   North Broward Detention Facility?

22     A.   February 16, 1999.

23     Q.   What date were you released, if you know?

24     A.   I don't.  I don't remember.

25     Q.   What was your sentence?

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    Ten days.

 2        Q.    And is it likely you were released?

 3        A.    I can probably count on my fingers but --

 4        Q.    Okay.  It is not really important.  It is in

 5   the records.

 6              At the time you were admitted to North

 7   Broward Detention Facility, were you under the care of

 8   a physician?

 9        A.    Yes, I was.

10        Q.    Who was that physician?

11        A.    Arlene Richards, and Dr. Mack.

12        Q.    Do you know Dr. Mack's first name?

13        A.    Kenneth.

14        Q.    Are those two physicians partners?

15        A.    Yes, they are--

16        Q.    And when--

17        A.    -- and when one doctor is not in, the other

18   one is on call.

19        Q.    Do you know what those physicians'

20   specialties are?

21        A.    I believe they are general practitioners.  I

22   also believe Kenneth Mack is internal medicine.

23        Q.    Had you seen any other physicians on a

24   regular basis at the time?

25        A.    At the time I was seeing a urologist
```

KLEIN, BURY & ASSOCIATES, INC.

1    Dr. Jeffrey Mark.   I am sorry, Dr. Jeffrey Marks.

2        Q.   Do you know where Dr. Macks' office is?

3        A.   It's on fifth street here in Plantation.   I

4    don't know the exact address.

5        Q.   Where you seeing any other physicians at the

6    time?

7        A.   No, sir.

8        Q.   Were you receiving physical therapy at that

9    time?

10       A.   Yes, sir.

11       Q.   And who were you receiving physical therapy

12   from?

13       A.   Healthsouth Sunrise Rehabilitation Center.

14       Q.   And would you go to Healthsouth or would

15   they come to you?

16       A.   No, I would go there.

17       Q.   Were you seeing any other health care

18   providers in the period say a year before your

19   incarceration?

20       A.   I was being seen by -- a home health care

21   nurse would come in every day, and I guess just take

22   care of my bowel program and my wound and everything.

23       Q.   Who was the home health care provider, do

24   you remember?

25       A.   I don't remember.

KLEIN, BURY & ASSOCIATES, INC.

1          Q.    Do you still have somebody seeing you for

2    home health care?

3          A.    I have -- on November 16, I will have home

4    health care for like three or four days since my

5    caregiver will be gone on vacation.

6          Q.    And who will that be provided by?

7          A.    The folder is right over there.  Home Health

8    Corporation of America.

9          Q.    Where are they located?

10         A.    I believe Fort Lauderdale.

11         Q.    Back to Dr. Richards, and is it Richards or

12   Richard?

13         A.    Richards.

14         Q.    Back to Richards and Dr. Mack.  For what

15   ailments were you seeing those two physicians?

16         A.    Not really ailments, just I wanted them as

17   general practitioners, just someone that I can go to,

18   you know, if I had any problems or anything.  Because

19   before the accident I didn't have a doctor, and I knew

20   after the accident that I would need to go to the

21   doctor quite often because of my condition.

22         Q.    If you remember, prior to your

23   incarceration, when was the last time you saw either

24   Dr. Richards or Dr. Mack?

25         A.    A week prior, I believe.

```
 1        Q.    And what was that for?

 2        A.    That was for the incarceration.  I had to

 3   get all of my medications, and all of my special needs

 4   faxed over to the Broward County Detention facility so

 5   I went in to see Dr. Kenneth Mack to have that done.

 6        Q.    Did Dr. Mack perform a physical examination

 7   at that time?

 8        A.    Yes, he did at that time.

 9        Q.    When you saw Dr. Mack prior to your

10   incarceration, did he make any findings of any sort or

11   did he just perform a physical examination and provide

12   the meds?

13        A.    Exactly.  He performed the physical

14   examinations and just, you know, just to make a list

15   of all the special needs and all the special

16   medications that I needed, and that is what we

17   consulted on that day as I recall.

18        Q.    But he didn't actually treat you for

19   anything, is that correct?

20        A.    No, sir.

21        Q.    In your complaint you say that when you

22   entered the Broward County Jail system, you had a

23   grade one decubitus, is that correct?

24        A.    I had grade one ulcers on my sacrum.

25        Q.    How do you know it was a grade one ulcer?
```

KLEIN, BURY & ASSOCIATES, INC.

1        A.    That is what was told to me by Dr. Mack.

2        Q.    When did Dr. Mack tell you that?

3        A.    During the physical examination the week

4   prior to my incarceration.

5        Q.    When you entered the Broward County Jail

6   system did you make the jail authorities aware that

7   you had had what you call a grade one sacral ulcer?

8        A.    Yes, and also my doctors as well.  He,

9   Dr. Mack, faxed some papers including my special needs

10  as well as what was wrong with me including the wound.

11       Q.    How do you know Dr. Mack faxed papers

12  regarding your special needs especially in regards to

13  the sacral ulcer?

14       A.    He told me and also my mother that he did.

15       Q.    Do you have any documentation regarding what

16  Dr. Mack faxed?

17       A.    I don't.

18       Q.    Other than what Dr. Mack told you regarding

19  a grade one sacral ulcer, is there any documentation

20  that shows that -- strike it.

21             With the exception of what Dr. Mack told you

22  regarding the grade one ulcer, is there any

23  documentation that shows that you had a grade one

24  sacral ulcer at the time you entered the jail system?

25       A.    I believe it is in my medical records

1    Dr. Mack, every time he sees me, writes down and

2    updates my record.  I believe it is in my medical

3    record.

4        Q.   Would it surprised you to find that the

5    medical records upon your entry to the Broward County

6    Jail system shows that you had a grade three sacral

7    ulcer on entry to the jail system?

8        A.   No, it would not surprise me at all.

9        Q.   Why would it not surprise you?

10       A.   Because I really cannot recall exactly what

11   Dr. Mack told me.

12       Q.   So you are not sure it was a grade one when

13   you entered the jail system, is that correct?

14       A.   That is correct.

15       Q.   While you were incarcerated in the North

16   Broward Detention facility were you seen by health

17   care providers?

18       A.   In the facility?  No, I wasn't.

19       Q.   You were never seen by a physician's

20   assistant or any nursing staff at any time, is that

21   your testimony?

22       A.   The first couple of days, no I was not.

23       Q.   That is not what I asked you, sir.

24            During your incarceration, during the whole

25   incarceration.

1          A.    During the whole incarceration I was visited
2     by a nurse maybe twice.
3          Q.    Were you taking medication when you entered
4     the Broward County Jail system?
5          A.    Yes, I was.
6          Q.    What were those medications?
7          A.    Pancrease for -- I believe they removed my
8     pancreas in November of '98, and ever since then I
9     have been on the medication Pancrease, and I was
10    taking Backtofin for my back.  It was used to calm
11    down muscle spasms.
12         Q.    Those are the only medications you were
13    taking?
14         A.    Yes.
15         Q.    Do you recall being given a chest x-ray
16    while you were in the Broward County Jail system?
17         A.    No, I do not.
18         Q.    You do not recall being given a chest x-ray
19    on the 25th of February 1999, is that correct?
20         A.    That is correct.
21               MR. TOOMEY:  Let's go off the record.
22               (Off-the-record discussion.)
23               MR. TOOMEY:  We can go back on.
24    BY MR. TOOMEY:
25         Q.    In your complaint you state on paragraph 12

KLEIN, BURY & ASSOCIATES, INC.

1    that the act of the defendants in this case violated

2    your constitutional rights.

3            How do you claim that the actions of the

4    sheriff's office violated your constitutional rights?

5        A.    Well, it is my belief that not being given

6    my medication or the proper utensils I would say such

7    as catheters et cetera in form of a -- it was just in

8    a form as a punishment as I saw it.  And when I asked

9    for it, I was punished further.

10       Q.    When you say it was in the form of a

11   punishment, how do you know that?

12       A.    Well, the actions of the guards just

13   warranted -- I mean it just showed me that I was

14   punished, that it was punishment.

15           I can give you an example.  When I was

16   freezing cold, when I first got into the North

17   Detention Center, I was freezing cold and I guess I

18   wanted to get familiar with my surroundings, so I had

19   a blanket on my legs while I was in my wheelchair so I

20   can get some -- I wanted to get familiar with my

21   surroundings.  I decided to come out with the blanket

22   on.

23           The guard informed me that I could not have

24   a blanket on while I was out of my cell.  So I said

25   okay.  I went back into my cell, the TV was on in this

KLEIN, BURY & ASSOCIATES, INC.

```
 1    room, there was a room with six cells in the room was
 2    a table, a TV.  I was in the far cell, and the TV was
 3    on.  So I had the blanket on, and there was a doorway.
 4    I was -- the doorway was maybe over my right leg, and
 5    I was -- three quarters of my body was in the cell,
 6    and from my right leg on was out of the cell, and my
 7    blanket was still on my legs because I was freezing
 8    cold.
 9              That is when the guard came around and
10    actually physically turned me around and pushed me and
11    said, you cannot have it outside.  And I was not
12    outside.  And that is when everything started taking
13    place.
14        Q.    I don't understand.  In your mind, how does
15    that equate to punishment?
16        A.    Well, that incident just snowballed into
17    other incidents.  They were -- I just I guess out of
18    anger and out of fear as well as the overall, the
19    other emotions that were going through me at the time
20    I just was steadfast, I was steaming.
21              I think I made a comment or two out loud not
22    directly to anybody, just generalizing, and I guess
23    I'm trying to recall here, I needed to cath myself
24    because at the time I didn't have any catheter tubes
25    in my cell, and after that -- it was right after that
```

1   incident in fact that I pushed the emergency button.

2          I said I need a catheter.  I need to cath

3   myself, because at the time I had not cath'd myself

4   for six hours, and I usually cath myself every four

5   hours.

6          I knew my bladder was getting extended so I

7   needed to cath myself, and because the incident just

8   occurred, I assumed that the guards were just thinking

9   that I wanted to get attention, which I wasn't.

10          I needed to get the catheterization tube so

11   I can relieve myself.  And they wouldn't, they said

12   we'll get it to you.  We'll get it to you.  Fifteen

13   minutes went by, we will get it to you.  I pressed the

14   emergency button, again we'll get it to you.  We'll

15   get it to you.

16          I pressed the emergency button again within

17   an hour and a half, I pushed the emergency buttons

18   four times, and I still didn't get a catheterization

19   tube.

20          I believe on the fifth time they said

21   everybody was in lock down in this cell.  Everybody

22   was against me because I wanted to get a

23   catheterization tube.  That is how I see it as a form

24   of punishment.

25      Q.   I still don't understand.  Why was it

```
 1    punishment?
 2              MR. CRUANES:  Objection, asked and answered.
 3              MR. TOOMEY:  He has not answered my
 4         question.
 5              MR. CRUANES:  He has to his ability.  If you
 6         continue to ask, you will get the same answer.
 7    BY MR. TOOMEY:
 8         Q.   Did anybody ever tell you you were being
 9    punished for catheterization material?
10         A.   I believe nobody comes out and says you are
11    being -- somebody does not come out and say, I am
12    punishing you for this.
13         Q.   So the perception, it was your perception
14    that you were being punished, is that correct?
15         A.   Yes.
16         Q.   By the way, do you recall seeing a request
17    to produce propounded by my office in this case
18    wherein we asked for income tax records?
19         A.   I did not see that request.
20         Q.   I'm going to represent to you that in June
21    of this year my office, Mr. Anchel, of my office,
22    propounded a request to produce, which is income tax
23    forms for the years 1987 through the present and your
24    answer was that you did not have any such forms.
25              Was there some reason that you don't have
```

```
 1    income tax or payroll records for those years even
 2    though you were working?
 3        A.    I don't have any information for you at this
 4    moment.
 5        Q.    But you were employed, right?
 6        A.    Yes, I was.
 7        Q.    Also that request to produce, there are some
 8    photographs -- well, first pursuant to that request to
 9    produce my office received a document entitled, Logs
10    for Incarceration.  Is that a document that you
11    recreated?
12        A.    My mother created this document.
13        Q.    Can I see it?  The third notation on that
14    list says that a picture was taken of your sacral
15    ulcer, is that correct?
16        A.    Could you tell me the exact date on which
17    this --
18        Q.    I am asking you to identify what it says
19    actually.
20        A.    I --
21        Q.    Does it say when the picture was taken?
22              MR. CRUANES:  February 15, is that what you
23        mean?
24              MR. TOOMEY:  Yes, sir.
25              THE WITNESS:  Yes.
```

KLEIN, BURY & ASSOCIATES, INC.

1    BY MR. TOOMEY:

2        Q.    Who took that picture, if you know?

3        A.    I believe it was the nurse at doctor --

4    nurse's office.  I am not sure about that.

5        Q.    Who would know?

6        A.    Dr. Mack.

7        Q.    If I show you a series of pictures do you

8    think you know which one was the pictures taken on

9    February 15?

10       A.    No.

11       Q.    There is also on that list, further on the

12   list, there is a notation that another photograph was

13   taken, do you see that?  I think it is dated 26th of

14   February?

15       A.    Yes, I'm getting -- yes, I see that.

16       Q.    Do you recall who took that photograph?

17       A.    I think my mother did.

18       Q.    If I show you the same series of

19   photographs, do you think you can pick the right one

20   out?

21       A.    Yes.  I'm recalling a different picture.  I

22   am recalling a picture of me in a wheelchair.  I can't

23   really identify which picture was taken of my wound.

24       Q.    But your mother took that picture, correct,

25   the second picture?

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    Yes.   I believe so.   I am not really sure.
 2   The picture I was talking about was the one with me
 3   sitting in a wheelchair that my mother took as soon as
 4   I was released.    That is the one that I was recalling.
 5        Q.    Okay.   Sometime upon your release from jail
 6   you sought treatment from Plantation General Hospital,
 7   is that correct?
 8        A.    Yes, that is correct.
 9        Q.    Is that on the same date you were released?
10        A.    Yes, it is.
11        Q.    Why is it that you went to Plantation
12   General?
13        A.    My doctor's office is located near
14   Plantation General Hospital.
15        Q.    Which doctor is that?
16        A.    Dr. Arlene Richards and Dr. Kenneth Mack.
17        Q.    Did you contact either of those physicians
18   before you went to Plantation General?
19        A.    No, I did not.   It was early in the morning
20   and their offices were not open.
21        Q.    How did you arrive at Plantation General?
22        A.    My mother brought me there directly from the
23   North Broward Detention facility.
24        Q.    If you recall, which physicians did you see
25   at Plantation General Hospital?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1          A.    I do not recall.

 2          Q.    What were you seeking treatment for when you

 3    entered Plantation General Hospital?

 4          A.    I had a very bad stomach ache as well as my

 5    urine was dark amber, almost a reddish yellow color,

 6    and I was worried that I had contracted a UTI.

 7          Q.    What is a UTI?

 8          A.    Urinary tract infection.

 9          Q.    Why were you worried that you had contracted

10    a urinary tract infection?

11          A.    Because of a lack of my bladder release as

12    well as the unsanitary ways that I was I guess forced

13    to catheterize myself.

14          Q.    How long were you at Plantation General?

15          A.    I don't recall.  It was only for -- it

16    was -- I don't recall the hours, but I know it was

17    only half a day.

18          Q.    When you left Plantation General, were you

19    given any instructions by the doctors there?

20          A.    I guess, I don't recall that.  I don't

21    recall that at all.

22          Q.    Sometime subsequent to being released from

23    Plantation General, did you see your doctors?

24          A.    Yes, I did.  I saw -- I don't recall which

25    one I saw, but I believe it was Dr. Arlene Richards,
```

1    but I don't know for sure.

2        Q.    Do you continue to see Dr. Arlene Richards?

3        A.    Yes, I do.

4        Q.    At present have you seen any other

5    physicians?

6        A.    Dr. Jeffrey Marks.

7        Q.    While you were at Plantation General, did

8    you receive treatment for the decubitus ulcer?

9        A.    Yes, I did.

10       Q.    What was that treatment?

11       A.    They cleaned it out after they hosed me

12   down.  They cleaned it out and they proceeded to put a

13   wet dry bandage on there, which consists of Calistat,

14   I believe, saline solution, and a four by four pad and

15   some bandages.

16       Q.    Following your release from Plantation

17   General, did you seek additional treatment for the

18   sacral ulcer?

19       A.    Yes, I did.  I went to Dr. Richards to see

20   what could be done, and I believe she put me on a new

21   regiment of taking care of it with some Intrasite

22   Jell, some more Calistat, saline solution, and new

23   bandages I believe, I am not sure what kind.

24       Q.    Did Dr. Richards' treatment ease the

25   problem?

KLEIN, BURY & ASSOCIATES, INC.

1       A.    No, it's still there.

2       Q.    You still have a sacral ulcer?

3       A.    Yes, I do.

4       Q.    Prior to being admitted to the Broward

5    County Jail, how long had you suffered from decubitus

6    ulcers?

7       A.    I believe since my accident on March 15, but

8    they were on my feet, and my heels and I think there

9    was one back there too, I can't recall.

10      Q.    You did have --

11      A.    A sacral ulcer.

12      Q.    -- a sacral decubitus ulcer on your entry to

13   the jail, correct?

14      A.    Yes.

15      Q.    How long had that been there?

16      A.    That I can't recall.  I thought it was there

17   for maybe four or five months, but I can't recall the

18   exact time.

19      Q.    Okay.  Were you receiving treatment for the

20   sacral ulcer before you went into jail?

21      A.    Yes, before I went into incarceration.

22      Q.    Was that treatment from Richards or Mack?

23      A.    It was from a combination of Dr. Richards,

24   Marks, and Dr -- I believe Dr. Kenneth Mark helped me

25   out on that too.

KLEIN, BURY & ASSOCIATES, INC.

```
 1              It depends on which physician I was seeing
 2    at the time I was going in for the doctor's visit.
 3         Q.   Are you currently taking any medication?
 4         A.   Yes, I am taking Pancrease, and Backtofin.
 5         Q.   Anything else?
 6         A.   That's all.
 7         Q.   I just wanted to make sure that I have the
 8    right records from the state in this case.
 9              Your middle name you said before is Raymond,
10    is that correct?
11         A.   Correct.
12         Q.   Is there some reason that the criminal
13    records would show your middle name as Michael, or as
14    Scott M. Earley?
15         A.   No, I don't know why that would happen.
16              My brother's middle name is Michael.
17         Q.   Well, let's make sure.  What is your date of
18    birth?
19         A.   2/16/72.
20         Q.   You went to jail on your birthday?
21         A.   Yes, I did.
22         Q.   When you saw your physicians after being
23    released from the North Broward Detention facility,
24    have any of your physicians told you that your
25    condition was worsened while you were in the jail?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1          A.    Yes.

 2          Q.    Which doctor was that?

 3          A.    Arlene Richards.

 4          Q.    What did she tell you?

 5          A.    Well, she said that the wound had -- she

 6    said that it grew bigger, and it was red.  I guess the

 7    circle was larger.  I didn't see it myself, but that

 8    is what she told me.

 9                And she said that I lost a lot of weight.  I

10    am not sure about the exact amount, how much I lost,

11    but I lost a lot of weight, and a lot of muscle which

12    in turn hurt me in my rehab.

13          Q.    Did Dr. Richards tell you anything else

14    specifically about your decubitus ulcer?

15          A.    Not that I can recall.

16          Q.    I am sorry if I asked you this before, but

17    we know that you had a decubitus ulcer when you

18    entered the Broward County Jail system.  Prior to that

19    particular ulcer at that particular time, had you ever

20    had a sacral decubitus ulcer before?

21          A.    No.

22          Q.    At that time you had been paralyzed for

23    approximately a year, less than a year, ten months?

24          A.    Less than a year, yeah.

25          Q.    And your paralysis is related to the charge
```

 1    for which you were incarcerated during this particular

 2    incarceration, is that correct, from the accident you

 3    were talking about?  The accident and this

 4    incarceration were related, is that correct?

 5         A.    Correct.

 6         Q.    Other than the other day that we spoke

 7    about, have you ever been arrested for anything else?

 8         A.    No, sir.

 9         Q.    You stated in your complaint that the

10    Broward Sheriff's Office prevented you from receiving

11    adequate medical care.  Tell me how that occurred.

12         A.    Well, I didn't receive my medications, and

13    when I did receive medications it was not the correct

14    one.

15              They substituted Mylanta for my Pancrease

16    medicine which is like, you know, apples and oranges.

17    It is totally two different medications.

18              They didn't provide me with a sterile

19    atmosphere for me to cath myself, and relieve my

20    bladder.  I was only receiving a tube, and the tube

21    that I did receive was not the right size.

22              I didn't receive any cleaning -- any

23    Betadine, I believe that is what the liquid is called,

24    or any type of lubrication, KY Jelly as well for my

25    special needs.

KLEIN, BURY & ASSOCIATES, INC.

```
 1              The sleeping facility that I was in was a
 2    steel cot with about an inch and a half thick
 3    mattress, which is, I don't know, implorable I guess
 4    with my particular special needs, especially when
 5    across the way I saw perfectly good hospital beds not
 6    being used at all.  No one was in these hospital beds,
 7    and I just found it outrageous.
 8         Q.   Okay.  Let me be more specific.  Your
 9    complaint says that you were prevented from receiving
10    adequate medical care.
11         A.   Uh-huh.
12         Q.   It sounds to me from what you just said that
13    you received medical care, but you think it was the
14    wrong medical care, is that correct?
15         A.   It was not the medical care that could
16    upkeep my special needs, which means that, you know,
17    there are certain things that certain people need,
18    certain medications, certain types of supplies that
19    are proper, and I didn't receive that.
20         Q.   All right.  Let me see if I can clear it up.
21    You are not saying that you didn't receive any medical
22    care, you are saying that the medical care that you
23    received was improper, correct?
24         A.   Correct.
25         Q.   In the ten days that you were in the North
```

KLEIN, BURY & ASSOCIATES, INC.

 1   Broward Detention Center, did you write any

 2   grievances?

 3        A.   No.

 4        Q.   Who did you speak to while you were

 5   incarcerated regarding your complaints of inadequate

 6   medical care?

 7        A.   My mother is the only person that I could

 8   rely on to call the right people since I only had a

 9   limited amount of phone use.

10        Q.   Who did you speak to in the jail, if anyone?

11        A.   In the jail?  No one.

12        Q.   Okay.  You say in your complaint that upon

13   your release you were quote -- not quote, parked by

14   the side of the road in mid 40s degree weather.

15        A.   Yes.

16        Q.   Tell me about that.

17        A.   They woke me up at I would say about three

18   o'clock in the morning, told me to get all my stuff

19   together, and that I was being released.

20             So I got all my stuff together, everything

21   that I had, and I proceeded to, I guess, the desk

22   where they release people.

23             I stayed there for about maybe 20, 25

24   minutes, then they shuffled maybe about four or five

25   of us into a room and they said get changed into your

KLEIN, BURY & ASSOCIATES, INC.

1    regular street clothes.

2            Well, I could not get changed because I was

3    so weak, and not being able to eat and I had lost so

4    much weight.  I could not dress myself even before the

5    incarceration.  I could not dress myself.

6            So I asked for help from anyone that could

7    help me out, but they saw that I was soiled, and they

8    could smell that I was soiled because I was not

9    changed or anything during the incarceration, and

10   because they saw that I was soiled, no one would help

11   me.

12           So I had to struggle to rip the orange pants

13   off of my legs, and of course I took the shirt off

14   with no problem, and I looked for my clothes.

15           And for some unknown reason it seemed

16   because I was the last one in the place that my

17   clothes were missing.  So they gave me some left over,

18   a left over shirt, and some shorts that were not mine

19   that I did not own, and I did not have any circulation

20   stockings as well because they misplaced that as well.

21           So I rolled out, and I asked if there was

22   anywhere inside that I could make a phone call and

23   they told me no that you would have to make a phone

24   call outside.

25           They shuffled me outside.  I made my phone

KLEIN,  BURY & ASSOCIATES,  INC.

1    call, and it was a very cold night.  I don't know if

2    it was 40 degrees or if it was 50 degrees, I know that

3    it was very cold, and I called my mother who was maybe

4    just getting -- as soon as I called her she woke up,

5    so she was not up already.

6          And she was about maybe 45, 40 minutes drive

7    out from getting dressed, and going out there and

8    everything like that so it was about a 45 minute wait,

9    and I was in shorts and a short shirt, short sleeve

10   shirt with no circulation stockings to keep me warm,

11   just sitting out there in a parking lot with no one

12   around, no one in sight, no officers, no security

13   guards outside.  I was just in the parking lot by

14   myself.

15       Q.   Okay.  Okay.  Following being left in the

16   parking lot as you say, did you receive any medical

17   attention related to being outside in the cold?

18       A.   No, I didn't suffer from any hypothermia or

19   anything.

20       Q.   Let me see if I have this right.  You had no

21   conversations with anyone working at the jail

22   regarding your request for medical attention?

23       A.   Well, I had requested such as pushing the

24   emergency button, and asking for my medications as

25   well as I believe I was rolled into the nurse's

 1    station that was there, and I talked to a couple of

 2    nurses there about getting my proper medication as

 3    well as the stomach aches and the ulcers -- I was

 4    bleeding, and I was soiled so I did talk to a couple

 5    of nurses at the nurse's station there.

 6         Q.    When did you talk to the nurses?

 7         A.    Probably about a day or two after I was in

 8    the North Broward facility.

 9         Q.    Is it your testimony that that is the only

10    time that you had contact with any health care

11    providers at the jail?

12         A.    At the North Broward facility, yes.

13               At the downtown facility I did talk to the

14    nurse there, but I only spent one night there and she

15    was, she planned on helping me, but then I was

16    transferred to North, to the North Broward facility.

17         Q.    What do you mean when you say she planned on

18    helping you?

19         A.    Well, she was very cooperative in trying to

20    find out what the facts were for my medications and my

21    supplies, and she was very helpful.  I remember that

22    clearly.

23               In fact, the people at the downtown Broward

24    facility were very nice to me, and throughout my

25    incarceration I wished I was at the downtown facility

    1    instead of the North Broward facility.

    2         Q.    Would it surprise you to find, Scott, that

    3    the medical records show that your decubitus ulcer was

    4    stage three upon presentation to the North Broward

    5    Detention Center, and also stage three at Plantation

    6    General Hospital upon your release?

    7         A.    No.  Because as you told me earlier that

    8    Dr. Mack said it was a grade three.  So I am assuming

    9    that the jail would say the same thing.

   10         Q.    When -- sorry strike that.

   11              Prior to the car accident that we spoke of

   12    earlier, did you have any other medical problems?

   13         A.    No.  Just a case of pneumonia back in '96,

   14    and that's about it.  Nothing really serious.

   15              MR. TOOMEY:  Off the record.

   16              (Off the record discussion.)

   17              MR. TOOMEY:  Let's go back.

   18    BY MR. TOOMEY:

   19         Q.    Scott, since your accident, have your

   20    doctors told you that your injuries are permanent?

   21         A.    Yes, sir.  Dr. Jeffrey Canter who was my

   22    neurosurgeon.

   23         Q.    When did you last see Dr. Canter?

   24         A.    October of '98.

   25              MR. TOOMEY:  I think I'm done.  I know I am

KLEIN, BURY & ASSOCIATES, INC.

1    done.   Let me take a few minutes, and go over my

2    notes.   I'm done.

3          (Thereupon, Defendant's Exhibit 1 was marked

4    for identification.)

5          (Thereupon, the deposition concluded at

6    approximately 10:15 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2
    STATE OF FLORIDA  )
 3                    )
    COUNTY OF BROWARD )
 4

 5

 6

 7        I, EVELIN SIERRA, Court Reporter, certify that

 8    I was authorized to and did stenographically report

 9    the foregoing proceedings and that the transcript is

10    a true and complete record of my stenographic notes.

11        DATED this 23rd day of November, 2000.

12

13

14
                    _____
15                  EVELIN SIERRA, Court Reporter
                    and Notary Public, State of
16                  Florida at Large.

17

18

19

20

21

22

23

24

25
```

KLEIN, BURY & ASSOCIATES, INC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:   00-6104-CIV-ZLOCH
MAGISTRATE JUDGE SELTZER

SCOTT EARLEY,

     Plaintiffs,

vs.

SHERIFF OF BROWARD COUNTY,
FLORIDA

     Defendants.

_____/

590 NW 66th Avenue
Plantation, FL 33317
November 7, 2000
10:30 a.m.

### DEPOSITION OF PATRICIA WHITE

Taken before EVELIN SIERRA, Court Reporter,
and Notary Public, in and for the State of Florida, at
Large, pursuant to a Notice of Taking Deposition.

KLEIN, BURY & ASSOCIATES, INC.

```
 1   APPEARANCES:

 2          Carlos Cruanes, Esquire
              appearing on behalf of the Plaintiff.
 3
            BUNNEL, WOULFE, et al.
 4          Gregg A. Toomey, Esquire
              appearing on behalf of the Defendant.
 5

 6                          -  -  -  -  -

 7
     WITNESS                      DIRECT    CROSS
 8
     SCOTT EARLEY
 9     by: Mr. Toomey                 3

10                          -  -  -  -  -

11

12   ATTACHMENT:

13   Log for Scott's Incarceration.

14

15   CERTIFIED QUESTIONS:   NONE

16                          -  -  -  -  -

17

18

19

20

21

22

23

24

25
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1   Thereupon:

 2                    PATRICIA WHITE

 3   was called as a witness and having been first duly

 4   sworn, was examined, testified, and stated as follows:

 5            THE WITNESS:  I do.

 6                    DIRECT EXAMINATION

 7   BY MR. TOOMEY:

 8       Q.   Please state your name for the record.

 9       A.   Patricia Ann White.

10       Q.   Spell your first and last name please?

11       A.   W-H-I-T-E  P-A-T-R-I-C-I-A.

12       Q.   We are here today, Ms. White, pursuant to a

13   notice issued by my office in a case brought by your

14   son against BSO.

15            I will ask you some questions.  I ask that

16   if you don't understand my question, that you ask me

17   to rephrase them.

18            If you do not ask me to rephrase them, I

19   will assume that you understood the question and the

20   answer you give was to my question, is that fair?

21       A.   That is fair.

22       Q.   Your current mailing address?  Your current

23   address?

24       A.   590 NW 66th Avenue; Plantation, Florida

25   33317.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        Q.   Is that where this deposition is occurring?

 2        A.   Yes, it is.

 3        Q.   What is your date of birth?

 4        A.   11/8/50.

 5        Q.   Your social security number?

 6        A.   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.

 7             MR. TOOMEY:  Off the record.

 8             (Off the record discussion.)

 9             MR. TOOMEY:  Back on.

10   BY MR. TOOMEY:

11        Q.   Are you currently employed?

12        A.   Yes, I am.

13        Q.   Who are you employed by?

14        A.   Bank of America.

15        Q.   What position are you in with Bank of

16   America?

17        A.   Executive administrator, assistant.

18        Q.   Which office do you work in?

19        A.   Downtown Fort Lauderdale.

20        Q.   What is an executive administrator

21   assistant?

22        A.   It is a secretary.

23        Q.   To whom?

24        A.   The regional executive.  For the regional

25   executive for the region, Carl Koenig.  It is
```

KLEIN, BURY & ASSOCIATES, INC.

1    pronounced -- spelled K-O-E-N-I-G.

2         Q.    His position is regional--

3         A.    Executive for the region, central Broward

4    region.

5         Q.    How long have you been employed by Bank of

6    America, or how long have you been employed by Bank of

7    America, or any of its previous names?

8         A.    Eighteen and a half years.

9         Q.    What is the mailing address for Bank of

10   America?

11        A.    One Financial Plaza, 14th Floor; Fort

12   Lauderdale, Florida, 33394.

13        Q.    Let's talk about your education.  You

14   attended college?

15        A.    No.

16        Q.    Have you had any post secondary education?

17        A.    No.

18        Q.    Where did you go to high school?

19        A.    Cabrini High School in New Orleans.

20        Q.    Did you move directly from New Orleans to

21   Florida?

22        A.    In '69.

23        Q.    That is a yes?

24        A.    Yes.

25        Q.    How long have you lived in this home?

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    Five years.

 2        Q.    And prior to living here, where did you

 3   live?

 4        A.    Pembroke Pines.

 5        Q.    Do you recall that address?

 6        A.    16820 -- no, I can't recall.  I have got it

 7   written.

 8              MR. CRUANES:  Off the record.

 9   BY MR. TOOMEY:

10        Q.    I would never want to make it a quiz.

11              Who are you currently married to?

12        A.    John White.

13        Q.    How long have you been married to John

14   White?

15        A.    Four years.

16        Q.    What does Mr. White do for a living?

17        A.    He works for the Town of Davie Equipment,

18   equipment operator.

19        Q.    Were you married previously?

20        A.    Yes.

21        Q.    To whom?

22        A.    Michael James Earley.

23        Q.    And when were you divorced?  I am assuming

24   you were divorced?

25        A.    Yes, I am.  Thank God.  1989.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        Q.    Do you have current contact with Mr. Earley?

 2        A.    Always.  Always.

 3        Q.    Has Mr. Earley had any -- has Mr. Earley

 4   participated in any way with your son's treatment?

 5        A.    No.

 6        Q.    To your knowledge does your son have contact

 7   with his father?

 8        A.    Yes.

 9        Q.    Do you know where Michael Earley currently

10   lives?

11        A.    Virginia Gardens.

12        Q.    At some point your son had proceedings

13   occurring in the criminal courts in Broward County, is

14   that correct?

15        A.    That is correct.

16        Q.    Did you attend any of those hearings?

17        A.    No, Michael Earley did.

18        Q.    Were you with your son when he was admitted

19   to the North Broward Detention Center facility?

20        A.    Michael Earley was.  Can I explain?

21        Q.    Sure.  Go ahead.

22        A.    I had involved his father letting him know

23   that I was -- I was doing the treatment.  Since he was

24   a police officer, I wanted him to stand by his son and

25   do all the legal portion of it because I didn't
```

KLEIN, BURY & ASSOCIATES, INC.

1    understand it.

2         Q.   Where is Mike Earley a police officer?

3         A.   Miami Springs.

4         Q.   Okay.   Just to make things simpler, you were

5    not with Scott when he entered the jail system.

6              Did you have any contact with Scott while he

7    was in the jail system?

8         A.   Yes, and his doctors.

9         Q.   How was the contact effected between you and

10   your son?

11        A.   The first two days by phone, and then when

12   he was not allowed to use the phone, Mike Earley, I

13   called him to try and track him down, and then also I

14   was allowed to go in and see him on Sunday between

15   those ten days that he was in.

16        Q.   So you had telephone calls the first couple

17   of days that Scott was incarcerated, and then you saw

18   him one Sunday?

19        A.   That is correct.

20        Q.   Is that correct?

21        A.   Right.

22        Q.   You said you had conversations, is that

23   correct?

24        A.   That is correct.

25        Q.   When did those conversations occur?

     1          A.    Before and after he was incarcerated.

     2          Q.    Let's talk about before he was incarcerated.

     3     What was the sum and substance of those conversations?

     4          A.    Basically to get him prepared for when he

     5     had to attend the ten days in the facility to make

     6     sure that he was supplied the -- the judge had stated

     7     that he would be in a hospital setting.

     8          Q.    Never mind what the judge said.  I am only

     9     interested in the conversation you had with the

    10     physicians.

    11          A.    And then basically I wanted to make sure I

    12     gave them phone numbers.

    13          Q.    Gave who phone numbers?

    14          A.    Dr. Arlene Richards and Dr. Mack, phone

    15     numbers of the Broward County facility.  I made all

    16     the phone calls basically to try and find out how to

    17     get the medication to him correctly.

    18          Q.    Your son has testified that either or both

    19     doctors Richards and Mack faxed some documents

    20     regarding Scott's care and treatment to the Broward

    21     County Jail's office.

    22                Do you have any knowledge of those documents

    23     being faxed?

    24          A.    Yes, sir.

    25          Q.    What is your knowledge?

                      KLEIN, BURY & ASSOCIATES, INC.

```
 1         A.    Dr. Arlene Richards, I called to make sure

 2    that they were sent.  She said, Patty, I have sent

 3    them three times.

 4         Q.    Other than what Dr. Richards told you, do

 5    you have any documentation that shows that those items

 6    were faxed to the Broward County jail system?

 7         A.    No, sir.

 8         Q.    Did Dr. Richards ever give you a copy of the

 9    facsimile transmission?

10         A.    No, sir.

11         Q.    Is that the total of the conversation that

12    you had with doctors Richards and or Mack regarding

13    your son's incarceration?

14         A.    Yes, basically.

15         Q.    As I understand you were also -- as I

16    understand, you were also at the jail when your son

17    was released, is that correct?

18         A.    Yes, sir.

19         Q.    What type of day was that, if you recall?

20         A.    Five o'clock in the morning.

21         Q.    Did you attend with your son when he went to

22    the Plantation General Hospital d?

23         A.    Yes, sir.

24         Q.    What made you go to Plantation General

25    Hospital?
```

```
 1        A.    Because Dr. Mack and Dr. Arlene Richard's
 2    office is right there, and that is their main
 3    hospital.
 4        Q.    I understand that.  But why did you go to
 5    the hospital that night?
 6        A.    Because of the condition that my son was in.
 7        Q.    Was that your idea or your son's idea.
 8        A.    No, mine.
 9        Q.    Tell me how you decided to do this?
10        A.    Because, well, because of the size of his
11    feet, because of the complaints from Scott of his
12    stomach pains, and his overall look.
13        Q.    Did you speak to any of the health care
14    providers at Plantation General Hospital?
15        A.    I spoke to the doctor, the nurses.  They
16    would not touch him because he had not been bathed
17    they went and showered him first.
18        Q.    Do you remember which doctors you spoke to?
19        A.    No, I don't remember the name.
20        Q.    To your knowledge what was the treatment
21    your son was given at Plantation General Hospital?
22        A.    They took him for a urinary tract infection.
23    They checked to make sure also blood tests was done,
24    and then the nurse came in to treat his wound.
25             Of course, they saw I had a camera, and they
```

1    didn't want me to take pictures, but once the curtains

2    were closed, I did.

3        Q.    Why did you have a camera?

4        A.    Because of the way that Scott had told me

5    that he was being treated, and the condition that I

6    saw him in on Sunday.

7            I knew that he was receiving inhumane

8    treatment, and the reason why I say it is if you would

9    see your son in the way I saw my son, you would have

10   done anything you could for him.

11       Q.    So you took some pictures at some point?

12       A.    Uh-huh.

13       Q.    Particularly, did you take pictures of the

14   sacral ulcer?

15       A.    Yes.

16       Q.    And when were those pictures taken?

17       A.    The same day he was released.  It was on the

18   26th.

19       Q.    To my understanding some pictures were taken

20   earlier as well before the incarceration.  Did you

21   take those pictures?

22       A.    The nurse that was taking care of him had

23   heeled his wound, to the point where it was almost

24   closed, and she had taken the pictures the night

25   before he went in.


                KLEIN, BURY & ASSOCIATES, INC.

```
 1         Q.    What is that nurse's name?

 2         A.    I don't recall.

 3         Q.    Do you know who she worked for?

 4         A.    It was a health care provider that

 5    Dr. Arlene Richards sent to us.

 6         Q.    If I show you some pictures, can you pick

 7    out the ones that you took?

 8         A.    I am pretty sure I could.

 9         Q.    Handing you a series of pictures that

10    purport to show us sacral ulcers.  Which of those

11    pictures?

12         A.    This was the day before he went.

13         Q.    Did you take that picture, ma'am?

14         A.    That was taken by the nurse.

15         Q.    That was taken by the nurse?

16         A.    No.

17         Q.    Show me the pictures that you took?

18         A.    This one, this one, this one, and this one.

19         Q.    Okay.  What type of camera did you take

20    these pictures with?

21         A.    A Polaroid.

22         Q.    An instamatic kind of camera?

23         A.    Instamatic.  And then the other one I used

24    the 35 millimeter.

25         Q.    Have you been involved in any discussions
```

KLEIN, BURY & ASSOCIATES, INC.

1   with any other health care providers subsequent to the

2   night at Plantation General Hospital with regard to

3   the sacral wound?

4       A.   I didn't understand that.

5       Q.   Have you talked to any other doctors

6   regarding the decubitus ulcer?

7       A.   I talked to all his doctors.

8       Q.   Tell me about conversations you have had

9   specifically regarding the decubitus ulcer after Scott

10   was in Plantation General Hospital?

11       A.   Dr. Arlene Richards.

12       Q.   What did you talk to Dr. Arlene Richards

13   about?

14       A.   Using different bandages to -- because the

15   wound was deeper than it had been.  She told me to use

16   the Intrasite, the saline like I had been using, but

17   she told me to double pad, to put gauze in the hole.

18       Q.   Did Dr. Arlene Richards ever tell you that

19   any change in the status of the ulcer was caused by

20   Scott's incarceration?

21       A.   No, she never made the statement.

22       Q.   Did you ever have any conversations with any

23   of the officials or employees of the Broward County

24   jail?

25       A.   When I was trying to get help to him.  I was

KLEIN, BURY & ASSOCIATES, INC.

```
 1    on the phone with everybody that I could get my hands

 2    on.   I even found a guard.   I worked with the wife of

 3    a guard there, and I even asked the wife to try to get

 4    a hold of her husband just to bring him a blanket, and

 5    he did.

 6         Q.   Did you ever have any conversations with --

 7    directly have any conversations with any employees of

 8    the Broward County jail system--

 9         A.   No.

10         Q.   -- regarding your son's incarceration?   Is

11    that a no?

12         A.   No.   That is a no.

13         Q.   Do you know why the home health care nurse

14    photographed Scott's decubitus ulcer before he was

15    sent to Broward County Jail?

16         A.   She did a series of shots for Arlene

17    Richards.   That was part of her care giving, that she

18    had to show Dr. Arlene Richards the step by step

19    procedures.

20         Q.   Are there additional photographs taken by

21    that home health care nurse?

22         A.   Yes, sir.

23         Q.   Do you have those pictures?

24         A.   No, I don't.

25         Q.   Do you know who does?
```

```
 1        A.    She does.

 2        Q.    The nurse does?

 3        A.    Yes.   Whether she supplied them to

 4   Dr. Richards or she kept them in her folder in her

 5   office, I don't know.

 6        Q.    How did you end up with that picture?

 7        A.    I ended up with a few of them.  She did

 8   leave a couple of them here if you want to see them.

 9        Q.    The nurse directly gave you those pictures?

10        A.    Yes.

11        Q.    The picture that is --

12        A.    (Witness nodding.)

13        Q.    When did -- when did she give you that

14   picture?

15        A.    On the 15th of February.

16        Q.    Did you ask her for it?

17        A.    Yes.

18        Q.    Why is that?

19        A.    Because she suggested that I keep the

20   picture.

21        Q.    Did she say why?

22        A.    Yes.

23        Q.    Why?

24        A.    Because she could not believe that the judge

25   had ordered him to go to jail.
```

```
 1                 MR. TOOMEY:  We'll just make an attachment
 2         to the deposition.
 3    BY MR. TOOMEY:
 4         Q.   I will show you a document that purports to
 5    be a log for -- entitled log for Scott's incarceration
 6    that was admitted as Defendant's One in the deposition
 7    of Scott Earley.  And we are going to attach it to
 8    this deposition.
 9              Would you take a look at this document for
10    me, and tell me if that is a document that you
11    created?
12         A.   Yes, it is.
13         Q.   When did you create that document?
14         A.   During the ten days I started it when she
15    was incarcerated.  Well it states -- I am trying to
16    think when I actually started it.  Yes, it was during.
17         Q.   You started writing it?
18         A.   After the first few phone calls when I saw
19    how it was going, that is when I started it.
20         Q.   And when was the last time you added
21    anything to that document?
22         A.   Do you know when I presented this to you?
23    When I gave it to you, that is when I stopped.  I
24    can't remember.
25         Q.   I'll make it simpler for you.
```

KLEIN, BURY & ASSOCIATES, INC.

 1    A.    Okay.

 2         Q.    Did you continue adding entries to this

 3    document after Scott's incarceration was completed?

 4    A.    No, I mean --

 5         Q.    Did the question make sense?

 6    A.    Yes, it made sense, but it's -- maybe I

 7    should say I don't remember.  That is what I should

 8    say because it's been a while, and I just don't

 9    remember all the dates and times and stuff.  I know I

10    started it during, and I know I finished it when I

11    gave it to Carlos.

12         Q.    Okay.  Are the items noted on here, things

13    that you specifically knew, that you had first-hand

14    knowledge of?

15    A.    Some of them were statements from Scott when

16    I talked to him on the phone.

17         Q.    So not everything in here is within your

18    firsthand knowledge, is that correct?

19    A.    I would have to point them out to you.

20         Q.    Some things are firsthand knowledge, and

21    some things are not, correct?

22    A.    Exactly, that is correct.

23         Q.    If we were to look -- I will stand up and

24    look behind you because we only have one copy of this.

25               So if we looked at say the third entry here

```
 1    that's listed as 2/15/99, and it states?

 2        A.    Scott called Dr. Mack.

 3        Q.    That is not something you would have

 4    firsthand knowledge of, is that correct?

 5        A.    That is correct.

 6        Q.    As we go down 2/20/99.  Scott's father got

 7    in touch with the nurse.

 8        A.    That is something that Mike Earley told me,

 9    and this is whenever -- when I called Dr. Richards.

10    That is me.

11        Q.    2/17/99 Scott finally transferred to the

12    infirmary.  That is not something that you would have

13    personal knowledge of, is that correct?

14        A.    That is correct.

15        Q.    2/18/99.  Scott called home and said all

16    doctors orders were ignored.  Do you have knowledge

17    that he called you?

18        A.    Scott called me, yes.

19        Q.    But you don't have any firsthand knowledge

20    that the doctors' orders were ignored, is that

21    correct?

22        A.    Exactly.  That is correct.

23        Q.    Who is Mike Bosco.

24        A.    Mike Bosco.  Can I see the document.

25        Q.    It is listed in the document.
```

KLEIN, BURY & ASSOCIATES, INC.

1      A.    Which date?

2      Q.    February 22 of '99.

3      A.    That's a friend of Scott's who is a DJ for

4   Y-100.

5      Q.    And again, you made all those entries on

6   this document, is that correct?

7      A.    Yes, I did, but I have not seen that

8   document for over a year.

9      Q.    It says here you contacted Senator

10  Campbell's office?

11     A.    I did.

12     Q.    Is that Skip Campbell?

13     A.    Yes.

14     Q.    You did that personally?

15     A.    Yes.

16     Q.    Who did you speak to at Senator Campbell's

17  office?

18     A.    Holly Krolick (spelled phonetically.)

19     Q.    That would be Holly Krolick?

20     A.    Yes.

21     Q.    Did you ever speak to Senator Campbell

22  himself?

23     A.    No, never not a chance to, cause he was

24  very busy.

25     Q.    Other than the physicians which you spoke

KLEIN, BURY & ASSOCIATES, INC.

```
 1    about, have you had any conversations with anyone

 2    regarding the care and treatment Scott received at the

 3    Broward County Jail?

 4         A.    Did I discuss it with -- yes, I did.

 5         Q.    Who is that?

 6         A.    The nurse.

 7         Q.    The home health care nurse that we talked

 8    about before?

 9         A.    Yes.

10         Q.    Anybody else?

11         A.    Just his doctors, and the health care

12    people, my husband, my mother-in-law.

13         Q.    Who is your mother-in-law?

14         A.    She lives here with us.

15         Q.    Her name?

16         A.    Francis White.

17         Q.    Is your ex-husband still a police officer in

18    Miami Lakes?

19         A.    Yes.  It's Miami Springs though.

20         Q.    Miami Springs.  Just wanted to make sure.

21    Somehow I knew I didn't have that right.

22         A.    Okay.

23         Q.    One more thing I need to look at, and we are

24    almost there.  Okay.  I am done.

25              MR. CRUANES:  We'll waive.
```

KLEIN, BURY & ASSOCIATES, INC.

1          (Thereupon, the deposition was cocluded at

2     10:45 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KLEIN, BURY & ASSOCIATES, INC.

```
 1

 2
     STATE OF FLORIDA    )
 3                       )
     COUNTY OF BROWARD )
 4

 5

 6

 7         I, EVELIN SIERRA, Court Reporter, certify that

 8    I was authorized to and did stenographically report

 9    the foregoing proceedings and that the transcript is

10    a true and complete record of my stenographic notes.

11         DATED this 21st day of November, 2000

12

13

14    _____

15         EVELIN SIERRA, Court Reporter
           and Notary Public, State of
16         Florida at Large.

17

18

19

20

21

22

23

24

25
```

KLEIN, BURY & ASSOCIATES, INC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SCOTT EARLEY.

CASE NO. 00-6104-CIV-ZLOCH

Plaintiff.

MAGISTRATE JUDGE SELTZER

v.

SHERIFF OF BROWARD COUNTY.
FLORIDA,

Defendant.

_____/

## PLAINTIFF'S NOTICE OF SERVICE
## OF ANSWERS TO DEFENDANT'S INTERROGATORIES

Plaintiff, Scott Earley, hereby gives notice of service of his original answers to Defendant's

General Liability Interrogatories numbered 1 - 37 propounded on June 2, 2000.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by U.S.

mail to Alan C. Anchell, Esq., Bunnel, Woulfe, Kirschbaum, Keller, Cohen & McIntyre, P.A.,

Attorneys for Defendant, 888 East Las Olas Boulevard. Suite 400, Fort Lauderdale, FL 33303-0340

this ___ day of July, 2000.

HIGH, STACK, PALAHACH
& CRUANES
3929 Ponce de Leon Boulevard
Coral Gables, Florida 33134
Telephone: (305) 443-3329

By: _____

Carlos Cruanes
Florida Bar No.0121940

1

## ANSWERS TO GENERAL LIABILITY INTERROGATORIES

1.  Scott Raymond Earley
    590 NW 66 Avenue
    Plantation, Florida 33317
    Date of Birth:          2-16-72
    Social Security No.:    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
    Driver's License No.:   E640796720560
    No Spouse
    Single
    Never been married
    No children

2.  12/1997 - 3/1998       Internet Global Communications
                           On-Line Talk Show Host
                           $300.00 per week
                           Immediate Supervisor -Stephen Bauer
                           No contact information available

    8/1997 - 12/1997       Alton Entertainment, Miami Beach, Florida
                           Associate Producer
                           $600.00 per week
                           Immediate Supervisor -Michael McMoore

    6/1997 - 8/1997        Five Star Productions, Delray Beach, Florida
                           Associate Producer
                           $500.00 per week
                           Immediate Supervisor - Laura Bailey
                           Owner - Scott Wooley

    8/1996 - 8/1997        TV Innovations, Fort Lauderdale, Florida
                           Associate Producer
                           $400.00 per week
                           Immediate Supervisor - Patti Elliott
                           Owner - Ron Godfrey

    1/1996 - 8/1996        Information Television Network, Boca Raton, Florida
                           Associate Producer
                           $400.00 per week
                           Immediate Supervisor - John Santicerma

    4/1995-12/1995         Grantal, Inc., Fort Lauderdale, FL
                           Cold Caller

2

                    $200.00 per week
                    Immediate Supervisor - Scott Udine

11/1994 - 4/1995     Prudential Securities, Plantation, Florida
                    Cold Caller
                    $200.00 per week
                    Immediate Supervisor - Michael Cohen

3/1993 - 11/1994     PCM Securities, Fort Lauderdale, FL
                    Cold Caller
                    $200.00 per week
                    Immediate Supervisor - Richard Ginsburg
                    Owner - Donald O'Shey

The rest of my time I was in school at Broward Community College.

3.     Graduated Cooper City High School with Diploma in 1990
       Went to Broward Community College but did not earn a degree major Theatre.
       Went to Johnson and Lipman training center for Series 7 Licence to become a stockbroker

4.     I did not consume alcohol or take drugs or medication because I was in the custody of
Broward County Jail.

5.     No crime or conviction

6.     Car accident on 3-15-98. Severed spinal cord and was paralyzed from the waist down.
Dislocated hip and shattered femur bone.

7.     Dr. Arlene Richards
       4100 South Hospital Drive
       Suite 300
       Plantation, Florida 33317
       954-797-0601

       Carl Henry Health South Rehab Center

       Dr. Jeffrey Marks
       7390 N.W. 5th Street
       Plantation, Florida 33317
       954-587-7010

8.     Medicaid from May, 1998 only

3

9.    Yes, paralyzed from the waist down which produced back pain and eating disorders.

10.    Toe nails were bleeding because I was not provided with circulation socks and left barefoot. Stomach pains, chest pain when breathing, blood in urine, urinary tract infection, pain in lower back, ulcer on sacrum open and bleeding. I had a decubitus ulcer on my sacral opening, which with constant treatment had been reduced to a sacrum grade 1 when I entered the detention facility. Because of the lack of medical treatment, it turned into a grade 4 by the time I was released. I also suffered a relapse in my mental adjustment to my paralysis, and to my desire to go on.

11.    Yes.

My treating physician was:
Dr. Arlene Richards
4100 South Hospital Drive
Suite 300
Plantation, Florida 33317
954-797-0601

12.    Dr. Arlene Richards
4100 South Hospital Drive
Suite 300
Plantation, Florida 33317
954-797-0601
Approximately $530.00
General practitioner.

Plantation Hospital
401 N.W. 42 Avenue
Plantation, Florida 33317
Total charges unknown.
Treated for chest / abdominal pains, urinary tract infection, and sacral decubitus ulcer.

13    I am a paraplegic and will continue to receive medical treatment for the rest of my life. My condition and injuries were worsened due to the lack of medical attention while I was incarcerated. I will continue to see my primary care physician, Dr. Arlene Richards, and any other health care providers as they become necessary. Their names are unknown at this time.

14.    I have never served in the military service.

15    Geico Insurance Company
4295 Ocmulgee East Boulevard
Macon, GA 31295-0001
Bodily injury liability claim made for automobile accident which occurred on March 15, 1998.

4

Scott Earley v. Sheriff of Broward County, Florida
CASE NO. 00-6104-CIV-ZLOCH

Agency for Health Care Administration
Medicaid Third Party Liability
P.O. Box 12900
Tallahassee, FL 32317-2900
Claim for medical expenses resulting from an automobile accident which occurred on March
15, 1998.

16.    Not applicable.

17    Not applicable.

18.    None

19    Patsy White
       590 N.W. 66 Avenue
       Plantation, FL 33317

       Michael J. Earley
       5631 G. S.W. 11 Street
       Margate, FL 33068

       Chris Pare
       North Broward Detention Center
       1550 N.W. 30th Avenue
       Pompano Beach, Florida

       Dr. Arlene Richards
       4100 South Hospital Drive
       Suite 300
       Plantation, Florida 33317

20.    None

21    None

22.    Unknown at this time.

23.    On or about February 16, 1999, I was, as a result of misdemeanor proceedings, confined in
the North Broward Detention Facility, located in Broward County, and operated by the Sheriff of
Broward County to serve a sentence of ten days. The Court chose this facility because it allegedly

5

could accommodate my condition.

Defendant's agents at the facility were well aware of my condition. Aside from the obvious nature of my condition, prior to my incarceration, my mother, Patsy White, made it very clear to Judge Trachman of my medical condition and of my special medical needs. At my sentencing hearing on January 25, 1999, the judge stated that I would be treated as if I were in a medical facility and that all my special needs for my injuries would be taken care of. On February 8, 2000, eight days prior to my incarceration, my doctor, Dr. Mack, wrote a list of prescriptions and of my special needs and faxed it twice to the infirmary at the North Broward County Detention Facility.

The nature of my condition renders me unable to care for myself. I was routinely "parked" and forgotten; I am supposed to catheterize every five to six hours with my own catheterization materials, but instead was only allowed to catheterize twice a day, and with the wrong size tubing with no lubrication. As to my bowel needs. I need to be put on my side and cleaned once I am done. This was not done, and I remained in my own feces for quite some time. As a result, I developed severe decubitus ulcer infections.

I repeatedly complained as my condition worsened, and was simply ignored and told to shut up. When I insisted, disciplinary actions were taken against me and I was placed in isolation.

Upon the arrival of my scheduled release date February 26, 1999, agents of the Defendant, took me outside and left me there alone in fifty degree weather, to await my mother, in a pair of shorts and a shirt.

24.    No

25.    No

26.    Judge Lisa Trachman
       Date of sentencing - 1-25-99

27.    Aside from the obvious nature of my condition, prior to my incarceration, my mother, Patsy White, made it very clear to Judge Trachman of my medical condition and of my special medical needs. At my sentencing hearing on January 25, 1999, the judge stated that I would be treated as if I were in a medical facility and that all my special needs for my injuries would be taken care of. On February 8, 2000, eight days prior to my incarceration, my doctor, Dr. Mack, wrote a list of prescriptions and of my special needs and faxed it twice to the infirmary at the North Broward County Detention Facility.

28.    Chris Pare
       North Broward Detention Center
       1550 N.W. 30th Avenue
       Pompano Beach, Florida

6

Scott Earley v. Sheriff of Broward County, Florida
CASE NO. 00-6104-CIV-ZLOCH

Several other guards whose names will be ascertained through discovery.

29.    Yes, I had a decubitus ulcer on my sacral opening, sacrum grade 1 when I entered the detention facility. It turned into grade 4 by the time I was released.

30.    I am paralyzed from the waist down and therefore I need assistance for bowel and urinary needs. I need to catheterize every five to six hours, and as to my bowel needs, I need to be put on my side and cleaned once I am done. While at the North Broward Detention Facility, these needs were ignored and caused my decubitus ulcer to become infected.

31.    On February 22, 2000, I was formally disciplined (see documents attached to Request for Production request #13) for refusing to stop pressing the medical assistance button because I needed my catheterization materials, and was refused. I am supposed to catheterize every five to six hours, but instead was only allowed to catheterize twice a day, and with the wrong size tubing with no lubrication. As a result, I was left in isolation, barefoot, my medical needs ignored.

32    The names of the individual guards will be ascertained through discovery.

33.    I was released in a pair of shorts and a shirt in the early morning hours of February 26, 2000, and left in the parking lot of the facility in fifty degree weather to wait for my mother to pick me up. I was transported at 3:00 a.m. directly to the emergency room at Plantation Hospital by my mother, Patsy White.

34.    Plaintiff is paralyzed from the waist down and is unable to care for his medical, bowel and urinary needs. The Defendant failed to provide Plaintiff with proper medical care and attention, as detailed in the instructions sent by Dr. Marks.

35.    The standard as set forth in the United States Supreme Court in Estelle v. Gamble 439 U.S. 97 (1976), is that "deliberate indifference to the serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment whether the indifference is manifested by prison doctors...or by prison guards..."

36.    See the answers above.

37    See the answers above.

7

## GENERAL LIABILITY INTERROGATORIES
### TO PLAINTIFF SCOTT EARLEY

In accordance with Rule 1.340(e) of the Fla. R. Civ. P., sufficient space has been provided after each interrogatory for the answer to be inserted. However, if more space is needed, you should append the answer to the interrogatory, making reference to such attachment in the space provided for the answer. The Rule does not provide for placing all the answers on a single, separate page.

(If answering for another person or entity, answer with respect to that person or entity, unless otherwise stated.)

1.      State your full name, any other names by which you have been known, your age, present address, date of birth, social security number, driver's license number, the name and address of your present spouse, periods of all marriages, and if you have children, their names, current addresses and ages.

2.      List the names, business addresses, dates of employment, and rates of pay regarding all employers, including self-employment, for whom you have worked in the past ten (10) years, stating your job title and the name of your supervisor.

2

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

3.    Describe your education and also special training and experience for work in business or profession listing the names and addresses of all schools, colleges and occupational programs attended, and as to each, give the dates of attendance and any diplomas or degree you earned.

4.    Did you consume any alcoholic beverages or take any drugs or medications within 12 hours before the time of the incident described in the complaint? If so, state the type and amount of alcoholic beverages, drugs, or medication which were consumed, and when and where you consumed them; and if you have ever been a habitual user of alcohol or drugs, give the nature and date of such use, and if you received treatment for drug addiction or alcoholism, give the date of all such treatment, and the names and addresses of the persons and entities rendering such treatment.

5.    Have you ever been convicted of a crime, other than any juvenile adjudication, which under the law under which you were convicted was punishable by death or imprisonment in excess of 1 year, or that involved dishonesty or a false statement regardless of the punishment? If so, state as to each conviction the specific crime and the date and place of conviction.

3

6.    List all accidents and personal injuries of any kind that you suffered before or since the happening of the incident or accident which is the subject of this litigation, and as to each such accident or injury state the names and addresses of any other parties involved, date, time, place and nature of the accident or injury, the names and addresses of the health care providers (including but not limited to physicians, chiropractors, podiatrists, dentists, psychologists, visiting nurses, hospitals, clinics and ambulatory care centers) involved in your care, treatment or examination, the names and addresses of insurance companies and agencies and adjusting offices involved, and if suit was filed or a compensation claim made, the date of the suit or claim and the court or tribunal in which it was filed.

7.    State the names and addresses of all health care providers (including but not limited to physicians, chiropractors, podiatrists, dentists, psychologists, visiting nurses, hospitals, clinics and ambulatory care centers) involved in your care, treatment or examination during the 10 years preceding the accident or incident which is the subject of this litigation, and as to each state the date and nature of the ailment, injury, illness or other reason for which care, treatment or examination was required and the nature of any operations performed.

8.    State the names and addresses of all insurance carriers or other entities with whom you have had any medical, hospital or disability coverage in the past 10 years and as to each, state the policy number, the type of coverage provided, the dates of coverage, if canceled the reason for cancellation, and the date, nature and claim number of all claims filed.

4

9.    Were you suffering from physical infirmity, disability, or sickness at the time of the incident described in the complaint? If so, what was the nature of the infirmity, disability, or sickness?

10.   Describe each injury for which you are claiming damages in this litigation specifying the part of your body that was injured, the nature of the injury, and as to any injuries you contend are permanent, the effects on you that you claim are permanent.

11.   Have you ever had an injury or medical problem with the same part of your body that you described and referred to in your answer to Interrogatory No. 10? If so, describe any and all treatment, the name and address of who provided the treatment, the dates of treatment and the results.

5

12.    List the names and addresses of each health care provider (including but not limited to physicians, chiropractors, podiatrists, dentists, psychologists, visiting nurses, hospitals, clinics, and ambulatory care centers) who has been involved in your care, treatment or examination since the accident or incident which is the subject of this litigation and as to each, state the dates and nature of the care, treatment and examination, the amount of all charges incurred, all disability ratings given, and state whether you are claiming that such care, treatment or examination was necessitated by the accident or incident which is the subject of this litigation.

13.    If it will be necessary for you to have any future treatment by reason of the accident or incident which is the subject of this litigation, state the future medical treatment you will need and the names and addresses of the health care providers you expect to render such treatment.

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

14.  If you have ever served in the military forces of any country or if you have ever been treated at any service related medical facility, please state the branches in which you served, the dates of your service, your rank upon discharge, the nature of discharge (honorable, dishonorable, medical, etc.) where you were last stationed, the name and address of all medical facilities in which you were examined, treated or confined, the date of each examination, treatment or confinement and date and description of all service connected disabilities together with the percentage of disability and dollar amount of disability payments received.

15.  Please identify all claims by you for personal injuries (in court or directly with an insurance company or individual) and claims under worker's compensation, unemployment compensation, Medicaid, welfare, food stamps, HRS and Social Security Disability benefits, that you have ever made, including the date of each claim and the name and address of individual/agency with whom it was made.

16.  List all activities which you engaged in prior to the accident or incident which is the subject of this litigation which you contend you are either not able to do because of the incident or accident or are able to do less frequently or well and as to each indicate that frequency with which you did the activity prior to and since the accident or incident.

7

17. If you claim to have lost wages or other income as a result of the accident or incident which is the subject of this litigation, state as to each the nature of the wages or income lost, the amount lost, the period during which it was lost, the dates of any lost time from work, and the names and addresses of the persons and entities that would have otherwise paid you the wages or other income.

18. If you claim expense or loss not otherwise listed in the answers to these interrogatories, state the date on which each such expense and loss was incurred, the amount of each expense and loss and the name, address and phone number of any person or entity with whom any such expense was incurred.

19. State the names, addresses and phone numbers of all persons (other than experts) believed by you or known by you or your attorney to have any knowledge pertaining to any of the issues which are the subject of this litigation, and specify the subject matter about which the witness has knowledge.

8

20.  State whether you or your attorneys have any written or recorded statements of any persons (not expert) including any defendant in this litigation and, if so, state as to each the name, address and phone number of the person giving the statement; the date the statement was obtained, the name, address and phone number of the person who obtained it, and whether it is written or recorded.

21.  If you overheard any statements or conversations by any defendants, or any representative of any defendants, or any other persons regarding the accident or incident which is the subject of this litigation, state as to each the name, address and phone number of the person making such statement, the capacity or relationship of the person, (bystander, agent of a party, employee of a party, etc.) making such statement, and the names, address and phone numbers of any other persons present at the time of such statement.

22.  Do you intend to call any expert witnesses at the trial of this case? If so, identify each witness; describe his qualifications as an expert; state the subject matter upon which he is expected to testify; state the substance of the   facts and opinions to which he is expected to testify and give a summary of the grounds for each opinion.

SUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

23.   State in detail exactly how the incident alleged in the Complaint occurred, how you contend the Defendants violated your civil rights and/or maliciously prosecuted or falsely imprisoned or arrested you, and all facts which support these contentions and include all actions taken by you to prevent the incidents.

24.   Have you made an agreement with anyone that would limit the party's liability to anyone for any of the damages sued upon in this case? If so, state the terms of the agreement and the parties to it.

25.   Please state if you have ever been a party, either plaintiff or defendant, in a lawsuit other than the present matter, and, if so, state whether you were plaintiff or defendant, the nature of the action, and the date and court in which such suit was filed.

26.    State the name of the Judge who sentenced Plaintiff to the North Broward Detention
       Facility and provide the date of sentencing.

27.    State the factual basis of your assertion in Paragraph 7 of Amended Complaint, and
       state the nature of the condition of which Defendant was allegedly aware.

28.    State the identities of each of Defendant's agents you claim were told of the specials
       needs of the Plaintiff, as alleged in Paragraph 8 of Plaintiff's Amended Complaint.

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 ▪ (954) 761-8600

29.    State whether Plaintiff had any decubitus ulcers on his body at the time he entered the North Broward Detention Facility. If any decubitus ulcers existed, state the location of each ulcer and the grade of each ulcer.

30.    Specifically state the bowel and urinary needs of the Plaintiff at the time he was incarcerated at the North Broward Detention Facility.

31.    State what disciplinary actions were alleged taken against Plaintiff as a result of his pleas for medical assistance as referenced in Paragraph 10 of Plaintiff's Amended Complaint.

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

32.    Identify each individual who was told of Plaintiff's medical complaints and identify
       which individuals told Plaintiff to "shut up" in response to Plaintiff's Complaints.

33.    Upon Plaintiff's release from the North Broward Detention Facility, explain how
       Plaintiff was transported from the facility, providing the name and address of the
       person who transported him.

34.    State with specificity how Defendant failed to provide Plaintiff with necessary and
       adequate medical care as alleged in Paragraphs 12 and 13 of Plaintiff's Amended
       Complaint.

BUNNELL, WOULFE, KIRSCHBAUM, KELLER, COHEN & McINTYRE, P.A., PO DRAWER 030340, FORT LAUDERDALE, FL 33303-0340 • (954) 761-8600

35.    State in detail the standards for delivery of medical care for an inmate in a County facility as referenced in Paragraph 14 of Plaintiff's Amended Complaint.

36.    State the factual basis for the allegation contained in Paragraph 16 of the Amended Complaint.

37.    State the factual basis for the allegation contained in Paragraph 17 of the Plaintiff's Amended Complaint.

_____

SCOTT EARLEY

STATE OF Florida )
                          ) ss:
COUNTY OF Miami-Dade )

SCOTT EARLEY, being duly sworn upon oath deposes and says that he is the Plaintiff
in the aforementioned case. and that the foregoing answers to Interrogatories are true and
correct to the best of his knowledge. information, and belief.

The foregoing instrument was acknowledged before me this 12 day of June .
2000, by Scott Earley , (who is (personally known to me)(or who has
produced)_____ (as identification) and who (did/did not) take an oath.

_____
Linda J. Foytik
Notary Public, State of Florida
at Large
(Signature of Notary)

_____
Linda J. Foytik
(Name of Notary Typed,
Printed or Stamped)

_____

(Commission Number)

OFFICIAL NOTARY SEAL
LINDA J FOYTIK
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC613305
MY COMMISSION EXP. JAN. 13,2001

15