UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SCOTT EARLEY,                          CASE NO.: 00-6104-CIV-ZLOCH

    Plaintiff,                         MAGISTRATE JUDGE SELTZER

v.

SHERIFF OF BROWARD COUNTY,
FLORIDA and EMSA CORRECTIONAL
CARE. INC., a corporation

    Defendants.

_____/



### *DEFENDANTS' UNDISPUTED STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT*

Pursuant to *Rule 56 of the Federal Rules of Civil Procedure* and *Local Rule*

*7.5*, the Defendants. SHERIFF OF BROWARD COUNTY (hereinafter referred to

as "SHERIFF") and EMSA CORRECTIONAL CARE, INC., (hereinafter referred

to as "EMSA"), move for entry of a final summary judgment in their favor as to all

of the Plaintiff's claims in this case. In support of their motion, Defendants submit

the following Statement of Facts, which are undisputed by the Defendants for

purposes of this motion only. [1]

_____

[1] The deposition of Scott Earley is being filed simultaneously with this motion
and is attached as Exhibit 1.

AUG 1 5 2001

1. SCOTT EARLEY was involved in an automobile accident on March 15, 1998 in which he was the driver of the vehicle involved in the accident. (Deposition of SCOTT EARLEY. Pgs. 12-13)

2. SCOTT EARLEY was charged with driving under the influence of alcohol as a result of this accident, and was sentenced to six (6) months probation, ten (10) days of jail time, as well as various fines and restitution. (Deposition of SCOTT EARLEY, Pg. 14)

3. SCOTT EARLEY had previously been charged with driving under the influence of alcohol in the state of Florida in September of 1992. (Deposition of SCOTT EARLEY, Pg. 15)

4. SCOTT EARLEY was rendered a paraplegic as a result of the injuries he sustained in the automobile accident which occurred on March 15, 1998. (Deposition of SCOTT EARLEY, Pg. 12).

5. SCOTT EARLEY entered the Broward County Main Jail on February 16, 1999. (Deposition of SCOTT EARLEY, Pg. 15).

6. The SHERIFF has contracted with EMSA to provide medical staffing at each of its jail facilities in Broward County. (Please see Plaintiff's Second Amended Complaint. Pg. 6).

7. While SCOTT EARLEY was at the Broward County Main Jail he

2

spoke to an EMSA nurse who was very cooperative in trying to ascertain the medications which SCOTT EARLEY was taking prior to his incarceration, and in learning what medical supplies SCOTT EARLEY required for his medical conditions. (Deposition of SCOTT EARLEY, Pg. 40).

8.    At the time that SCOTT EARLEY entered the Broward County Jail on February 16, 1999 he had a sacral decubitus ulcer which had been there for approximately four to five months prior to his incarceration. (Deposition of SCOTT EARLEY, Pg. 32)

9.    SCOTT EARLEY had suffered from chronic decubitus ulcers since March 15, 1998, the date of his automobile accident, and was receiving treatment for his decubitus ulcers prior to his incarceration (Deposition of SCOTT EARLEY, Pg. 32).

10.    SCOTT EARLEY was taking Pancrease, a medication for pancreatitis, and Backlofin, a muscle relaxant, at the time of his incarceration. (Deposition of SCOTT EARLEY, Pg. 22).

11.    SCOTT EARLEY was transferred from the Broward County Main Jail to the North Broward Detention Center after he had spent one night at the Main Jail. (Deposition of SCOTT EARLEY, Pg. 40).

12.    SCOTT EARLEY received medication and supplies for his medical

3

condition, including catheters, during his incarceration, however, disagreed with the manner in which the medical care was provided and did not think the medical care was sufficient to keep up with his special medical needs. (Deposition of SCOTT EARLEY, Pgs. 35 and 36).

13.    SCOTT EARLEY was incarcerated in the jail for ten days, and was released in the early morning hours of February 26, 1999. Upon his release, MR. EARLEY was directed to a telephone outside the jail so that he could call for a ride home. Due to security reasons, MR. EARLEY was required to wait outside the jail for his mother to pick him up after his release from the jail. (Deposition of SCOTT EARLEY, Pgs. 14, 38, 39).

14.    Subsequent to his release, SCOTT EARLEY sought treatment at Plantation General Hospital related to complaints of abdominal pain, and discolored urine. SCOTT EARLEY received wound care related to his decubitus ulcer while at Plantation General Hospital, and was released to go home after having only been at the hospital for a few hours. (Deposition of SCOTT EARLEY, Pgs. 29, 31).

15.    SCOTT EARLEY did not file any grievances related to his medical care during the ten days he was incarcerated in the Broward County Jail facilities. (Deposition of SCOTT EARLEY, Pg. 37)

I HEREBY CERTIFY that a true and correct copy of the foregoing MOTION

4

FOR SUMMARY JUDGMENT was furnished this __10__ day of August, 2001, by

U.S. Mail, postage prepaid, to: CARLOS CRUANES, ESQUIRE, HIGH,

STACK,PALAHACH & CRUANES, Attorneys for Plaintiff, 2655 LeJeune Road,

Suite 1108, Coral Gables, Florida 33134.

> BUNNELL, WOULFE, KIRSCHBAUM,
> KELLER, McINTYRE & GREGOIRE, P.A.
> Attorneys for Defendants
> 888 East Las Olas Blvd., Suite 400
> Fort Lauderdale, FL 33301
> (854) 761-8600

Dated: August 10, 2001

By: _____

Ft. Lauderdale, Florida

JODI C. PAGE

FBN: 0174629

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:   00-6104-CIV-ZLOCH
MAGISTRATE JUDGE SELTZER

SCOTT EARLEY,

     Plaintiffs,

vs.

**ORIGINAL**

SHERIFF OF BROWARD COUNTY,
FLORIDA

     Defendants.

_____/

590 NW 66th Avenue
Plantation, FL 33317
November 7, 2000
9:30 a.m.

## DEPOSITION OF SCOTT EARLEY

     Taken before EVELIN SIERRA, Court Reporter,
and Notary Public, in and for the State of Florida, at
Large, pursuant to a Notice of Taking Deposition.

Exhibit 1

KLEIN, BURY & ASSOCIATES, INC.

```
 1

 2   APPEARANCES:

 3          Carlos Cruanes, Esquire
            appearing on behalf of the Plaintiff.
 4
            BUNNEL, WOULFE, et al.
 5          Gregg A. Toomey, Esquire
            appearing on behalf of the Defendant.
 6

 7                         - - - - -

 8
     WITNESS                      DIRECT    CROSS
 9
     SCOTT EARLEY
10     by: Mr. Toomey                 3

11                         - - - - -

12

13   DEFENDANT'S EXHIBITS FOR IDENTIFICATION:

14   1 - Log for Scott's Incarceration

15   CERTIFIED QUESTIONS:   NONE

16                         - - - - -

17

18

19

20

21

22

23

24

25
```

```
 1    Thereupon:

 2                        SCOTT EARLEY

 3    was called as a witness and having been first duly

 4    sworn, was examined, testified, and stated as follows:

 5              THE WITNESS:  I do.

 6                     DIRECT EXAMINATION

 7    BY MR. TOOMEY:

 8         Q.   Please state your name for the record?

 9         A.   Scott Earley.

10         Q.   Spell your name, please.

11         A.   E-A-R-L-E-Y.

12         Q.   And do you have a middle name, Scott?

13         A.   Yes, I do.  Raymond.

14         Q.   I am going to ask you a series of questions

15    pursuant to my notice of deposition.  I ask that if

16    you don't understand any of my questions, please ask

17    me to rephrase it, and I will be happen to rephrase if

18    you ask me to.

19              If you answer my questions without asking me

20    to rephrase, I will assume that you understood my

21    question, and the answer you give was to my question.

22              What is your current residential address?

23         A.   590 NW 66 Avenue.

24         Q.   And is that where we are today?

25         A.   Yes.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1       Q.   Who owns this home?

 2       A.   John White and Patricia White.

 3       Q.   Is Patricia White your mother?

 4       A.   Yes.

 5       Q.   What is your relationship with John White?

 6       A.   He's my stepfather.

 7       Q.   Who is your birth father?

 8       A.   Michael James Earley.

 9       Q.   Is Michael James Earley located in this

10   area?

11       A.   No.  He is located in Miami Springs,

12   Florida.

13       Q.   Do you happen to know his address?

14       A.   I don't.  I know it is located in Virginia

15   Gardens.

16       Q.   What is your social security number?

17       A.   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.

18       Q.   Your date of birth?

19       A.   February 16, 1972.

20       Q.   Are you currently employed?

21       A.   No, I am not.

22       Q.   When was the last time you were employed?

23       A.   March 15, 1998.

24       Q.   And by whom were you employed at that time?

25       A.   Internet Global Communications.
```

KLEIN, BURY & ASSOCIATES, INC.

1     Q.    Internet?

2     A.    Yes.

3     Q.    What is your position with Internet Global?

4     A.    Internet talk show host.

5     Q.    What does an internet talk show host do?

6     A.    It's a talk show host that is mainly on the

7    Internet.  It is not broadcast on television.

8     Q.    How does that work?

9     A.    It works -- I can't tell you the exact

10   technical, but it works through video going into the

11   computer video camera, and I had a microphone, a head

12   set microphone on.

13          What we would do is, we would broadcast on

14   the Internet through Broadband through different clubs

15   in Fort Lauderdale and South Beach.

16    Q.    What is the business address of Internet

17   Global Communication?

18    A.    I believe they went out of business.

19    Q.    Do you know when they went out of business?

20    A.    I believe it was October or November of

21   1998.

22    Q.    Who was your supervisor at Internet Global

23   Communications?

24    A.    Steven Halpern.

25    Q.    Do you know the location of Mr. Halpern?

KLEIN, BURY & ASSOCIATES, INC.

1      A.    No, I do not.  I do understand that he still

2    runs Dick De'Vince's (phonetic spelling) club, but I

3    don't know where their facility is.

4      Q.    And what was your rate of pay when you were

5    working for Internet Communications?

6      A.    I was doing $100 a show.

7      Q.    How many shows would you do in an average

8    week?

9      A.    Three to four.  It depends on the week.

10     Q.    Okay.  That employment ended in March of

11   1998?

12     A.    Correct.

13     Q.    Where did you work before that?

14     A.    I worked at Alton Entertainment in Miami

15   Beach, Florida.

16     Q.    What was your position there?

17     A.    I was associate producer for the television

18   show Crook and Chase.

19     Q.    What were you doing as an associate

20   producer?

21     A.    I would look at different technologies that

22   were out, that were coming out, and I would make five

23   to ten minute segments on the Crook and Chase Show,

24   and then I would call the company that was making this

25   particular technology, and try to get sponsorship from

KLEIN, BURY & ASSOCIATES, INC.

1    the company for that five to ten minute segment.

2         Q.    Is that the country music show?

3         A.    Yes.    It is a talk show.    It was a morning

4    talk show, I believe on TNT.

5         Q.    What kind of technologies are we talking

6    about here?

7         A.    Like every day household products

8    technologies, new business that would come out or new

9    household appliances.

10        Q.    This is something that the talk show host

11   would talk about?

12        A.    Yes.

13        Q.    And what was your remuneration for that

14   employment?

15        A.    I received $600 dollars a week.

16        Q.    And who was your supervisor there?

17        A.    I can't remember.

18        Q.    Does Alton Entertainment still exist to your

19   knowledge?

20        A.    I believe so.

21        Q.    And how long were you employed by Alton

22   Entertainment?

23        A.    Six months.

24        Q.    Did that employment end as a result of --

25   you went to Internet Global Communications after some

KLEIN, BURY & ASSOCIATES, INC.

```
 1    period --
 2         A.    Correct.
 3         Q.    Wait for me to finish my question.
 4               Was it some period of time before you
 5    changed jobs?
 6         A.    There was a two-week lull.
 7         Q.    Okay.  We'll do one more.  Prior to Alton
 8    Entertainment, where did you work?
 9         A.    Five Star Productions in Delray Beach.
10         Q.    What was your position there?
11         A.    Associate producer.
12         Q.    What were your duties?
13         A.    Same.  I just worked on a different show
14    called Today's Environment, and also Parenting in the
15    Nineties.  I worked on two shows.
16         Q.    What was your rate of pay there?
17         A.    $400 a week.
18         Q.    How long were you employed by Five Star
19    Productions?
20         A.    That was another six months.
21         Q.    And the name of your supervisor there?
22         A.    Laura Bailey.
23         Q.    Do you know the whereabouts of Ms. Bailey?
24         A.    She is still in Delray Beach.
25         Q.    Is she still employed by Five Star
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1    Productions, to your knowledge?

 2         A.    Yes, sir.

 3         Q.    Let's talk about your education.  Where did

 4    you go to high school?

 5         A.    Cooper City High School in Florida.

 6         Q.    You graduated from Cooper City?

 7         A.    Correct.

 8         Q.    And after you graduated from Cooper City you

 9    attended college?

10         A.    I attended community college, but I did not

11    receive a degree.

12         Q.    Where did you attend community college?

13         A.    Broward Community College.

14         Q.    What were you studying?

15         A.    My major was theater.  My minor was

16    management.

17         Q.    How long were you attending Broward

18    Community College?

19         A.    On and off for about a year and a half.

20         Q.    Do you have any other post secondary

21    education?

22         A.    I'm not really sure.  I guess this would be

23    technical.  I went to Johnson Littman for the Series

24    Seven test.

25         Q.    What is the Series Seven test?
```

KLEIN, BURY & ASSOCIATES, INC.

```
1        A.    A test to get your license to become an

2   investment advisor.

3        Q.    Did you get that license?

4        A.    No, I did not.

5        Q.    How long did you attend Johnson and Littman?

6        A.    Two months.

7        Q.    Why did you leave?

8        A.    It wasn't that I left.  It was a two-month

9   course.

10        Q.    So you completed the course?

11        A.    I completed the course, and I took the test,

12   and I failed.

13        Q.    You have to wait for me to finish my

14   question?

15        A.    I apologize.

16        Q.    I understand everybody in the room

17   understands what we are doing, but the court reporter

18   cannot take both of us down at the same time.

19        A.    I apologize once again.

20        Q.    That's okay.  When did you take your Series

21   Seven test?

22        A.    I took it three times.  I don't know the

23   exact dates.  I know they were in the years of '92 or

24   '93.

25        Q.    You studied for the Series Seven test, but
```

KLEIN, BURY & ASSOCIATES, INC.

 1    somehow you ended up in television work?

 2         A.    Yes.

 3         Q.    Tell me how that happened?

 4         A.    Well, right after I would say my bartending

 5    experience one of my friends allowed me the chance of

 6    becoming a stockbroker, and I would first have to

 7    become a cold caller for a security firm called TCMS

 8    Securities, this is back in September of '92.

 9              So I went in there and I became a cold

10    caller, and I had to be a cold caller for three

11    months, before they gave me the opportunity to go to

12    Johnson and Littman to take my Series Seven test, and

13    I was with TCMS Securities.

14              Then I went to Gruntle (spelled

15    phonetically).   After Gruntle I went to Prudential,

16    after Prudential, I went back to Gruntle.   This was in

17    a span of maybe three years, and then I was also

18    interested in theater and television and I was looking

19    in the paper one day, and there was an advertisement

20    for associate producer for an independent television

21    production company, and I was just sick and tired of

22    the stock business and being a cold caller earning

23    $250 a week.

24              So I just decided to take a chance and

25    applied for the associate producer job.   That is how I

1    got into television.

2         Q.    You said you had experience as a bartender.

3    Where did you bartend?

4         A.    Higgy's (spelled phonetically).

5         Q.    I am sorry?

6         A.    Higgy's Cafe, old Marqui's place from the

7    Dolphins.  I also bartended in TGI Friday in Pembroke

8    Pines, and -- anywhere else?  I'm trying to remember.

9    In Kahoots.

10        Q.    When did you work in In Kahoots?

11        A.    I believe I worked there on and off from the

12   years of '92 to '94.

13        Q.    Okay.  Scott, tell us how it is that you

14   came to be paralyzed?

15        A.    On 3/15/98 I was in a car accident, which

16   resulted in the flip over of my vehicle, and it

17   ejected me out of the vehicle.  When paramedics

18   arrived on the scene they found that my spinal column

19   was sticking out of the skin, and my left leg was

20   wrapped around my neck.

21              As a result, I received a T12/L1 incomplete

22   injury, a dislocated left hip, and a shatter right

23   femur bone.

24        Q.    When you say you had an incomplete injury,

25   what does that mean?

```
 1        A.    There are two types of spinal cord injuries,
 2    there is incomplete and complete.  Incomplete means
 3    that there are some abrasions.  A complete injury
 4    means that the spinal cord is completely severed.
 5        Q.    I assume you were taken from the accident
 6    scene to the hospital, is that correct?
 7        A.    North Broward General Hospital.
 8        Q.    Where did that accident occur?
 9        A.    It occurred on 95 near Copans Road on the
10    ramp.
11        Q.    Was this a roll over accident, is that what
12    you said?
13        A.    Yes, it was.
14        Q.    Any other vehicles involved?
15        A.    One other vehicle.
16        Q.    Do you know who the driver of that vehicle
17    was?
18        A.    I cannot recall his name.
19        Q.    Were you arrested as a result of that
20    accident?
21        A.    I was not arrested, but I was charged.
22        Q.    What were you charged with?
23        A.    DUI.
24        Q.    How long were you in North Broward General
25    Hospital?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1         A.    From March until I think it was June,
 2    beginning of June.  Oh, no, I apologize, it is the end
 3    of April I was there til.
 4         Q.    From March until the end of April?
 5         A.    Yes, sir.  March 15 to the end of April.
 6         Q.    Okay.  Who were -- who were your treating
 7    physicians while you were at North Broward General
 8    Hospital?
 9         A.    I cannot recall those names.
10         Q.    All right.  You said you were charged with
11    DUI in that accident, is that correct?
12         A.    Correct.
13         Q.    What was the outcome of those proceedings?
14         A.    The DUI proceedings?
15         Q.    Yes, sir.
16         A.    I was sentenced to probation, ten days in an
17    institution and I believe some fines and retribution.
18         Q.    You were sentenced to probation for what
19    period of time?
20         A.    I believe six months.  Six, seven months, I
21    am not sure of the date.
22         Q.    You were detained in a facility?
23         A.    I was in the facility for ten days.
24         Q.    What facility was that?
25         A.    The Broward County Jail.
```

| | | |
|---|---|---|
| 1 | Q. | Which one? |
| 2 | A. | I believe the one in Pompano. |
| 3 | Q. | The North Broward Detention Facility? |
| 4 | A. | The North Broward Detention Facility, |
| 5 | correct, sir. | |
| 6 | Q. | You said you were ordered to make |
| 7 | restitution, is that correct? | |
| 8 | A. | Yes, sir. |
| 9 | Q. | Did you make that restitution? |
| 10 | A. | Yes, sir. |
| 11 | Q. | Is this your first DUI arrest? |
| 12 | A. | No, sir. |
| 13 | Q. | When were your other DUI arrests? |
| 14 | A. | I had a DUI arrest in '92.  In September of |
| 15 | '92. | |
| 16 | Q. | Where was that? |
| 17 | A. | That was in the Keys.  Mile marker 92. |
| 18 | Q. | Any others? |
| 19 | A. | No. |
| 20 | Q. | Okay.  So on what date did you enter the |
| 21 | North Broward Detention Facility? | |
| 22 | A. | February 16, 1999. |
| 23 | Q. | What date were you released, if you know? |
| 24 | A. | I don't.  I don't remember. |
| 25 | Q. | What was your sentence? |

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    Ten days.

 2        Q.    And is it likely you were released?

 3        A.    I can probably count on my fingers but --

 4        Q.    Okay.  It is not really important.  It is in

 5   the records.

 6              At the time you were admitted to North

 7   Broward Detention Facility, were you under the care of

 8   a physician?

 9        A.    Yes, I was.

10        Q.    Who was that physician?

11        A.    Arlene Richards, and Dr. Mack.

12        Q.    Do you know Dr. Mack's first name?

13        A.    Kenneth.

14        Q.    Are those two physicians partners?

15        A.    Yes, they are--

16        Q.    And when--

17        A.    -- and when one doctor is not in, the other

18   one is on call.

19        Q.    Do you know what those physicians'

20   specialties are?

21        A.    I believe they are general practitioners.  I

22   also believe Kenneth Mack is internal medicine.

23        Q.    Had you seen any other physicians on a

24   regular basis at the time?

25        A.    At the time I was seeing a urologist
```

KLEIN, BURY & ASSOCIATES, INC.

1    Dr. Jeffrey Mark.  I am sorry, Dr. Jeffrey Marks.

2         Q.   Do you know where Dr. Macks' office is?

3         A.   It's on fifth street here in Plantation.   I

4    don't know the exact address.

5         Q.   Where you seeing any other physicians at the

6    time?

7         A.   No, sir.

8         Q.   Were you receiving physical therapy at that

9    time?

10        A.   Yes, sir.

11        Q.   And who were you receiving physical therapy

12   from?

13        A.   Healthsouth Sunrise Rehabilitation Center.

14        Q.   And would you go to Healthsouth or would

15   they come to you?

16        A.   No, I would go there.

17        Q.   Were you seeing any other health care

18   providers in the period say a year before your

19   incarceration?

20        A.   I was being seen by -- a home health care

21   nurse would come in every day, and I guess just take

22   care of my bowel program and my wound and everything.

23        Q.   Who was the home health care provider, do

24   you remember?

25        A.   I don't remember.

KLEIN, BURY & ASSOCIATES, INC.

1    Q.    Do you still have somebody seeing you for

2    home health care?

3    A.    I have -- on November 16, I will have home

4    health care for like three or four days since my

5    caregiver will be gone on vacation.

6    Q.    And who will that be provided by?

7    A.    The folder is right over there.  Home Health

8    Corporation of America.

9    Q.    Where are they located?

10    A.    I believe Fort Lauderdale.

11    Q.    Back to Dr. Richards, and is it Richards or

12    Richard?

13    A.    Richards.

14    Q.    Back to Richards and Dr. Mack.  For what

15    ailments were you seeing those two physicians?

16    A.    Not really ailments, just I wanted them as

17    general practitioners, just someone that I can go to,

18    you know, if I had any problems or anything.  Because

19    before the accident I didn't have a doctor, and I knew

20    after the accident that I would need to go to the

21    doctor quite often because of my condition.

22    Q.    If you remember, prior to your

23    incarceration, when was the last time you saw either

24    Dr. Richards or Dr. Mack?

25    A.    A week prior, I believe.

KLEIN, BURY & ASSOCIATES, INC.

```
 1        Q.    And what was that for?

 2        A.    That was for the incarceration.  I had to

 3   get all of my medications, and all of my special needs

 4   faxed over to the Broward County Detention facility so

 5   I went in to see Dr. Kenneth Mack to have that done.

 6        Q.    Did Dr. Mack perform a physical examination

 7   at that time?

 8        A.    Yes, he did at that time.

 9        Q.    When you saw Dr. Mack prior to your

10   incarceration, did he make any findings of any sort or

11   did he just perform a physical examination and provide

12   the meds?

13        A.    Exactly.  He performed the physical

14   examinations and just, you know, just to make a list

15   of all the special needs and all the special

16   medications that I needed, and that is what we

17   consulted on that day as I recall.

18        Q.    But he didn't actually treat you for

19   anything, is that correct?

20        A.    No, sir.

21        Q.    In your complaint you say that when you

22   entered the Broward County Jail system, you had a

23   grade one decubitus, is that correct?

24        A.    I had grade one ulcers on my sacrum.

25        Q.    How do you know it was a grade one ulcer?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    That is what was told to me by Dr. Mack.

 2        Q.    When did Dr. Mack tell you that?

 3        A.    During the physical examination the week

 4   prior to my incarceration.

 5        Q.    When you entered the Broward County Jail

 6   system did you make the jail authorities aware that

 7   you had had what you call a grade one sacral ulcer?

 8        A.    Yes, and also my doctors as well.  He,

 9   Dr. Mack, faxed some papers including my special needs

10   as well as what was wrong with me including the wound.

11        Q.    How do you know Dr. Mack faxed papers

12   regarding your special needs especially in regards to

13   the sacral ulcer?

14        A.    He told me and also my mother that he did.

15        Q.    Do you have any documentation regarding what

16   Dr. Mack faxed?

17        A.    I don't.

18        Q.    Other than what Dr. Mack told you regarding

19   a grade one sacral ulcer, is there any documentation

20   that shows that -- strike it.

21              With the exception of what Dr. Mack told you

22   regarding the grade one ulcer, is there any

23   documentation that shows that you had a grade one

24   sacral ulcer at the time you entered the jail system?

25        A.    I believe it is in my medical records
```

KLEIN, BURY & ASSOCIATES, INC.

1    Dr. Mack, every time he sees me, writes down and

2    updates my record.  I believe it is in my medical

3    record.

4        Q.    Would it surprised you to find that the

5    medical records upon your entry to the Broward County

6    Jail system shows that you had a grade three sacral

7    ulcer on entry to the jail system?

8        A.    No, it would not surprise me at all.

9        Q.    Why would it not surprise you?

10        A.    Because I really cannot recall exactly what

11   Dr. Mack told me.

12        Q.    So you are not sure it was a grade one when

13   you entered the jail system, is that correct?

14        A.    That is correct.

15        Q.    While you were incarcerated in the North

16   Broward Detention facility were you seen by health

17   care providers?

18        A.    In the facility?  No, I wasn't.

19        Q.    You were never seen by a physician's

20   assistant or any nursing staff at any time, is that

21   your testimony?

22        A.    The first couple of days, no I was not.

23        Q.    That is not what I asked you, sir.

24              During your incarceration, during the whole

25   incarceration.

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    During the whole incarceration I was visited
 2   by a nurse maybe twice.
 3        Q.    Were you taking medication when you entered
 4   the Broward County Jail system?
 5        A.    Yes, I was.
 6        Q.    What were those medications?
 7        A.    Pancrease for -- I believe they removed my
 8   pancreas in November of '98, and ever since then I
 9   have been on the medication Pancrease, and I was
10   taking Backtofin for my back.  It was used to calm
11   down muscle spasms.
12        Q.    Those are the only medications you were
13   taking?
14        A.    Yes.
15        Q.    Do you recall being given a chest x-ray
16   while you were in the Broward County Jail system?
17        A.    No, I do not.
18        Q.    You do not recall being given a chest x-ray
19   on the 25th of February 1999, is that correct?
20        A.    That is correct.
21              MR. TOOMEY:  Let's go off the record.
22              (Off-the-record discussion.)
23              MR. TOOMEY:  We can go back on.
24   BY MR. TOOMEY:
25        Q.    In your complaint you state on paragraph 12
```

```
 1   that the act of the defendants in this case violated

 2   your constitutional rights.

 3            How do you claim that the actions of the

 4   sheriff's office violated your constitutional rights?

 5        A.   Well, it is my belief that not being given

 6   my medication or the proper utensils I would say such

 7   as catheters et cetera in form of a -- it was just in

 8   a form as a punishment as I saw it.  And when I asked

 9   for it, I was punished further.

10        Q.   When you say it was in the form of a

11   punishment, how do you know that?

12        A.   Well, the actions of the guards just

13   warranted -- I mean it just showed me that I was

14   punished, that it was punishment.

15            I can give you an example.  When I was

16   freezing cold, when I first got into the North

17   Detention Center, I was freezing cold and I guess I

18   wanted to get familiar with my surroundings, so I had

19   a blanket on my legs while I was in my wheelchair so I

20   can get some -- I wanted to get familiar with my

21   surroundings.  I decided to come out with the blanket

22   on.

23            The guard informed me that I could not have

24   a blanket on while I was out of my cell.  So I said

25   okay.  I went back into my cell, the TV was on in this
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1   room, there was a room with six cells in the room was
 2   a table, a TV.  I was in the far cell, and the TV was
 3   on.  So I had the blanket on, and there was a doorway.
 4   I was -- the doorway was maybe over my right leg, and
 5   I was -- three quarters of my body was in the cell,
 6   and from my right leg on was out of the cell, and my
 7   blanket was still on my legs because I was freezing
 8   cold.
 9           That is when the guard came around and
10   actually physically turned me around and pushed me and
11   said, you cannot have it outside.  And I was not
12   outside.  And that is when everything started taking
13   place.
14       Q.   I don't understand.  In your mind, how does
15   that equate to punishment?
16       A.   Well, that incident just snowballed into
17   other incidents.  They were -- I just I guess out of
18   anger and out of fear as well as the overall, the
19   other emotions that were going through me at the time
20   I just was steadfast, I was steaming.
21           I think I made a comment or two out loud not
22   directly to anybody, just generalizing, and I guess
23   I'm trying to recall here, I needed to cath myself
24   because at the time I didn't have any catheter tubes
25   in my cell, and after that -- it was right after that
```

KLEIN, BURY & ASSOCIATES, INC.

1    incident in fact that I pushed the emergency button.

2           I said I need a catheter. I need to cath

3    myself, because at the time I had not cath'd myself

4    for six hours, and I usually cath myself every four

5    hours.

6           I knew my bladder was getting extended so I

7    needed to cath myself, and because the incident just

8    occurred, I assumed that the guards were just thinking

9    that I wanted to get attention, which I wasn't.

10          I needed to get the catheterization tube so

11   I can relieve myself. And they wouldn't, they said

12   we'll get it to you. We'll get it to you. Fifteen

13   minutes went by, we will get it to you. I pressed the

14   emergency button, again we'll get it to you. We'll

15   get it to you.

16          I pressed the emergency button again within

17   an hour and a half, I pushed the emergency buttons

18   four times, and I still didn't get a catheterization

19   tube.

20          I believe on the fifth time they said

21   everybody was in lock down in this cell. Everybody

22   was against me because I wanted to get a

23   catheterization tube. That is how I see it as a form

24   of punishment.

25      Q.   I still don't understand. Why was it

KLEIN, BURY & ASSOCIATES, INC.

```
 1   punishment?
 2              MR. CRUANES:  Objection, asked and answered.
 3              MR. TOOMEY:  He has not answered my
 4         question.
 5              MR. CRUANES:  He has to his ability.  If you
 6         continue to ask, you will get the same answer.
 7   BY MR. TOOMEY:
 8         Q.    Did anybody ever tell you you were being
 9   punished for catheterization material?
10         A.    I believe nobody comes out and says you are
11   being -- somebody does not come out and say, I am
12   punishing you for this.
13         Q.    So the perception, it was your perception
14   that you were being punished, is that correct?
15         A.    Yes.
16         Q.    By the way, do you recall seeing a request
17   to produce propounded by my office in this case
18   wherein we asked for income tax records?
19         A.    I did not see that request.
20         Q.    I'm going to represent to you that in June
21   of this year my office, Mr. Anchel, of my office,
22   propounded a request to produce, which is income tax
23   forms for the years 1987 through the present and your
24   answer was that you did not have any such forms.
25              Was there some reason that you don't have
```

KLEIN, BURY & ASSOCIATES, INC.

1     income tax or payroll records for those years even

2     though you were working?

3          A.    I don't have any information for you at this

4     moment.

5          Q.    But you were employed, right?

6          A.    Yes, I was.

7          Q.    Also that request to produce, there are some

8     photographs -- well, first pursuant to that request to

9     produce my office received a document entitled, Logs

10    for Incarceration.  Is that a document that you

11    recreated?

12         A.    My mother created this document.

13         Q.    Can I see it?  The third notation on that

14    list says that a picture was taken of your sacral

15    ulcer, is that correct?

16         A.    Could you tell me the exact date on which

17    this --

18         Q.    I am asking you to identify what it says

19    actually.

20         A.    I --

21         Q.    Does it say when the picture was taken?

22               MR. CRUANES:  February 15, is that what you

23         mean?

24               MR. TOOMEY:  Yes, sir.

25               THE WITNESS:  Yes.


               KLEIN, BURY & ASSOCIATES, INC.

        1    BY MR. TOOMEY:

        2         Q.    Who took that picture, if you know?

        3         A.    I believe it was the nurse at doctor --

        4    nurse's office.  I am not sure about that.

        5         Q.    Who would know?

        6         A.    Dr. Mack.

        7         Q.    If I show you a series of pictures do you

        8    think you know which one was the pictures taken on

        9    February 15?

       10         A.    No.

       11         Q.    There is also on that list, further on the

       12    list, there is a notation that another photograph was

       13    taken, do you see that?  I think it is dated 26th of

       14    February?

       15         A.    Yes, I'm getting -- yes, I see that.

       16         Q.    Do you recall who took that photograph?

       17         A.    I think my mother did.

       18         Q.    If I show you the same series of

       19    photographs, do you think you can pick the right one

       20    out?

       21         A.    Yes.  I'm recalling a different picture.  I

       22    am recalling a picture of me in a wheelchair.  I can't

       23    really identify which picture was taken of my wound.

       24         Q.    But your mother took that picture, correct,

       25    the second picture?

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    Yes.   I believe so.   I am not really sure.

 2   The picture I was talking about was the one with me

 3   sitting in a wheelchair that my mother took as soon as

 4   I was released.   That is the one that I was recalling.

 5        Q.    Okay.   Sometime upon your release from jail

 6   you sought treatment from Plantation General Hospital,

 7   is that correct?

 8        A.    Yes, that is correct.

 9        Q.    Is that on the same date you were released?

10        A.    Yes, it is.

11        Q.    Why is it that you went to Plantation

12   General?

13        A.    My doctor's office is located near

14   Plantation General Hospital.

15        Q.    Which doctor is that?

16        A.    Dr. Arlene Richards and Dr. Kenneth Mack.

17        Q.    Did you contact either of those physicians

18   before you went to Plantation General?

19        A.    No, I did not.   It was early in the morning

20   and their offices were not open.

21        Q.    How did you arrive at Plantation General?

22        A.    My mother brought me there directly from the

23   North Broward Detention facility.

24        Q.    If you recall, which physicians did you see

25   at Plantation General Hospital?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1          A.     I do not recall.

 2          Q.     What were you seeking treatment for when you

 3     entered Plantation General Hospital?

 4          A.     I had a very bad stomach ache as well as my

 5     urine was dark amber, almost a reddish yellow color,

 6     and I was worried that I had contracted a UTI.

 7          Q.     What is a UTI?

 8          A.     Urinary tract infection.

 9          Q.     Why were you worried that you had contracted

10     a urinary tract infection?

11          A.     Because of a lack of my bladder release as

12     well as the unsanitary ways that I was I guess forced

13     to catheterize myself.

14          Q.     How long were you at Plantation General?

15          A.     I don't recall.  It was only for -- it

16     was -- I don't recall the hours, but I know it was

17     only half a day.

18          Q.     When you left Plantation General, were you

19     given any instructions by the doctors there?

20          A.     I guess, I don't recall that.  I don't

21     recall that at all.

22          Q.     Sometime subsequent to being released from

23     Plantation General, did you see your doctors?

24          A.     Yes, I did.  I saw -- I don't recall which

25     one I saw, but I believe it was Dr. Arlene Richards,
```

1    but I don't know for sure.

2        Q.    Do you continue to see Dr. Arlene Richards?

3        A.    Yes, I do.

4        Q.    At present have you seen any other

5    physicians?

6        A.    Dr. Jeffrey Marks.

7        Q.    While you were at Plantation General, did

8    you receive treatment for the decubitus ulcer?

9        A.    Yes, I did.

10        Q.    What was that treatment?

11        A.    They cleaned it out after they hosed me

12    down.    They cleaned it out and they proceeded to put a

13    wet dry bandage on there, which consists of Calistat,

14    I believe, saline solution, and a four by four pad and

15    some bandages.

16        Q.    Following your release from Plantation

17    General, did you seek additional treatment for the

18    sacral ulcer?

19        A.    Yes, I did.    I went to Dr. Richards to see

20    what could be done, and I believe she put me on a new

21    regiment of taking care of it with some Intrasite

22    Jell, some more Calistat, saline solution, and new

23    bandages I believe, I am not sure what kind.

24        Q.    Did Dr. Richards' treatment ease the

25    problem?

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    No, it's still there.

 2        Q.    You still have a sacral ulcer?

 3        A.    Yes, I do.

 4        Q.    Prior to being admitted to the Broward

 5   County Jail, how long had you suffered from decubitus

 6   ulcers?

 7        A.    I believe since my accident on March 15, but

 8   they were on my feet, and my heels and I think there

 9   was one back there too, I can't recall.

10        Q.    You did have --

11        A.    A sacral ulcer.

12        Q.    -- a sacral decubitus ulcer on your entry to

13   the jail, correct?

14        A.    Yes.

15        Q.    How long had that been there?

16        A.    That I can't recall.  I thought it was there

17   for maybe four or five months, but I can't recall the

18   exact time.

19        Q.    Okay.  Were you receiving treatment for the

20   sacral ulcer before you went into jail?

21        A.    Yes, before I went into incarceration.

22        Q.    Was that treatment from Richards or Mack?

23        A.    It was from a combination of Dr. Richards,

24   Marks, and Dr -- I believe Dr. Kenneth Mark helped me

25   out on that too.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1              It depends on which physician I was seeing
 2    at the time I was going in for the doctor's visit.
 3         Q.   Are you currently taking any medication?
 4         A.   Yes, I am taking Pancrease, and Backtofin.
 5         Q.   Anything else?
 6         A.   That's all.
 7         Q.   I just wanted to make sure that I have the
 8    right records from the state in this case.
 9              Your middle name you said before is Raymond,
10    is that correct?
11         A.   Correct.
12         Q.   Is there some reason that the criminal
13    records would show your middle name as Michael, or as
14    Scott M. Earley?
15         A.   No, I don't know why that would happen.
16              My brother's middle name is Michael.
17         Q.   Well, let's make sure.  What is your date of
18    birth?
19         A.   2/16/72.
20         Q.   You went to jail on your birthday?
21         A.   Yes, I did.
22         Q.   When you saw your physicians after being
23    released from the North Broward Detention facility,
24    have any of your physicians told you that your
25    condition was worsened while you were in the jail?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1       A.   Yes.

 2       Q.   Which doctor was that?

 3       A.   Arlene Richards.

 4       Q.   What did she tell you?

 5       A.   Well, she said that the wound had -- she

 6   said that it grew bigger, and it was red.  I guess the

 7   circle was larger.  I didn't see it myself, but that

 8   is what she told me.

 9            And she said that I lost a lot of weight.  I

10   am not sure about the exact amount, how much I lost,

11   but I lost a lot of weight, and a lot of muscle which

12   in turn hurt me in my rehab.

13       Q.   Did Dr. Richards tell you anything else

14   specifically about your decubitus ulcer?

15       A.   Not that I can recall.

16       Q.   I am sorry if I asked you this before, but

17   we know that you had a decubitus ulcer when you

18   entered the Broward County Jail system.  Prior to that

19   particular ulcer at that particular time, had you ever

20   had a sacral decubitus ulcer before?

21       A.   No.

22       Q.   At that time you had been paralyzed for

23   approximately a year, less than a year, ten months?

24       A.   Less than a year, yeah.

25       Q.   And your paralysis is related to the charge
```

```
 1    for which you were incarcerated during this particular
 2    incarceration, is that correct, from the accident you
 3    were talking about?  The accident and this
 4    incarceration were related, is that correct?
 5         A.    Correct.
 6         Q.    Other than the other day that we spoke
 7    about, have you ever been arrested for anything else?
 8         A.    No, sir.
 9         Q.    You stated in your complaint that the
10    Broward Sheriff's Office prevented you from receiving
11    adequate medical care.  Tell me how that occurred.
12         A.    Well, I didn't receive my medications, and
13    when I did receive medications it was not the correct
14    one.
15              They substituted Mylanta for my Pancrease
16    medicine which is like, you know, apples and oranges.
17    It is totally two different medications.
18              They didn't provide me with a sterile
19    atmosphere for me to cath myself, and relieve my
20    bladder.  I was only receiving a tube, and the tube
21    that I did receive was not the right size.
22              I didn't receive any cleaning -- any
23    Betadine, I believe that is what the liquid is called,
24    or any type of lubrication, KY Jelly as well for my
25    special needs.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1              The sleeping facility that I was in was a
 2    steel cot with about an inch and a half thick
 3    mattress, which is, I don't know, implorable I guess
 4    with my particular special needs, especially when
 5    across the way I saw perfectly good hospital beds not
 6    being used at all.  No one was in these hospital beds,
 7    and I just found it outrageous.
 8         Q.   Okay.  Let me be more specific.  Your
 9    complaint says that you were prevented from receiving
10    adequate medical care.
11         A.   Uh-huh.
12         Q.   It sounds to me from what you just said that
13    you received medical care, but you think it was the
14    wrong medical care, is that correct?
15         A.   It was not the medical care that could
16    upkeep my special needs, which means that, you know,
17    there are certain things that certain people need,
18    certain medications, certain types of supplies that
19    are proper, and I didn't receive that.
20         Q.   All right.  Let me see if I can clear it up.
21    You are not saying that you didn't receive any medical
22    care, you are saying that the medical care that you
23    received was improper, correct?
24         A.   Correct.
25         Q.   In the ten days that you were in the North
```

KLEIN, BURY & ASSOCIATES, INC.

 1   Broward Detention Center, did you write any

 2   grievances?

 3        A.   No.

 4        Q.   Who did you speak to while you were

 5   incarcerated regarding your complaints of inadequate

 6   medical care?

 7        A.   My mother is the only person that I could

 8   rely on to call the right people since I only had a

 9   limited amount of phone use.

10        Q.   Who did you speak to in the jail, if anyone?

11        A.   In the jail?  No one.

12        Q.   Okay.  You say in your complaint that upon

13   your release you were quote -- not quote, parked by

14   the side of the road in mid 40s degree weather.

15        A.   Yes.

16        Q.   Tell me about that.

17        A.   They woke me up at I would say about three

18   o'clock in the morning, told me to get all my stuff

19   together, and that I was being released.

20             So I got all my stuff together, everything

21   that I had, and I proceeded to, I guess, the desk

22   where they release people.

23             I stayed there for about maybe 20, 25

24   minutes, then they shuffled maybe about four or five

25   of us into a room and they said get changed into your

KLEIN, BURY & ASSOCIATES, INC.

     1    regular street clothes.

     2            Well, I could not get changed because I was

     3    so weak, and not being able to eat and I had lost so

     4    much weight.  I could not dress myself even before the

     5    incarceration.  I could not dress myself.

     6            So I asked for help from anyone that could

     7    help me out, but they saw that I was soiled, and they

     8    could smell that I was soiled because I was not

     9    changed or anything during the incarceration, and

    10    because they saw that I was soiled, no one would help

    11    me.

    12            So I had to struggle to rip the orange pants

    13    off of my legs, and of course I took the shirt off

    14    with no problem, and I looked for my clothes.

    15            And for some unknown reason it seemed

    16    because I was the last one in the place that my

    17    clothes were missing.  So they gave me some left over,

    18    a left over shirt, and some shorts that were not mine

    19    that I did not own, and I did not have any circulation

    20    stockings as well because they misplaced that as well.

    21            So I rolled out, and I asked if there was

    22    anywhere inside that I could make a phone call and

    23    they told me no that you would have to make a phone

    24    call outside.

    25            They shuffled me outside.  I made my phone

1    call, and it was a very cold night. I don't know if
2    it was 40 degrees or if it was 50 degrees, I know that
3    it was very cold, and I called my mother who was maybe
4    just getting -- as soon as I called her she woke up,
5    so she was not up already.

6           And she was about maybe 45, 40 minutes drive
7    out from getting dressed, and going out there and
8    everything like that so it was about a 45 minute wait,
9    and I was in shorts and a short shirt, short sleeve
10   shirt with no circulation stockings to keep me warm,
11   just sitting out there in a parking lot with no one
12   around, no one in sight, no officers, no security
13   guards outside. I was just in the parking lot by
14   myself.

15      Q.    Okay. Okay. Following being left in the
16   parking lot as you say, did you receive any medical
17   attention related to being outside in the cold?

18      A.    No, I didn't suffer from any hypothermia or
19   anything.

20      Q.    Let me see if I have this right. You had no
21   conversations with anyone working at the jail
22   regarding your request for medical attention?

23      A.    Well, I had requested such as pushing the
24   emergency button, and asking for my medications as
25   well as I believe I was rolled into the nurse's

```
 1    station that was there, and I talked to a couple of
 2    nurses there about getting my proper medication as
 3    well as the stomach aches and the ulcers -- I was
 4    bleeding, and I was soiled so I did talk to a couple
 5    of nurses at the nurse's station there.
 6        Q.    When did you talk to the nurses?
 7        A.    Probably about a day or two after I was in
 8    the North Broward facility.
 9        Q.    Is it your testimony that that is the only
10    time that you had contact with any health care
11    providers at the jail?
12        A.    At the North Broward facility, yes.
13              At the downtown facility I did talk to the
14    nurse there, but I only spent one night there and she
15    was, she planned on helping me, but then I was
16    transferred to North, to the North Broward facility.
17        Q.    What do you mean when you say she planned on
18    helping you?
19        A.    Well, she was very cooperative in trying to
20    find out what the facts were for my medications and my
21    supplies, and she was very helpful.  I remember that
22    clearly.
23              In fact, the people at the downtown Broward
24    facility were very nice to me, and throughout my
25    incarceration I wished I was at the downtown facility
```

1    instead of the North Broward facility.

2        Q.    Would it surprise you to find, Scott, that

3    the medical records show that your decubitus ulcer was

4    stage three upon presentation to the North Broward

5    Detention Center, and also stage three at Plantation

6    General Hospital upon your release?

7        A.    No.    Because as you told me earlier that

8    Dr. Mack said it was a grade three.    So I am assuming

9    that the jail would say the same thing.

10       Q.    When -- sorry strike that.

11             Prior to the car accident that we spoke of

12   earlier, did you have any other medical problems?

13       A.    No.    Just a case of pneumonia back in '96,

14   and that's about it.    Nothing really serious.

15             MR. TOOMEY:    Off the record.

16             (Off the record discussion.)

17             MR. TOOMEY:    Let's go back.

18   BY MR. TOOMEY:

19       Q.    Scott, since your accident, have your

20   doctors told you that your injuries are permanent?

21       A.    Yes, sir.    Dr. Jeffrey Canter who was my

22   neurosurgeon.

23       Q.    When did you last see Dr. Canter?

24       A.    October of '98.

25             MR. TOOMEY:    I think I'm done.    I know I am

KLEIN, BURY & ASSOCIATES, INC.

```
 1     done.   Let me take a few minutes, and go over my
 2     notes.   I'm done.
 3          (Thereupon, Defendant's Exhibit 1 was marked
 4     for identification.)
 5          (Thereupon, the deposition concluded at
 6     approximately 10:15 a.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1

2
     STATE OF FLORIDA   )
3                       )
     COUNTY OF BROWARD  )
4

5

6

7        I, EVELIN SIERRA, Court Reporter, certify that

8    I was authorized to and did stenographically report

9    the foregoing proceedings and that the transcript is

10   a true and complete record of my stenographic notes.

11       DATED this 23rd day of November, 2000.

12

13

14                     _____

15                     EVELIN SIERRA, Court Reporter
                       and Notary Public, State of
16                     Florida at Large.

17

18

19

20

21

22

23

24

25
```

KLEIN, BURY & ASSOCIATES, INC.

DEFENDANTS
EXHIBIT
11|01|00

*Page 1*

**March 01, 1999**

# *Log for Scott's Incarceration*

- **1/25/99** - Judge Lisa Trachman sentenced Scott to 10 days in the county infirmary
  It was stated that he would be treated as if he were in a medical facility
  and that all my special needs for my injuries would be available
- **2/ 8/99** - Scott went to his doctor's office to have the list of prescriptions and
- special needs faxed to the infirmary.
- **2/15/99** - Scott called Dr. Mack and was told that the orders were faxed twice to
- Chris Pare at 954-831-5573. 9:00 p.m. picture taken of Scott's wound
- **2/16/99** - Scott was admitted to the Broward County facility (downtown Ft.
  Lauderdale) at 9:30 a.m. He did not get processed until 5:00 p.m. He
- was not allowed to relieve himself (no catheration material). He had his
  medications with him but was told he could not have any personal items.
- **2/17/99** - Scott finally transfered to infirmary (had not been changed in two days)
- **2/18/99** - Scott called home and said that all doctor's orders were ignored
  He was sleeping on a steel cot with a two inch pad, not given any
  medication prescribe by the doctor, and the only pain medication he
  got for his back was tylenol.
- **2/19/99** - Scott didn't call home
- **2/20/99** - Scott's father got in touch with the nurses station and spoke to the
  head nurse. We found out that Scott was put in isolation. He was
  allowed one phone call and told his father that he was put there for
  insisting on getting his catherazation materials. Patsy called Dr. Richards
  with details of the ignored orders. She faxed a new set of orders to
  Rafel Senedeir at 954-831-3526.
- **2/21/99** - Visiting hours. Mike and Patsy saw the condition that Scott was in.
  He was barefooted (no circulation stockings) His toe nails bleeding.
- **2/22/99** - Contacted Mike Bosco (friend of Scott's) He contacted Senator
  Campbell's office. Holly Krulic contacted me at work immeadiately.
  She made several calls.
- **2/24/99** - Scott was given his special stockings and an egg crate mattress.
- **2/25/99** - 10th day - not released
- **2/26/99** - Scott called home at 4:40 a.m. He was told that his sweat pants had
  been stolen. He was asked to leave the premises with a pair of shorts
  on. The temperature was 50 degrees. I found him in the parking lot
  shivering.
  5:47 a.m. Admitted to Plantation General Hospital. Nurses suggested
  that he be bathed before the examination, since he hadn't for 10 days.
  Admitted with pains in stomach, Pain in chest when breathing. Blood in
  urnine, Pain in lower back, Ulcer on sacrum open and bleeding
  (pictures taken).

*Page 2*

- 2/26/99 - **Discharged** from hospital with two prescriptions. (urinary track infection and Potassium pills) They suggest he take antiacids for his stomach and chest pains. They said to immeadiately start his pancreous medicine because the enzime level was high. No one mentioned his wound care. A nurse did come and clean and dress his wound. She stated that he needed a wound care doctor.

**Details of ignored orders:**

- Medication          5 prescribtions - Pain medication as needed
- Cathersation        every 5 to 6 hours - only allowed material for twice a day - wrong size of tubing with no lubrication
- Bedding             Special air mattress (Ulcer on sacrum)
- Diapers             Not trained since the paralysis

**Names:**

- **Deputy Yanoski**
- **Deputy Haines**
- **Nurse Peggy**
- **Charlie Shift**
- **Alpha Shift** - 11:30 p.m.- 4:30 a.m. Slept through their shift

**Inmates:**

- Bob Burke 954-942-7965
- Mike (??) Cast on his right leg

**Disciplinary Hearing:**

- Held by three officers telling Scott what he did wrong. They recommended 40 days isolation if he had a longer term.

*Sunday Janurary 24, 1999*

*Your Honor,*

*I am Patricia White, Scott's mother. I wanted to let you know a few things if Scott has to go to jail. I have really struggled for the last 10 months to try and help Scott to be able to take care of himself. I finally got him into Health South Rehab. I hope that he can continue to go for thearpy on Tuesdays and Thursdays from 1:00 to 3:00 p.m. He also is not potty trained yet and has a ulcer on his secrum. He has a nurse that attends to him daily for the ulcer and another to come and clean him. There is a lot of equipment and medical meterial that he uses. Will this be provided? What do we need to bring for him besides clothes? I am new to these kinds of tatics so I don't know what to expect. It just seems to me that a man in Scott's condition can not be any harm to anyone since he's paralized. For the last 10 months he has never ventured out. He will always need some one to help him in and out of places. He is still learning how to deal with his handicap. He also is on zoloft which is a anti-depressent drug. He needs to take three every day. There are more prescriptions that I can list for whomever will be caring for him.*
*I wish that there was a way that you could place him in my custody instead of jail.*

*Thank you in advance,*

*Patricia White*

February 21, 1999

Judge Lisa G. Trachman

Your Honor,
I Beg You! Please read this!!!!
Urgent!!!

My son, Scott Earley was admitted to the Broward County Jail System on 2/16/99. He is paralyzed from the waist down and needs assistance on getting dressed and diapers changed. He spent the first two days in the holding cell downtown without being treated or changed. He was then transferred to the infirmary at Pompano. His doctor faxed instructions 3 different times for wound care and medication. Twice before he arrived and the third time on Saturday. (Dr. Arlene Richards). The orders have been ignored. He has not received any of his medication, which is vital. They only allow him to catheterize himself twice a day when he should be doing it every 5 hours. He already has blood in his urine. I was allowed to see him on Sunday and could not believe the condition of his feet. Since he has no circulation in his legs he must wear teds (special stockings). The blood has rushed down to his toes and they are bleeding. He was barefooted.

For nine months the hospitals and doctors have worked on getting him better since the accident and now we will have to start all over again. Scott did not kill anyone. He does not deserve this treatment. He was put in isolation for complaining that he was too cold. I've seen the guards there walking around with jackets. He is in short sleeves. He has two rods in his spine and gets colder then the normal person.

Since he has been paralyzed I feel that his punishment is enough. He hurt no one but himself and he'll have to pay for it for the rest of his life. This inhumane treatment is uncalled for. I beg you to get him out of this detention center before the damages are irreversible.

Thank you in advance for considering my plea of early release of this situation.

Patricia White

Work #305-817-4843
Home #954-584-7810