UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  00-6104-CIV-ZLOCH
MAGISTRATE JUDGE SELTZER

SCOTT EARLEY,

     Plaintiffs,

vs.

**ORIGINAL**

SHERIFF OF BROWARD COUNTY,
FLORIDA

     Defendants.

_____/

590 NW 66th Avenue
Plantation, FL 33317
November 7, 2000
9:30 a.m.

## DEPOSITION OF SCOTT EARLEY

     Taken before EVELIN SIERRA, Court Reporter,

and Notary Public, in and for the State of Florida, at

Large, pursuant to a Notice of Taking Deposition.

KLEIN, BURY & ASSOCIATES, INC.

```
 1

 2    APPEARANCES:

 3          Carlos Cruanes, Esquire
            appearing on behalf of the Plaintiff.
 4
            BUNNEL, WOULFE, et al.
 5          Gregg A. Toomey, Esquire
            appearing on behalf of the Defendant.
 6

 7                          - - - - -

 8
      WITNESS                      DIRECT    CROSS
 9
      SCOTT EARLEY
10      by: Mr. Toomey                3

11                          - - - - -

12

13    DEFENDANT'S EXHIBITS FOR IDENTIFICATION:

14    1 - Log for Scott's Incarceration

15    CERTIFIED QUESTIONS:  NONE

16                          - - - - -

17

18

19

20

21

22

23

24

25
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1    Thereupon:
 2                    SCOTT EARLEY
 3    was called as a witness and having been first duly
 4    sworn, was examined, testified, and stated as follows:
 5              THE WITNESS:   I do.
 6                    DIRECT EXAMINATION
 7    BY MR. TOOMEY:
 8         Q.   Please state your name for the record?
 9         A.   Scott Earley.
10         Q.   Spell your name, please.
11         A.   E-A-R-L-E-Y.
12         Q.   And do you have a middle name, Scott?
13         A.   Yes, I do.  Raymond.
14         Q.   I am going to ask you a series of questions
15    pursuant to my notice of deposition.  I ask that if
16    you don't understand any of my questions, please ask
17    me to rephrase it, and I will be happen to rephrase if
18    you ask me to.
19              If you answer my questions without asking me
20    to rephrase, I will assume that you understood my
21    question, and the answer you give was to my question.
22              What is your current residential address?
23         A.   590 NW 66 Avenue.
24         Q.   And is that where we are today?
25         A.   Yes.
```

KLEIN, BURY & ASSOCIATES, INC.

1     Q.     Who owns this home?

2     A.     John White and Patricia White.

3     Q.     Is Patricia White your mother?

4     A.     Yes.

5     Q.     What is your relationship with John White?

6     A.     He's my stepfather.

7     Q.     Who is your birth father?

8     A.     Michael James Earley.

9     Q.     Is Michael James Earley located in this

10    area?

11    A.     No.  He is located in Miami Springs,

12    Florida.

13    Q.     Do you happen to know his address?

14    A.     I don't.  I know it is located in Virginia

15    Gardens.

16    Q.     What is your social security number?

17    A.     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.

18    Q.     Your date of birth?

19    A.     February 16, 1972.

20    Q.     Are you currently employed?

21    A.     No, I am not.

22    Q.     When was the last time you were employed?

23    A.     March 15, 1998.

24    Q.     And by whom were you employed at that time?

25    A.     Internet Global Communications.

```
 1      Q.    Internet?

 2      A.    Yes.

 3      Q.    What is your position with Internet Global?

 4      A.    Internet talk show host.

 5      Q.    What does an internet talk show host do?

 6      A.    It's a talk show host that is mainly on the

 7   Internet.  It is not broadcast on television.

 8      Q.    How does that work?

 9      A.    It works -- I can't tell you the exact

10   technical, but it works through video going into the

11   computer video camera, and I had a microphone, a head

12   set microphone on.

13            What we would do is, we would broadcast on

14   the Internet through Broadband through different clubs

15   in Fort Lauderdale and South Beach.

16      Q.    What is the business address of Internet

17   Global Communication?

18      A.    I believe they went out of business.

19      Q.    Do you know when they went out of business?

20      A.    I believe it was October or November of

21   1998.

22      Q.    Who was your supervisor at Internet Global

23   Communications?

24      A.    Steven Halpern.

25      Q.    Do you know the location of Mr. Halpern?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    No, I do not.   I do understand that he still
 2    runs Dick De'Vince's (phonetic spelling) club, but I
 3    don't know where their facility is.
 4        Q.    And what was your rate of pay when you were
 5    working for Internet Communications?
 6        A.    I was doing $100 a show.
 7        Q.    How many shows would you do in an average
 8    week?
 9        A.    Three to four.   It depends on the week.
10        Q.    Okay.   That employment ended in March of
11    1998?
12        A.    Correct.
13        Q.    Where did you work before that?
14        A.    I worked at Alton Entertainment in Miami
15    Beach, Florida.
16        Q.    What was your position there?
17        A.    I was associate producer for the television
18    show Crook and Chase.
19        Q.    What were you doing as an associate
20    producer?
21        A.    I would look at different technologies that
22    were out, that were coming out, and I would make five
23    to ten minute segments on the Crook and Chase Show,
24    and then I would call the company that was making this
25    particular technology, and try to get sponsorship from
```

1    the company for that five to ten minute segment.

2         Q.   Is that the country music show?

3         A.   Yes.   It is a talk show.   It was a morning

4    talk show, I believe on TNT.

5         Q.   What kind of technologies are we talking

6    about here?

7         A.   Like every day household products

8    technologies, new business that would come out or new

9    household appliances.

10        Q.   This is something that the talk show host

11   would talk about?

12        A.   Yes.

13        Q.   And what was your remuneration for that

14   employment?

15        A.   I received $600 dollars a week.

16        Q.   And who was your supervisor there?

17        A.   I can't remember.

18        Q.   Does Alton Entertainment still exist to your

19   knowledge?

20        A.   I believe so.

21        Q.   And how long were you employed by Alton

22   Entertainment?

23        A.   Six months.

24        Q.   Did that employment end as a result of --

25   you went to Internet Global Communications after some

1    period --

2         A.    Correct.

3         Q.    Wait for me to finish my question.

4               Was it some period of time before you

5    changed jobs?

6         A.    There was a two-week lull.

7         Q.    Okay.   We'll do one more.   Prior to Alton

8    Entertainment, where did you work?

9         A.    Five Star Productions in Delray Beach.

10        Q.    What was your position there?

11        A.    Associate producer.

12        Q.    What were your duties?

13        A.    Same.   I just worked on a different show

14   called Today's Environment, and also Parenting in the

15   Nineties.   I worked on two shows.

16        Q.    What was your rate of pay there?

17        A.    $400 a week.

18        Q.    How long were you employed by Five Star

19   Productions?

20        A.    That was another six months.

21        Q.    And the name of your supervisor there?

22        A.    Laura Bailey.

23        Q.    Do you know the whereabouts of Ms. Bailey?

24        A.    She is still in Delray Beach.

25        Q.    Is she still employed by Five Star

KLEIN, BURY & ASSOCIATES, INC.

```
 1   Productions, to your knowledge?
 2        A.   Yes, sir.
 3        Q.   Let's talk about your education.  Where did
 4   you go to high school?
 5        A.   Cooper City High School in Florida.
 6        Q.   You graduated from Cooper City?
 7        A.   Correct.
 8        Q.   And after you graduated from Cooper City you
 9   attended college?
10        A.   I attended community college, but I did not
11   receive a degree.
12        Q.   Where did you attend community college?
13        A.   Broward Community College.
14        Q.   What were you studying?
15        A.   My major was theater.  My minor was
16   management.
17        Q.   How long were you attending Broward
18   Community College?
19        A.   On and off for about a year and a half.
20        Q.   Do you have any other post secondary
21   education?
22        A.   I'm not really sure.  I guess this would be
23   technical.  I went to Johnson Littman for the Series
24   Seven test.
25        Q.   What is the Series Seven test?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    A test to get your license to become an
 2   investment advisor.
 3        Q.    Did you get that license?
 4        A.    No, I did not.
 5        Q.    How long did you attend Johnson and Littman?
 6        A.    Two months.
 7        Q.    Why did you leave?
 8        A.    It wasn't that I left.  It was a two-month
 9   course.
10        Q.    So you completed the course?
11        A.    I completed the course, and I took the test,
12   and I failed.
13        Q.    You have to wait for me to finish my
14   question?
15        A.    I apologize.
16        Q.    I understand everybody in the room
17   understands what we are doing, but the court reporter
18   cannot take both of us down at the same time.
19        A.    I apologize once again.
20        Q.    That's okay.  When did you take your Series
21   Seven test?
22        A.    I took it three times.  I don't know the
23   exact dates.  I know they were in the years of '92 or
24   '93.
25        Q.    You studied for the Series Seven test, but
```

KLEIN, BURY & ASSOCIATES, INC.

1    somehow you ended up in television work?

2        A.    Yes.

3        Q.    Tell me how that happened?

4        A.    Well, right after I would say my bartending

5    experience one of my friends allowed me the chance of

6    becoming a stockbroker, and I would first have to

7    become a cold caller for a security firm called TCMS

8    Securities, this is back in September of '92.

9             So I went in there and I became a cold

10   caller, and I had to be a cold caller for three

11   months, before they gave me the opportunity to go to

12   Johnson and Littman to take my Series Seven test, and

13   I was with TCMS Securities.

14            Then I went to Gruntle (spelled

15   phonetically).  After Gruntle I went to Prudential,

16   after Prudential, I went back to Gruntle.  This was in

17   a span of maybe three years, and then I was also

18   interested in theater and television and I was looking

19   in the paper one day, and there was an advertisement

20   for associate producer for an independent television

21   production company, and I was just sick and tired of

22   the stock business and being a cold caller earning

23   $250 a week.

24            So I just decided to take a chance and

25   applied for the associate producer job.  That is how I

KLEIN, BURY & ASSOCIATES, INC.

```
 1   got into television.
 2        Q.   You said you had experience as a bartender.
 3   Where did you bartend?
 4        A.   Higgy's (spelled phonetically).
 5        Q.   I am sorry?
 6        A.   Higgy's Cafe, old Marqui's place from the
 7   Dolphins.  I also bartended in TGI Friday in Pembroke
 8   Pines, and -- anywhere else?  I'm trying to remember.
 9   In Kahoots.
10        Q.   When did you work in In Kahoots?
11        A.   I believe I worked there on and off from the
12   years of '92 to '94.
13        Q.   Okay.  Scott, tell us how it is that you
14   came to be paralyzed?
15        A.   On 3/15/98 I was in a car accident, which
16   resulted in the flip over of my vehicle, and it
17   ejected me out of the vehicle.  When paramedics
18   arrived on the scene they found that my spinal column
19   was sticking out of the skin, and my left leg was
20   wrapped around my neck.
21             As a result, I received a T12/L1 incomplete
22   injury, a dislocated left hip, and a shatter right
23   femur bone.
24        Q.   When you say you had an incomplete injury,
25   what does that mean?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    There are two types of spinal cord injuries,

 2   there is incomplete and complete.  Incomplete means

 3   that there are some abrasions.  A complete injury

 4   means that the spinal cord is completely severed.

 5        Q.    I assume you were taken from the accident

 6   scene to the hospital, is that correct?

 7        A.    North Broward General Hospital.

 8        Q.    Where did that accident occur?

 9        A.    It occurred on 95 near Copans Road on the

10   ramp.

11        Q.    Was this a roll over accident, is that what

12   you said?

13        A.    Yes, it was.

14        Q.    Any other vehicles involved?

15        A.    One other vehicle.

16        Q.    Do you know who the driver of that vehicle

17   was?

18        A.    I cannot recall his name.

19        Q.    Were you arrested as a result of that

20   accident?

21        A.    I was not arrested, but I was charged.

22        Q.    What were you charged with?

23        A.    DUI.

24        Q.    How long were you in North Broward General

25   Hospital?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1         A.    From March until I think it was June,
 2    beginning of June.  Oh, no, I apologize, it is the end
 3    of April I was there til.
 4         Q.    From March until the end of April?
 5         A.    Yes, sir.  March 15 to the end of April.
 6         Q.    Okay.  Who were -- who were your treating
 7    physicians while you were at North Broward General
 8    Hospital?
 9         A.    I cannot recall those names.
10         Q.    All right.  You said you were charged with
11    DUI in that accident, is that correct?
12         A.    Correct.
13         Q.    What was the outcome of those proceedings?
14         A.    The DUI proceedings?
15         Q.    Yes, sir.
16         A.    I was sentenced to probation, ten days in an
17    institution and I believe some fines and retribution.
18         Q.    You were sentenced to probation for what
19    period of time?
20         A.    I believe six months.  Six, seven months, I
21    am not sure of the date.
22         Q.    You were detained in a facility?
23         A.    I was in the facility for ten days.
24         Q.    What facility was that?
25         A.    The Broward County Jail.
```

```
 1        Q.    Which one?

 2        A.    I believe the one in Pompano.

 3        Q.    The North Broward Detention Facility?

 4        A.    The North Broward Detention Facility,

 5   correct, sir.

 6        Q.    You said you were ordered to make

 7   restitution, is that correct?

 8        A.    Yes, sir.

 9        Q.    Did you make that restitution?

10        A.    Yes, sir.

11        Q.    Is this your first DUI arrest?

12        A.    No, sir.

13        Q.    When were your other DUI arrests?

14        A.    I had a DUI arrest in '92.  In September of

15   '92.

16        Q.    Where was that?

17        A.    That was in the Keys.  Mile marker 92.

18        Q.    Any others?

19        A.    No.

20        Q.    Okay.  So on what date did you enter the

21   North Broward Detention Facility?

22        A.    February 16, 1999.

23        Q.    What date were you released, if you know?

24        A.    I don't.  I don't remember.

25        Q.    What was your sentence?
```

```
 1        A.    Ten days.

 2        Q.    And is it likely you were released?

 3        A.    I can probably count on my fingers but --

 4        Q.    Okay.  It is not really important.  It is in

 5   the records.

 6              At the time you were admitted to North

 7   Broward Detention Facility, were you under the care of

 8   a physician?

 9        A.    Yes, I was.

10        Q.    Who was that physician?

11        A.    Arlene Richards, and Dr. Mack.

12        Q.    Do you know Dr. Mack's first name?

13        A.    Kenneth.

14        Q.    Are those two physicians partners?

15        A.    Yes, they are--

16        Q.    And when--

17        A.    -- and when one doctor is not in, the other

18   one is on call.

19        Q.    Do you know what those physicians'

20   specialties are?

21        A.    I believe they are general practitioners.  I

22   also believe Kenneth Mack is internal medicine.

23        Q.    Had you seen any other physicians on a

24   regular basis at the time?

25        A.    At the time I was seeing a urologist
```

KLEIN, BURY & ASSOCIATES, INC.

1    Dr. Jeffrey Mark.  I am sorry, Dr. Jeffrey Marks.

2        Q.    Do you know where Dr. Macks' office is?

3        A.    It's on fifth street here in Plantation.  I

4    don't know the exact address.

5        Q.    Where you seeing any other physicians at the

6    time?

7        A.    No, sir.

8        Q.    Were you receiving physical therapy at that

9    time?

10        A.    Yes, sir.

11        Q.    And who were you receiving physical therapy

12    from?

13        A.    Healthsouth Sunrise Rehabilitation Center.

14        Q.    And would you go to Healthsouth or would

15    they come to you?

16        A.    No, I would go there.

17        Q.    Were you seeing any other health care

18    providers in the period say a year before your

19    incarceration?

20        A.    I was being seen by -- a home health care

21    nurse would come in every day, and I guess just take

22    care of my bowel program and my wound and everything.

23        Q.    Who was the home health care provider, do

24    you remember?

25        A.    I don't remember.

KLEIN, BURY & ASSOCIATES, INC.

```
 1        Q.   Do you still have somebody seeing you for

 2   home health care?

 3        A.   I have -- on November 16, I will have home

 4   health care for like three or four days since my

 5   caregiver will be gone on vacation.

 6        Q.   And who will that be provided by?

 7        A.   The folder is right over there.  Home Health

 8   Corporation of America.

 9        Q.   Where are they located?

10        A.   I believe Fort Lauderdale.

11        Q.   Back to Dr. Richards, and is it Richards or

12   Richard?

13        A.   Richards.

14        Q.   Back to Richards and Dr. Mack.  For what

15   ailments were you seeing those two physicians?

16        A.   Not really ailments, just I wanted them as

17   general practitioners, just someone that I can go to,

18   you know, if I had any problems or anything.  Because

19   before the accident I didn't have a doctor, and I knew

20   after the accident that I would need to go to the

21   doctor quite often because of my condition.

22        Q.   If you remember, prior to your

23   incarceration, when was the last time you saw either

24   Dr. Richards or Dr. Mack?

25        A.   A week prior, I believe.
```

KLEIN, BURY & ASSOCIATES, INC.

1      Q.    And what was that for?

2      A.    That was for the incarceration. I had to

3    get all of my medications, and all of my special needs

4    faxed over to the Broward County Detention facility so

5    I went in to see Dr. Kenneth Mack to have that done.

6      Q.    Did Dr. Mack perform a physical examination

7    at that time?

8      A.    Yes, he did at that time.

9      Q.    When you saw Dr. Mack prior to your

10   incarceration, did he make any findings of any sort or

11   did he just perform a physical examination and provide

12   the meds?

13     A.    Exactly. He performed the physical

14   examinations and just, you know, just to make a list

15   of all the special needs and all the special

16   medications that I needed, and that is what we

17   consulted on that day as I recall.

18     Q.    But he didn't actually treat you for

19   anything, is that correct?

20     A.    No, sir.

21     Q.    In your complaint you say that when you

22   entered the Broward County Jail system, you had a

23   grade one decubitus, is that correct?

24     A.    I had grade one ulcers on my sacrum.

25     Q.    How do you know it was a grade one ulcer?

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    That is what was told to me by Dr. Mack.

 2        Q.    When did Dr. Mack tell you that?

 3        A.    During the physical examination the week

 4   prior to my incarceration.

 5        Q.    When you entered the Broward County Jail

 6   system did you make the jail authorities aware that

 7   you had had what you call a grade one sacral ulcer?

 8        A.    Yes, and also my doctors as well.  He,

 9   Dr. Mack, faxed some papers including my special needs

10   as well as what was wrong with me including the wound.

11        Q.    How do you know Dr. Mack faxed papers

12   regarding your special needs especially in regards to

13   the sacral ulcer?

14        A.    He told me and also my mother that he did.

15        Q.    Do you have any documentation regarding what

16   Dr. Mack faxed?

17        A.    I don't.

18        Q.    Other than what Dr. Mack told you regarding

19   a grade one sacral ulcer, is there any documentation

20   that shows that -- strike it.

21              With the exception of what Dr. Mack told you

22   regarding the grade one ulcer, is there any

23   documentation that shows that you had a grade one

24   sacral ulcer at the time you entered the jail system?

25        A.    I believe it is in my medical records
```

KLEIN, BURY & ASSOCIATES, INC.

1    Dr. Mack, every time he sees me, writes down and

2    updates my record.  I believe it is in my medical

3    record.

4         Q.   Would it surprised you to find that the

5    medical records upon your entry to the Broward County

6    Jail system shows that you had a grade three sacral

7    ulcer on entry to the jail system?

8         A.   No, it would not surprise me at all.

9         Q.   Why would it not surprise you?

10         A.   Because I really cannot recall exactly what

11    Dr. Mack told me.

12         Q.   So you are not sure it was a grade one when

13    you entered the jail system, is that correct?

14         A.   That is correct.

15         Q.   While you were incarcerated in the North

16    Broward Detention facility were you seen by health

17    care providers?

18         A.   In the facility?  No, I wasn't.

19         Q.   You were never seen by a physician's

20    assistant or any nursing staff at any time, is that

21    your testimony?

22         A.   The first couple of days, no I was not.

23         Q.   That is not what I asked you, sir.

24              During your incarceration, during the whole

25    incarceration.

KLEIN, BURY & ASSOCIATES, INC.

```
 1          A.     During the whole incarceration I was visited
 2    by a nurse maybe twice.
 3          Q.     Were you taking medication when you entered
 4    the Broward County Jail system?
 5          A.     Yes, I was.
 6          Q.     What were those medications?
 7          A.     Pancrease for -- I believe they removed my
 8    pancreas in November of '98, and ever since then I
 9    have been on the medication Pancrease, and I was
10    taking Backtofin for my back.  It was used to calm
11    down muscle spasms.
12          Q.     Those are the only medications you were
13    taking?
14          A.     Yes.
15          Q.     Do you recall being given a chest x-ray
16    while you were in the Broward County Jail system?
17          A.     No, I do not.
18          Q.     You do not recall being given a chest x-ray
19    on the 25th of February 1999, is that correct?
20          A.     That is correct.
21                 MR. TOOMEY:  Let's go off the record.
22                 (Off-the-record discussion.)
23                 MR. TOOMEY:  We can go back on.
24    BY MR. TOOMEY:
25          Q.     In your complaint you state on paragraph 12
```

KLEIN, BURY & ASSOCIATES, INC.

 1    that the act of the defendants in this case violated
 2    your constitutional rights.

 3          How do you claim that the actions of the
 4    sheriff's office violated your constitutional rights?
 5    A.    Well, it is my belief that not being given
 6    my medication or the proper utensils I would say such
 7    as catheters et cetera in form of a -- it was just in
 8    a form as a punishment as I saw it.  And when I asked
 9    for it, I was punished further.
 10   Q.    When you say it was in the form of a
 11   punishment, how do you know that?
 12   A.    Well, the actions of the guards just
 13   warranted -- I mean it just showed me that I was
 14   punished, that it was punishment.

 15          I can give you an example.  When I was
 16   freezing cold, when I first got into the North
 17   Detention Center, I was freezing cold and I guess I
 18   wanted to get familiar with my surroundings, so I had
 19   a blanket on my legs while I was in my wheelchair so I
 20   can get some -- I wanted to get familiar with my
 21   surroundings.  I decided to come out with the blanket
 22   on.

 23          The guard informed me that I could not have
 24   a blanket on while I was out of my cell.  So I said
 25   okay.  I went back into my cell, the TV was on in this

KLEIN, BURY & ASSOCIATES, INC.

24

```
 1    room, there was a room with six cells in the room was
 2    a table, a TV.  I was in the far cell, and the TV was
 3    on.  So I had the blanket on, and there was a doorway.
 4    I was -- the doorway was maybe over my right leg, and
 5    I was -- three quarters of my body was in the cell,
 6    and from my right leg on was out of the cell, and my
 7    blanket was still on my legs because I was freezing
 8    cold.
 9              That is when the guard came around and
10    actually physically turned me around and pushed me and
11    said, you cannot have it outside.  And I was not
12    outside.  And that is when everything started taking
13    place.
14         Q.  I don't understand.  In your mind, how does
15    that equate to punishment?
16         A.  Well, that incident just snowballed into
17    other incidents.  They were -- I just I guess out of
18    anger and out of fear as well as the overall, the
19    other emotions that were going through me at the time
20    I just was steadfast, I was steaming.
21              I think I made a comment or two out loud not
22    directly to anybody, just generalizing, and I guess
23    I'm trying to recall here, I needed to cath myself
24    because at the time I didn't have any catheter tubes
25    in my cell, and after that -- it was right after that
```

KLEIN, BURY & ASSOCIATES, INC.

1    incident in fact that I pushed the emergency button.

2              I said I need a catheter.  I need to cath

3    myself, because at the time I had not cath'd myself

4    for six hours, and I usually cath myself every four

5    hours.

6              I knew my bladder was getting extended so I

7    needed to cath myself, and because the incident just

8    occurred, I assumed that the guards were just thinking

9    that I wanted to get attention, which I wasn't.

10             I needed to get the catheterization tube so

11   I can relieve myself.  And they wouldn't, they said

12   we'll get it to you.  We'll get it to you.  Fifteen

13   minutes went by, we will get it to you.  I pressed the

14   emergency button, again we'll get it to you.  We'll

15   get it to you.

16             I pressed the emergency button again within

17   an hour and a half, I pushed the emergency buttons

18   four times, and I still didn't get a catheterization

19   tube.

20             I believe on the fifth time they said

21   everybody was in lock down in this cell.  Everybody

22   was against me because I wanted to get a

23   catheterization tube.  That is how I see it as a form

24   of punishment.

25        Q.   I still don't understand.  Why was it

1   punishment?

2              MR. CRUANES:  Objection, asked and answered.

3              MR. TOOMEY:  He has not answered my

4         question.

5              MR. CRUANES:  He has to his ability.  If you

6         continue to ask, you will get the same answer.

7   BY MR. TOOMEY:

8         Q.    Did anybody ever tell you you were being

9   punished for catheterization material?

10        A.    I believe nobody comes out and says you are

11  being -- somebody does not come out and say, I am

12  punishing you for this.

13        Q.    So the perception, it was your perception

14  that you were being punished, is that correct?

15        A.    Yes.

16        Q.    By the way, do you recall seeing a request

17  to produce propounded by my office in this case

18  wherein we asked for income tax records?

19        A.    I did not see that request.

20        Q.    I'm going to represent to you that in June

21  of this year my office, Mr. Anchel, of my office,

22  propounded a request to produce, which is income tax

23  forms for the years 1987 through the present and your

24  answer was that you did not have any such forms.

25              Was there some reason that you don't have

KLEIN, BURY & ASSOCIATES, INC.

```
 1    income tax or payroll records for those years even
 2    though you were working?
 3         A.    I don't have any information for you at this
 4    moment.
 5         Q.    But you were employed, right?
 6         A.    Yes, I was.
 7         Q.    Also that request to produce, there are some
 8    photographs -- well, first pursuant to that request to
 9    produce my office received a document entitled, Logs
10    for Incarceration.  Is that a document that you
11    recreated?
12         A.    My mother created this document.
13         Q.    Can I see it?  The third notation on that
14    list says that a picture was taken of your sacral
15    ulcer, is that correct?
16         A.    Could you tell me the exact date on which
17    this --
18         Q.    I am asking you to identify what it says
19    actually.
20         A.    I --
21         Q.    Does it say when the picture was taken?
22               MR. CRUANES:  February 15, is that what you
23         mean?
24               MR. TOOMEY:  Yes, sir.
25               THE WITNESS:  Yes.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1   BY MR. TOOMEY:
 2        Q.   Who took that picture, if you know?
 3        A.   I believe it was the nurse at doctor --
 4   nurse's office.  I am not sure about that.
 5        Q.   Who would know?
 6        A.   Dr. Mack.
 7        Q.   If I show you a series of pictures do you
 8   think you know which one was the pictures taken on
 9   February 15?
10        A.   No.
11        Q.   There is also on that list, further on the
12   list, there is a notation that another photograph was
13   taken, do you see that?  I think it is dated 26th of
14   February?
15        A.   Yes, I'm getting -- yes, I see that.
16        Q.   Do you recall who took that photograph?
17        A.   I think my mother did.
18        Q.   If I show you the same series of
19   photographs, do you think you can pick the right one
20   out?
21        A.   Yes.  I'm recalling a different picture.  I
22   am recalling a picture of me in a wheelchair.  I can't
23   really identify which picture was taken of my wound.
24        Q.   But your mother took that picture, correct,
25   the second picture?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    Yes.   I believe so.   I am not really sure.
 2   The picture I was talking about was the one with me
 3   sitting in a wheelchair that my mother took as soon as
 4   I was released.   That is the one that I was recalling.
 5        Q.    Okay.   Sometime upon your release from jail
 6   you sought treatment from Plantation General Hospital,
 7   is that correct?
 8        A.    Yes, that is correct.
 9        Q.    Is that on the same date you were released?
10        A.    Yes, it is.
11        Q.    Why is it that you went to Plantation
12   General?
13        A.    My doctor's office is located near
14   Plantation General Hospital.
15        Q.    Which doctor is that?
16        A.    Dr. Arlene Richards and Dr. Kenneth Mack.
17        Q.    Did you contact either of those physicians
18   before you went to Plantation General?
19        A.    No, I did not.   It was early in the morning
20   and their offices were not open.
21        Q.    How did you arrive at Plantation General?
22        A.    My mother brought me there directly from the
23   North Broward Detention facility.
24        Q.    If you recall, which physicians did you see
25   at Plantation General Hospital?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1          A.    I do not recall.

 2          Q.    What were you seeking treatment for when you

 3    entered Plantation General Hospital?

 4          A.    I had a very bad stomach ache as well as my

 5    urine was dark amber, almost a reddish yellow color,

 6    and I was worried that I had contracted a UTI.

 7          Q.    What is a UTI?

 8          A.    Urinary tract infection.

 9          Q.    Why were you worried that you had contracted

10    a urinary tract infection?

11          A.    Because of a lack of my bladder release as

12    well as the unsanitary ways that I was I guess forced

13    to catheterize myself.

14          Q.    How long were you at Plantation General?

15          A.    I don't recall.  It was only for -- it

16    was -- I don't recall the hours, but I know it was

17    only half a day.

18          Q.    When you left Plantation General, were you

19    given any instructions by the doctors there?

20          A.    I guess, I don't recall that.  I don't

21    recall that at all.

22          Q.    Sometime subsequent to being released from

23    Plantation General, did you see your doctors?

24          A.    Yes, I did.  I saw -- I don't recall which

25    one I saw, but I believe it was Dr. Arlene Richards,
```

```
 1   but I don't know for sure.

 2        Q.   Do you continue to see Dr. Arlene Richards?

 3        A.   Yes, I do.

 4        Q.   At present have you seen any other

 5   physicians?

 6        A.   Dr. Jeffrey Marks.

 7        Q.   While you were at Plantation General, did

 8   you receive treatment for the decubitus ulcer?

 9        A.   Yes, I did.

10        Q.   What was that treatment?

11        A.   They cleaned it out after they hosed me

12   down.   They cleaned it out and they proceeded to put a

13   wet dry bandage on there, which consists of Calistat,

14   I believe, saline solution, and a four by four pad and

15   some bandages.

16        Q.   Following your release from Plantation

17   General, did you seek additional treatment for the

18   sacral ulcer?

19        A.   Yes, I did.  I went to Dr. Richards to see

20   what could be done, and I believe she put me on a new

21   regiment of taking care of it with some Intrasite

22   Jell, some more Calistat, saline solution, and new

23   bandages I believe, I am not sure what kind.

24        Q.   Did Dr. Richards' treatment ease the

25   problem?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    No, it's still there.

 2        Q.    You still have a sacral ulcer?

 3        A.    Yes, I do.

 4        Q.    Prior to being admitted to the Broward

 5   County Jail, how long had you suffered from decubitus

 6   ulcers?

 7        A.    I believe since my accident on March 15, but

 8   they were on my feet, and my heels and I think there

 9   was one back there too, I can't recall.

10        Q.    You did have --

11        A.    A sacral ulcer.

12        Q.    -- a sacral decubitus ulcer on your entry to

13   the jail, correct?

14        A.    Yes.

15        Q.    How long had that been there?

16        A.    That I can't recall.  I thought it was there

17   for maybe four or five months, but I can't recall the

18   exact time.

19        Q.    Okay.  Were you receiving treatment for the

20   sacral ulcer before you went into jail?

21        A.    Yes, before I went into incarceration.

22        Q.    Was that treatment from Richards or Mack?

23        A.    It was from a combination of Dr. Richards,

24   Marks, and Dr -- I believe Dr. Kenneth Mark helped me

25   out on that too.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1              It depends on which physician I was seeing
 2    at the time I was going in for the doctor's visit.
 3        Q.    Are you currently taking any medication?
 4        A.    Yes, I am taking Pancrease, and Backtofin.
 5        Q.    Anything else?
 6        A.    That's all.
 7        Q.    I just wanted to make sure that I have the
 8    right records from the state in this case.
 9              Your middle name you said before is Raymond,
10    is that correct?
11        A.    Correct.
12        Q.    Is there some reason that the criminal
13    records would show your middle name as Michael, or as
14    Scott M. Earley?
15        A.    No, I don't know why that would happen.
16              My brother's middle name is Michael.
17        Q.    Well, let's make sure.  What is your date of
18    birth?
19        A.    2/16/72.
20        Q.    You went to jail on your birthday?
21        A.    Yes, I did.
22        Q.    When you saw your physicians after being
23    released from the North Broward Detention facility,
24    have any of your physicians told you that your
25    condition was worsened while you were in the jail?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    Yes.

 2        Q.    Which doctor was that?

 3        A.    Arlene Richards.

 4        Q.    What did she tell you?

 5        A.    Well, she said that the wound had -- she

 6    said that it grew bigger, and it was red.  I guess the

 7    circle was larger.  I didn't see it myself, but that

 8    is what she told me.

 9              And she said that I lost a lot of weight.  I

10    am not sure about the exact amount, how much I lost,

11    but I lost a lot of weight, and a lot of muscle which

12    in turn hurt me in my rehab.

13        Q.    Did Dr. Richards tell you anything else

14    specifically about your decubitus ulcer?

15        A.    Not that I can recall.

16        Q.    I am sorry if I asked you this before, but

17    we know that you had a decubitus ulcer when you

18    entered the Broward County Jail system.  Prior to that

19    particular ulcer at that particular time, had you ever

20    had a sacral decubitus ulcer before?

21        A.    No.

22        Q.    At that time you had been paralyzed for

23    approximately a year, less than a year, ten months?

24        A.    Less than a year, yeah.

25        Q.    And your paralysis is related to the charge
```

```
 1    for which you were incarcerated during this particular

 2    incarceration, is that correct, from the accident you

 3    were talking about?  The accident and this

 4    incarceration were related, is that correct?

 5         A.   Correct.

 6         Q.   Other than the other day that we spoke

 7    about, have you ever been arrested for anything else?

 8         A.   No, sir.

 9         Q.   You stated in your complaint that the

10    Broward Sheriff's Office prevented you from receiving

11    adequate medical care.  Tell me how that occurred.

12         A.   Well, I didn't receive my medications, and

13    when I did receive medications it was not the correct

14    one.

15              They substituted Mylanta for my Pancrease

16    medicine which is like, you know, apples and oranges.

17    It is totally two different medications.

18              They didn't provide me with a sterile

19    atmosphere for me to cath myself, and relieve my

20    bladder.  I was only receiving a tube, and the tube

21    that I did receive was not the right size.

22              I didn't receive any cleaning -- any

23    Betadine, I believe that is what the liquid is called,

24    or any type of lubrication, KY Jelly as well for my

25    special needs.
```

KLEIN, BURY & ASSOCIATES, INC.

1          The sleeping facility that I was in was a

2     steel cot with about an inch and a half thick

3     mattress, which is, I don't know, implorable I guess

4     with my particular special needs, especially when

5     across the way I saw perfectly good hospital beds not

6     being used at all.  No one was in these hospital beds,

7     and I just found it outrageous.

8          Q.    Okay.  Let me be more specific.  Your

9     complaint says that you were prevented from receiving

10    adequate medical care.

11         A.    Uh-huh.

12         Q.    It sounds to me from what you just said that

13    you received medical care, but you think it was the

14    wrong medical care, is that correct?

15         A.    It was not the medical care that could

16    upkeep my special needs, which means that, you know,

17    there are certain things that certain people need,

18    certain medications, certain types of supplies that

19    are proper, and I didn't receive that.

20         Q.    All right.  Let me see if I can clear it up.

21    You are not saying that you didn't receive any medical

22    care, you are saying that the medical care that you

23    received was improper, correct?

24         A.    Correct.

25         Q.    In the ten days that you were in the North

KLEIN, BURY & ASSOCIATES, INC.

```
 1    Broward Detention Center, did you write any
 2    grievances?
 3         A.    No.
 4         Q.    Who did you speak to while you were
 5    incarcerated regarding your complaints of inadequate
 6    medical care?
 7         A.    My mother is the only person that I could
 8    rely on to call the right people since I only had a
 9    limited amount of phone use.
10         Q.    Who did you speak to in the jail, if anyone?
11         A.    In the jail?  No one.
12         Q.    Okay.  You say in your complaint that upon
13    your release you were quote -- not quote, parked by
14    the side of the road in mid 40s degree weather.
15         A.    Yes.
16         Q.    Tell me about that.
17         A.    They woke me up at I would say about three
18    o'clock in the morning, told me to get all my stuff
19    together, and that I was being released.
20              So I got all my stuff together, everything
21    that I had, and I proceeded to, I guess, the desk
22    where they release people.
23              I stayed there for about maybe 20, 25
24    minutes, then they shuffled maybe about four or five
25    of us into a room and they said get changed into your
```

1    regular street clothes.

2    Well, I could not get changed because I was

3    so weak, and not being able to eat and I had lost so

4    much weight. I could not dress myself even before the

5    incarceration. I could not dress myself.

6    So I asked for help from anyone that could

7    help me out, but they saw that I was soiled, and they

8    could smell that I was soiled because I was not

9    changed or anything during the incarceration, and

10   because they saw that I was soiled, no one would help

11   me.

12   So I had to struggle to rip the orange pants

13   off of my legs, and of course I took the shirt off

14   with no problem, and I looked for my clothes.

15   And for some unknown reason it seemed

16   because I was the last one in the place that my

17   clothes were missing. So they gave me some left over,

18   a left over shirt, and some shorts that were not mine

19   that I did not own, and I did not have any circulation

20   stockings as well because they misplaced that as well.

21   So I rolled out, and I asked if there was

22   anywhere inside that I could make a phone call and

23   they told me no that you would have to make a phone

24   call outside.

25   They shuffled me outside. I made my phone

1    call, and it was a very cold night. I don't know if
2    it was 40 degrees or if it was 50 degrees, I know that
3    it was very cold, and I called my mother who was maybe
4    just getting -- as soon as I called her she woke up,
5    so she was not up already.

6             And she was about maybe 45, 40 minutes drive
7    out from getting dressed, and going out there and
8    everything like that so it was about a 45 minute wait,
9    and I was in shorts and a short shirt, short sleeve
10   shirt with no circulation stockings to keep me warm,
11   just sitting out there in a parking lot with no one
12   around, no one in sight, no officers, no security
13   guards outside. I was just in the parking lot by
14   myself.

15        Q.   Okay. Okay. Following being left in the
16   parking lot as you say, did you receive any medical
17   attention related to being outside in the cold?

18        A.   No, I didn't suffer from any hypothermia or
19   anything.

20        Q.   Let me see if I have this right. You had no
21   conversations with anyone working at the jail
22   regarding your request for medical attention?

23        A.   Well, I had requested such as pushing the
24   emergency button, and asking for my medications as
25   well as I believe I was rolled into the nurse's

KLEIN, BURY & ASSOCIATES, INC.

```
 1   station that was there, and I talked to a couple of

 2   nurses there about getting my proper medication as

 3   well as the stomach aches and the ulcers -- I was

 4   bleeding, and I was soiled so I did talk to a couple

 5   of nurses at the nurse's station there.

 6        Q.   When did you talk to the nurses?

 7        A.   Probably about a day or two after I was in

 8   the North Broward facility.

 9        Q.   Is it your testimony that that is the only

10   time that you had contact with any health care

11   providers at the jail?

12        A.   At the North Broward facility, yes.

13             At the downtown facility I did talk to the

14   nurse there, but I only spent one night there and she

15   was, she planned on helping me, but then I was

16   transferred to North, to the North Broward facility.

17        Q.   What do you mean when you say she planned on

18   helping you?

19        A.   Well, she was very cooperative in trying to

20   find out what the facts were for my medications and my

21   supplies, and she was very helpful.  I remember that

22   clearly.

23             In fact, the people at the downtown Broward

24   facility were very nice to me, and throughout my

25   incarceration I wished I was at the downtown facility
```

1    instead of the North Broward facility.

2         Q.    Would it surprise you to find, Scott, that

3    the medical records show that your decubitus ulcer was

4    stage three upon presentation to the North Broward

5    Detention Center, and also stage three at Plantation

6    General Hospital upon your release?

7         A.    No.   Because as you told me earlier that

8    Dr. Mack said it was a grade three.   So I am assuming

9    that the jail would say the same thing.

10        Q.    When -- sorry strike that.

11             Prior to the car accident that we spoke of

12   earlier, did you have any other medical problems?

13        A.    No.   Just a case of pneumonia back in '96,

14   and that's about it.   Nothing really serious.

15             MR. TOOMEY:   Off the record.

16             (Off the record discussion.)

17             MR. TOOMEY:   Let's go back.

18   BY MR. TOOMEY:

19        Q.    Scott, since your accident, have your

20   doctors told you that your injuries are permanent?

21        A.    Yes, sir.   Dr. Jeffrey Canter who was my

22   neurosurgeon.

23        Q.    When did you last see Dr. Canter?

24        A.    October of '98.

25             MR. TOOMEY:   I think I'm done.   I know I am

KLEIN, BURY & ASSOCIATES, INC.

1    done.  Let me take a few minutes, and go over my

2    notes.  I'm done.

3        (Thereupon, Defendant's Exhibit 1 was marked

4    for identification.)

5        (Thereupon, the deposition concluded at

6    approximately 10:15 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KLEIN, BURY & ASSOCIATES, INC.

```
 1

 2
      STATE OF FLORIDA   )
 3                       )
      COUNTY OF BROWARD  )
 4

 5

 6

 7         I, EVELIN SIERRA, Court Reporter, certify that

 8    I was authorized to and did stenographically report

 9    the foregoing proceedings and that the transcript is

10    a true and complete record of my stenographic notes.

11         DATED this 23rd day of November, 2000.

12

13

14                       _____

15                       EVELIN SIERRA, Court Reporter
                         and Notary Public, State of
16                       Florida at Large.

17

18

19

20

21

22

23

24

25
```

KLEIN, BURY & ASSOCIATES, INC.



DEFENDANT'S
EXHIBIT
11/07/00

*Page 1*

**March 01, 1999**

# Log for Scott's Incarceration

- 1/25/99 - Judge Lisa Trachman sentenced Scott to 10 days in the county infirmary
  It was stated that he would be treated as if he were in a medical facility
  and that all my special needs for my injuries would be available
- 2/ 8/99 - Scott went to his doctor's office to have the list of prescriptions and
- special needs faxed to the infirmary.
- 2/15/99 - Scott called Dr. Mack and was told that the orders were faxed twice to
- Chris Pare at 954-831-5573. 9:00 p.m. picture taken of Scott's wound
- 2/16/99 - Scott was admitted to the Broward County facility (downtown Ft.
  Lauderdale) at 9:30 a.m. He did not get processed until 5:00 p.m. He
- was not allowed to relieve himself (no catheration material). He had his
  medications with him but was told he could not have any personal items.
- 2/17/99 - Scott finally transfered to infirmary (had not been changed in two days)
- 2/18/99 - Scott called home and said that all doctor's orders were ignored
  He was sleeping on a steel cot with a two inch pad, not given any
  medication prescribe by the doctor, and the only pain medication he
  got for his back was tylenol.
- 2/19/99 - Scott didn't call home
- 2/20/99 - Scott's father got in touch with the nurses station and spoke to the
  head nurse. We found out that Scott was put in isolation. He was
  allowed one phone call and told his father that he was put there for
  insisting on getting his catherazation materials. Patsy called Dr. Richards
  with details of the ignored orders. She faxed a new set of orders to
  Rafel Senedeir at 954-831-3526.
- 2/21/99 - Visiting hours. Mike and Patsy saw the condition that Scott was in.
  He was barefooted (no circulation stockings) His toe nails bleeding.
- 2/22/99 - Contacted Mike Bosco (friend of Scott's) He contacted Senator
  Campbell's office. Holly Krulic contacted me at work immeadiately.
  She made several calls.
- 2/24/99 - Scott was given his special stockings and an egg crate mattress.
- 2/25/99 - 10th day - not released
- 2/26/99 - Scott called home at 4:40 a.m. He was told that his sweat pants had
  been stolen. He was asked to leave the premises with a pair of shorts
  on. The temperature was 50 degrees. I found him in the parking lot
  shivering.

  5:47 a.m. Admitted to Plantation General Hospital. Nurses suggested
  that he be bathed before the examination, since he hadn't for 10 days.
  Admitted with pains in stomach, Pain in chest when breathing, Blood in
  urnine, Pain in lower back, Ulcer on sacrum open and bleeding
  (pictures taken).

*Page 2*

- **2/26/99 - Discharged** from hospital with two prescriptions. (urinary track
    infection and Potassium pills) They suggest he take antiacids for his
    stomach and chest pains. They said to immeadiately start his
    pancreous medicine because the enzime level was high. No one
    mentioned his wound care. A nurse did come and clean and dress his
    wound. She stated that he needed a wound care doctor.

**Details of ignored orders:**

- Medication          5 prescribtions - Pain medication as needed
- Cathersation        every 5 to 6 hours - only allowed material for twice a day -
                      wrong size of tubing with no lubrication
- Bedding             Special air mattress (Ulcer on sacrum)
- Diapers                    Not trained since the paralysis

**Names:**

- **Deputy Yanoski**
- **Deputy Haines**
- **Nurse Peggy**
- **Charlie Shift**
- **Alpha Shift** - 11:30 p.m.- 4:30 a.m. Slept through their shift

**Inmates:**

- Bob Burke 954-942-7965
- Mike (??) Cast on his right leg

**Disciplinary Hearing:**

- Held by three officers telling Scott what he did wrong. They recommended
    40 days isolation if he had a longer term.

*Sunday Janurary 24, 1999*

*Your Honor,*

*I am Patricia White, Scott's mother. I wanted to let you know a few things if Scott has to go to jail. I have really struggled for the last 10 months to try and help Scott to be able to take care of himself. I finally got him into Health South Rehab. I hope that he can continue to go for thearpy on Tuesdays and Thursdays from 1:00 to 3:00 p.m. He also is not potty trained yet and has a ulcer on his secrum. He has a nurse that attends to him daily for the ulcer and another to come and clean him. There is a lot of equipment and medical meterial that he uses. Will this be provided? What do we need to bring for him besides clothes? I am new to these kinds of tatics so I don't know what to expect. It just seems to me that a man in Scott's condition can not be any harm to anyone since he's paralized. For the last 10 months he has never ventured out. He will always need some one to help him in and out of places. He is still learning how to deal with his handicap. He also is on zoloft which is a anti-depressent drug. He needs to take three every day. There are more prescriptions that I can list for whomever will be caring for him.*
*I wish that there was a way that you could place him in my custody instead of jail.*

*Thank you in advance,*

*Patricia White*

February 21, 1999

Judge Lisa G. Trachman

Your Honor,
I Beg You!  Please read this!!!!
Urgent!!!

My son, Scott Earley was admitted to the Broward County Jail System
on 2/16/99. He is paralyzed from the waist down and needs assistance on
getting dressed and diapers changed. He spent the first two days in the
holding cell downtown without being treated or changed. He was then
transferred to the infirmary at Pompano. His doctor faxed instructions 3
different times for wound care and medication. Twice before he arrived and
the third time on Saturday. (Dr. Arlene Richards). The orders have been
ignored. He has not received any of his medication, which is vital. They only
allow him to catheterize himself twice a day when he should be doing it every
5 hours. He already has blood in his urine. I was allowed to see him on
Sunday and could not believe the condition of his feet. Since he has no
circulation in his legs he must wear teds (special stockings). The blood has
rushed down to his toes and they are bleeding. He was barefooted.

For nine months the hospitals and doctors have worked on getting him
better since the accident and now we will have to start all over again. Scott
did not kill anyone. He does not deserve this treatment. He was put in
isolation for complaining that he was too cold. I've seen the guards there
walking around with jackets. He is in short sleeves. He has two rods in his
spine and gets colder then the normal person.

Since he has been paralyzed I feel that his punishment is enough. He hurt
no one but himself and he'll have to pay for it for the rest of his life. This
inhumane treatment is uncalled for. I beg you to get him out of this
detention center before the damages are irreversible.

Thank you in advance for considering my plea of early release of this
situation.

Patricia White

Work #305-817-4843
Home #954-584-7810