UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SCOTT EARLEY,                                    CASE NO. 00-6104-CIV-ZLOCH

        Plaintiff,                              MAGISTRATE JUDGE SELTZER

v.

SHERIFF OF BROWARD COUNTY,
FLORIDA and EMSA CORRECTIONAL
CARE, INC., a corporation

        Defendants.

_____/

## PLAINTIFF'S NOTICE OF FILING DEPOSITION OF PATRICIA WHITE

NOTICE IS HEREBY GIVEN of the filing of the deposition of Patricia White in

support of Plaintiff's Response and Memorandum of Law in Opposition to Defendants,

SHERIFF OF BROWARD COUNTY, FLORIDA (hereinafter "Sheriff"), and EMSA

CORRECTIONAL CARE, INC. (hereinafter "EMSA"), Motion for Summary Judgment and

Memorandum of Law in Support.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by U.S.

mail to Jodi Page, Esq., Bunnel, Woulfe, Kirschbaum, Keller, Cohen & McIntyre, P.A.,

Attorneys for Defendant, 888 East Las Olas Boulevard, Suite 400, Fort Lauderdale, FL 33303-

0340 this 27th day of August, 2001.

HIGH, STACK, PALAHACH & CRUANES
2655 LeJeune Road, Suite 1108
Coral Gables, Florida 33134
Telephone No. (305) 443-3329
Facsimile No. (305) 443-0850
By: _____
    Carlos Cruanes
    Florida Bar No.0121940

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  00-6104-CIV-ZLOCH
MAGISTRATE JUDGE SELTZER

SCOTT EARLEY,

     Plaintiffs,

vs.

SHERIFF OF BROWARD COUNTY,
FLORIDA

     Defendants.

_____/


590 NW 66th Avenue
Plantation, FL 33317
November 7, 2000
10:30 a.m.


## DEPOSITION OF PATRICIA WHITE


     Taken before EVELIN SIERRA, Court Reporter,

and Notary Public, in and for the State of Florida, at

Large, pursuant to a Notice of Taking Deposition.


KLEIN, BURY & ASSOCIATES, INC.

```
 1   APPEARANCES:

 2          Carlos Cruanes, Esquire
            appearing on behalf of the Plaintiff.
 3
            BUNNEL, WOULFE, et al.
 4          Gregg A. Toomey, Esquire
            appearing on behalf of the Defendant.
 5

 6                      - - - - -

 7
     WITNESS                    DIRECT    CROSS
 8
     SCOTT EARLEY
 9     by: Mr. Toomey             3

10                      - - - - -

11

12   ATTACHMENT:

13   Log for Scott's Incarceration.

14

15   CERTIFIED QUESTIONS:  NONE

16                      - - - - -

17

18

19

20

21

22

23

24

25
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1   Thereupon:
 2                    PATRICIA WHITE
 3   was called as a witness and having been first duly
 4   sworn, was examined, testified, and stated as follows:
 5              THE WITNESS:  I do.
 6                    DIRECT EXAMINATION
 7   BY MR. TOOMEY:
 8       Q.   Please state your name for the record.
 9       A.   Patricia Ann White.
10       Q.   Spell your first and last name please?
11       A.   W-H-I-T-E  P-A-T-R-I-C-I-A.
12       Q.   We are here today, Ms. White, pursuant to a
13   notice issued by my office in a case brought by your
14   son against BSO.
15              I will ask you some questions.  I ask that
16   if you don't understand my question, that you ask me
17   to rephrase them.
18              If you do not ask me to rephrase them, I
19   will assume that you understood the question and the
20   answer you give was to my question, is that fair?
21       A.   That is fair.
22       Q.   Your current mailing address?  Your current
23   address?
24       A.   590 NW 66th Avenue; Plantation, Florida
25   33317.
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        Q.    Is that where this deposition is occurring?

 2        A.    Yes, it is.

 3        Q.    What is your date of birth?

 4        A.    11/8/50.

 5        Q.    Your social security number?

 6        A.    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.

 7              MR. TOOMEY:  Off the record.

 8              (Off the record discussion.)

 9              MR. TOOMEY:  Back on.

10   BY MR. TOOMEY:

11        Q.    Are you currently employed?

12        A.    Yes, I am.

13        Q.    Who are you employed by?

14        A.    Bank of America.

15        Q.    What position are you in with Bank of

16   America?

17        A.    Executive administrator, assistant.

18        Q.    Which office do you work in?

19        A.    Downtown Fort Lauderdale.

20        Q.    What is an executive administrator

21   assistant?

22        A.    It is a secretary.

23        Q.    To whom?

24        A.    The regional executive.  For the regional

25   executive for the region, Carl Koenig.  It is
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1    pronounced -- spelled K-O-E-N-I-G.
 2        Q.    His position is regional--
 3        A.    Executive for the region, central Broward
 4    region.
 5        Q.    How long have you been employed by Bank of
 6    America, or how long have you been employed by Bank of
 7    America, or any of its previous names?
 8        A.    Eighteen and a half years.
 9        Q.    What is the mailing address for Bank of
10    America?
11        A.    One Financial Plaza, 14th Floor; Fort
12    Lauderdale, Florida, 33394.
13        Q.    Let's talk about your education.  You
14    attended college?
15        A.    No.
16        Q.    Have you had any post secondary education?
17        A.    No.
18        Q.    Where did you go to high school?
19        A.    Cabrini High School in New Orleans.
20        Q.    Did you move directly from New Orleans to
21    Florida?
22        A.    In '69.
23        Q.    That is a yes?
24        A.    Yes.
25        Q.    How long have you lived in this home?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    Five years.

 2        Q.    And prior to living here, where did you

 3   live?

 4        A.    Pembroke Pines.

 5        Q.    Do you recall that address?

 6        A.    16820 -- no, I can't recall.  I have got it

 7   written.

 8              MR. CRUANES:  Off the record.

 9   BY MR. TOOMEY:

10        Q.    I would never want to make it a quiz.

11              Who are you currently married to?

12        A.    John White.

13        Q.    How long have you been married to John

14   White?

15        A.    Four years.

16        Q.    What does Mr. White do for a living?

17        A.    He works for the Town of Davie Equipment,

18   equipment operator.

19        Q.    Were you married previously?

20        A.    Yes.

21        Q.    To whom?

22        A.    Michael James Earley.

23        Q.    And when were you divorced?  I am assuming

24   you were divorced?

25        A.    Yes, I am.  Thank God.  1989.
```

KLEIN, BURY & ASSOCIATES, INC.

1     Q.    Do you have current contact with Mr. Earley?

2     A.    Always.  Always.

3     Q.    Has Mr. Earley had any -- has Mr. Earley

4     participated in any way with your son's treatment?

5     A.    No.

6     Q.    To your knowledge does your son have contact

7     with his father?

8     A.    Yes.

9     Q.    Do you know where Michael Earley currently

10    lives?

11    A.    Virginia Gardens.

12    Q.    At some point your son had proceedings

13    occurring in the criminal courts in Broward County, is

14    that correct?

15    A.    That is correct.

16    Q.    Did you attend any of those hearings?

17    A.    No, Michael Earley did.

18    Q.    Were you with your son when he was admitted

19    to the North Broward Detention Center facility?

20    A.    Michael Earley was.  Can I explain?

21    Q.    Sure.  Go ahead.

22    A.    I had involved his father letting him know

23    that I was -- I was doing the treatment.  Since he was

24    a police officer, I wanted him to stand by his son and

25    do all the legal portion of it because I didn't

 1    understand it.

 2         Q.    Where is Mike Earley a police officer?

 3         A.    Miami Springs.

 4         Q.    Okay.  Just to make things simpler, you were

 5    not with Scott when he entered the jail system.

 6               Did you have any contact with Scott while he

 7    was in the jail system?

 8         A.    Yes, and his doctors.

 9         Q.    How was the contact effected between you and

10    your son?

11         A.    The first two days by phone, and then when

12    he was not allowed to use the phone, Mike Earley, I

13    called him to try and track him down, and then also I

14    was allowed to go in and see him on Sunday between

15    those ten days that he was in.

16         Q.    So you had telephone calls the first couple

17    of days that Scott was incarcerated, and then you saw

18    him one Sunday?

19         A.    That is correct.

20         Q.    Is that correct?

21         A.    Right.

22         Q.    You said you had conversations, is that

23    correct?

24         A.    That is correct.

25         Q.    When did those conversations occur?

    1        A.    Before and after he was incarcerated.

    2        Q.    Let's talk about before he was incarcerated.

    3   What was the sum and substance of those conversations?

    4        A.    Basically to get him prepared for when he

    5   had to attend the ten days in the facility to make

    6   sure that he was supplied the -- the judge had stated

    7   that he would be in a hospital setting.

    8        Q.    Never mind what the judge said.  I am only

    9   interested in the conversation you had with the

   10   physicians.

   11        A.    And then basically I wanted to make sure I

   12   gave them phone numbers.

   13        Q.    Gave who phone numbers?

   14        A.    Dr. Arlene Richards and Dr. Mack, phone

   15   numbers of the Broward County facility.  I made all

   16   the phone calls basically to try and find out how to

   17   get the medication to him correctly.

   18        Q.    Your son has testified that either or both

   19   doctors Richards and Mack faxed some documents

   20   regarding Scott's care and treatment to the Broward

   21   County Jail's office.

   22              Do you have any knowledge of those documents

   23   being faxed?

   24        A.    Yes, sir.

   25        Q.    What is your knowledge?


                    KLEIN, BURY & ASSOCIATES, INC.

1         A.    Dr. Arlene Richards, I called to make sure

2    that they were sent.  She said, Patty, I have sent

3    them three times.

4         Q.    Other than what Dr. Richards told you, do

5    you have any documentation that shows that those items

6    were faxed to the Broward County jail system?

7         A.    No, sir.

8         Q.    Did Dr. Richards ever give you a copy of the

9    facsimile transmission?

10        A.    No, sir.

11        Q.    Is that the total of the conversation that

12   you had with doctors Richards and or Mack regarding

13   your son's incarceration?

14        A.    Yes, basically.

15        Q.    As I understand you were also -- as I

16   understand, you were also at the jail when your son

17   was released, is that correct?

18        A.    Yes, sir.

19        Q.    What type of day was that, if you recall?

20        A.    Five o'clock in the morning.

21        Q.    Did you attend with your son when he went to

22   the Plantation General Hospital d?

23        A.    Yes, sir.

24        Q.    What made you go to Plantation General

25   Hospital?

KLEIN, BURY & ASSOCIATES, INC.

1      A.    Because Dr. Mack and Dr. Arlene Richard's

2    office is right there, and that is their main

3    hospital.

4      Q.    I understand that.  But why did you go to

5    the hospital that night?

6      A.    Because of the condition that my son was in.

7      Q.    Was that your idea or your son's idea.

8      A.    No, mine.

9      Q.    Tell me how you decided to do this?

10      A.    Because, well, because of the size of his

11    feet, because of the complaints from Scott of his

12    stomach pains, and his overall look.

13      Q.    Did you speak to any of the health care

14    providers at Plantation General Hospital?

15      A.    I spoke to the doctor, the nurses.  They

16    would not touch him because he had not been bathed

17    they went and showered him first.

18      Q.    Do you remember which doctors you spoke to?

19      A.    No, I don't remember the name.

20      Q.    To your knowledge what was the treatment

21    your son was given at Plantation General Hospital?

22      A.    They took him for a urinary tract infection.

23    They checked to make sure also blood tests was done,

24    and then the nurse came in to treat his wound.

25            Of course, they saw I had a camera, and they

KLEIN, BURY & ASSOCIATES, INC.

1    didn't want me to take pictures, but once the curtains

2    were closed, I did.

3        Q.    Why did you have a camera?

4        A.    Because of the way that Scott had told me

5    that he was being treated, and the condition that I

6    saw him in on Sunday.

7            I knew that he was receiving inhumane

8    treatment, and the reason why I say it is if you would

9    see your son in the way I saw my son, you would have

10   done anything you could for him.

11       Q.    So you took some pictures at some point?

12       A.    Uh-huh.

13       Q.    Particularly, did you take pictures of the

14   sacral ulcer?

15       A.    Yes.

16       Q.    And when were those pictures taken?

17       A.    The same day he was released.  It was on the

18   26th.

19       Q.    To my understanding some pictures were taken

20   earlier as well before the incarceration.  Did you

21   take those pictures?

22       A.    The nurse that was taking care of him had

23   heeled his wound, to the point where it was almost

24   closed, and she had taken the pictures the night

25   before he went in.

```
 1        Q.   What is that nurse's name?

 2        A.   I don't recall.

 3        Q.   Do you know who she worked for?

 4        A.   It was a health care provider that

 5   Dr. Arlene Richards sent to us.

 6        Q.   If I show you some pictures, can you pick

 7   out the ones that you took?

 8        A.   I am pretty sure I could.

 9        Q.   Handing you a series of pictures that

10   purport to show us sacral ulcers.  Which of those

11   pictures?

12        A.   This was the day before he went.

13        Q.   Did you take that picture, ma'am?

14        A.   That was taken by the nurse.

15        Q.   That was taken by the nurse?

16        A.   No.

17        Q.   Show me the pictures that you took?

18        A.   This one, this one, this one, and this one.

19        Q.   Okay.  What type of camera did you take

20   these pictures with?

21        A.   A Polaroid.

22        Q.   An instamatic kind of camera?

23        A.   Instamatic.  And then the other one I used

24   the 35 millimeter.

25        Q.   Have you been involved in any discussions
```

KLEIN, BURY & ASSOCIATES, INC.

1    with any other health care providers subsequent to the

2    night at Plantation General Hospital with regard to

3    the sacral wound?

4         A.    I didn't understand that.

5         Q.    Have you talked to any other doctors

6    regarding the decubitus ulcer?

7         A.    I talked to all his doctors.

8         Q.    Tell me about conversations you have had

9    specifically regarding the decubitus ulcer after Scott

10   was in Plantation General Hospital?

11        A.    Dr. Arlene Richards.

12        Q.    What did you talk to Dr. Arlene Richards

13   about?

14        A.    Using different bandages to -- because the

15   wound was deeper than it had been.  She told me to use

16   the Intrasite, the saline like I had been using, but

17   she told me to double pad, to put gauze in the hole.

18        Q.    Did Dr. Arlene Richards ever tell you that

19   any change in the status of the ulcer was caused by

20   Scott's incarceration?

21        A.    No, she never made the statement.

22        Q.    Did you ever have any conversations with any

23   of the officials or employees of the Broward County

24   jail?

25        A.    When I was trying to get help to him.  I was

```
 1    on the phone with everybody that I could get my hands

 2    on.  I even found a guard.  I worked with the wife of

 3    a guard there, and I even asked the wife to try to get

 4    a hold of her husband just to bring him a blanket, and

 5    he did.

 6        Q.   Did you ever have any conversations with --

 7    directly have any conversations with any employees of

 8    the Broward County jail system--

 9        A.   No.

10        Q.   -- regarding your son's incarceration?  Is

11    that a no?

12        A.   No.  That is a no.

13        Q.   Do you know why the home health care nurse

14    photographed Scott's decubitus ulcer before he was

15    sent to Broward County Jail?

16        A.   She did a series of shots for Arlene

17    Richards.  That was part of her care giving, that she

18    had to show Dr. Arlene Richards the step by step

19    procedures.

20        Q.   Are there additional photographs taken by

21    that home health care nurse?

22        A.   Yes, sir.

23        Q.   Do you have those pictures?

24        A.   No, I don't.

25        Q.   Do you know who does?
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1      A.    She does.

 2      Q.    The nurse does?

 3      A.    Yes.   Whether she supplied them to

 4  Dr. Richards or she kept them in her folder in her

 5  office, I don't know.

 6      Q.    How did you end up with that picture?

 7      A.    I ended up with a few of them.   She did

 8  leave a couple of them here if you want to see them.

 9      Q.    The nurse directly gave you those pictures?

10      A.    Yes.

11      Q.    The picture that is --

12      A.    (Witness nodding.)

13      Q.    When did -- when did she give you that

14  picture?

15      A.    On the 15th of February.

16      Q.    Did you ask her for it?

17      A.    Yes.

18      Q.    Why is that?

19      A.    Because she suggested that I keep the

20  picture.

21      Q.    Did she say why?

22      A.    Yes.

23      Q.    Why?

24      A.    Because she could not believe that the judge

25  had ordered him to go to jail.
```

```
 1              MR. TOOMEY:  We'll just make an attachment
 2         to the deposition.
 3    BY MR. TOOMEY:
 4         Q.   I will show you a document that purports to
 5    be a log for -- entitled log for Scott's incarceration
 6    that was admitted as Defendant's One in the deposition
 7    of Scott Earley.  And we are going to attach it to
 8    this deposition.
 9              Would you take a look at this document for
10    me, and tell me if that is a document that you
11    created?
12         A.   Yes, it is.
13         Q.   When did you create that document?
14         A.   During the ten days I started it when she
15    was incarcerated.  Well it states -- I am trying to
16    think when I actually started it.  Yes, it was during.
17         Q.   You started writing it?
18         A.   After the first few phone calls when I saw
19    how it was going, that is when I started it.
20         Q.   And when was the last time you added
21    anything to that document?
22         A.   Do you know when I presented this to you?
23    When I gave it to you, that is when I stopped.  I
24    can't remember.
25         Q.   I'll make it simpler for you.
```

KLEIN, BURY & ASSOCIATES, INC.

```
1          A.    Okay.
2          Q.    Did you continue adding entries to this
3     document after Scott's incarceration was completed?
4          A.    No, I mean --
5          Q.    Did the question make sense?
6          A.    Yes, it made sense, but it's -- maybe I
7     should say I don't remember.  That is what I should
8     say because it's been a while, and I just don't
9     remember all the dates and times and stuff.  I know I
10    started it during, and I know I finished it when I
11    gave it to Carlos.
12         Q.    Okay.  Are the items noted on here, things
13    that you specifically knew, that you had first-hand
14    knowledge of?
15         A.    Some of them were statements from Scott when
16    I talked to him on the phone.
17         Q.    So not everything in here is within your
18    firsthand knowledge, is that correct?
19         A.    I would have to point them out to you.
20         Q.    Some things are firsthand knowledge, and
21    some things are not, correct?
22         A.    Exactly, that is correct.
23         Q.    If we were to look -- I will stand up and
24    look behind you because we only have one copy of this.
25              So if we looked at say the third entry here
```

KLEIN, BURY & ASSOCIATES, INC.

1    that's listed as 2/15/99, and it states?

2        A.    Scott called Dr. Mack.

3        Q.    That is not something you would have

4    firsthand knowledge of, is that correct?

5        A.    That is correct.

6        Q.    As we go down 2/20/99.  Scott's father got

7    in touch with the nurse.

8        A.    That is something that Mike Earley told me,

9    and this is whenever -- when I called Dr. Richards.

10   That is me.

11       Q.    2/17/99 Scott finally transferred to the

12   infirmary.  That is not something that you would have

13   personal knowledge of, is that correct?

14       A.    That is correct.

15       Q.    2/18/99.  Scott called home and said all

16   doctors orders were ignored.  Do you have knowledge

17   that he called you?

18       A.    Scott called me, yes.

19       Q.    But you don't have any firsthand knowledge

20   that the doctors' orders were ignored, is that

21   correct?

22       A.    Exactly.  That is correct.

23       Q.    Who is Mike Bosco.

24       A.    Mike Bosco.  Can I see the document.

25       Q.    It is listed in the document.

KLEIN, BURY & ASSOCIATES, INC.

```
 1        A.    Which date?

 2        Q.    February 22 of '99.

 3        A.    That's a friend of Scott's who is a DJ for

 4   Y-100.

 5        Q.    And again, you made all those entries on

 6   this document, is that correct?

 7        A.    Yes, I did, but I have not seen that

 8   document for over a year.

 9        Q.    It says here you contacted Senator

10   Campbell's office?

11        A.    I did.

12        Q.    Is that Skip Campbell?

13        A.    Yes.

14        Q.    You did that personally?

15        A.    Yes.

16        Q.    Who did you speak to at Senator Campbell's

17   office?

18        A.    Holly Krolick (spelled phonetically.)

19        Q.    That would be Holly Krolick?

20        A.    Yes.

21        Q.    Did you ever speak to Senator Campbell

22   himself?

23        A.    No, never not a chance to, cause he was

24   very busy.

25        Q.    Other than the physicians which you spoke
```

KLEIN, BURY & ASSOCIATES, INC.

```
 1   about, have you had any conversations with anyone

 2   regarding the care and treatment Scott received at the

 3   Broward County Jail?

 4        A.   Did I discuss it with -- yes, I did.

 5        Q.   Who is that?

 6        A.   The nurse.

 7        Q.   The home health care nurse that we talked

 8   about before?

 9        A.   Yes.

10        Q.   Anybody else?

11        A.   Just his doctors, and the health care

12   people, my husband, my mother-in-law.

13        Q.   Who is your mother-in-law?

14        A.   She lives here with us.

15        Q.   Her name?

16        A.   Francis White.

17        Q.   Is your ex-husband still a police officer in

18   Miami Lakes?

19        A.   Yes.  It's Miami Springs though.

20        Q.   Miami Springs.  Just wanted to make sure.

21   Somehow I knew I didn't have that right.

22        A.   Okay.

23        Q.   One more thing I need to look at, and we are

24   almost there.  Okay.  I am done.

25             MR. CRUANES:  We'll waive.
```

KLEIN, BURY & ASSOCIATES, INC.

1                    (Thereupon, the deposition was cocluded at

2          10:45 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2
        STATE OF FLORIDA    )
 3                          )
        COUNTY OF BROWARD )
 4

 5

 6

 7          I, EVELIN SIERRA, Court Reporter, certify that

 8      I was authorized to and did stenographically report

 9      the foregoing proceedings and that the transcript is

10      a true and complete record of my stenographic notes.

11          DATED this 21st day of November, 2000

12

13

14      _____

15                      EVELIN SIERRA, Court Reporter
                        and Notary Public, State of
16                      Florida at Large.

17

18

19

20

21

22

23

24

25
```

KLEIN,  BURY & ASSOCIATES, INC.

DEFENDANT'S
EXHIBIT

*Page 1*

**March 01, 1999**

# *Log for Scott's Incarceration*

- 1/25/99 - Judge Lisa Trachman sentenced Scott to 10 days in the county infirmary
  It was stated that he would be treated as if he were in a medical facility
  and that all my special needs for my injuries would be available
- 2/ 8/99 - Scott went to his doctor's office to have the list of prescriptions and
- special needs faxed to the infirmary.
- 2/15/99 - Scott called Dr. Mack and was told that the orders were faxed twice to
- Chris Pare at 954-831-5573. 9:00 p.m. picture taken of Scott's wound
- 2/16/99 - Scott was admitted to the Broward County facility (downtown Ft.
  Lauderdale) at 9:30 a.m. He did not get processed until 5:00 p.m. He
- was not allowed to relieve himself (no catheration material). He had his
  medications with him but was told he could not have any personal items.
- 2/17/99 - Scott finally transfered to infirmary (had not been changed in two days)
- 2/18/99 - Scott called home and said that all doctor's orders were ignored
  He was sleeping on a steel cot with a two inch pad, not given any
  medication prescribe by the doctor, and the only pain medication he
  got for his back was tylenol.
- 2/19/99 - Scott didn't call home
- 2/20/99 - Scott's father got in touch with the nurses station and spoke to the
  head nurse. We found out that Scott was put in isolation. He was
  allowed one phone call and told his father that he was put there for
  insisting on getting his catherazation materials. Patsy called Dr. Richards
  with details of the ignored orders. She faxed a new set of orders to
  Rafel Senedeir at 954-831-3526.
- 2/21/99 - Visiting hours. Mike and Patsy saw the condition that Scott was in.
  He was barefooted (no circulation stockings) His toe nails bleeding.
- 2/22/99 - Contacted Mike Bosco (friend of Scott's) He contacted Senator
  Campbell's office. Holly Krulic contacted me at work immeadiately.
  She made several calls.
- 2/24/99 - Scott was given his special stockings and an egg crate mattress.
- 2/25/99 - 10th day - not released
- 2/26/99 - Scott called home at 4:40 a.m. He was told that his sweat pants had
  been stolen. He was asked to leave the premises with a pair of shorts
  on. The temperature was 50 degrees. I found him in the parking lot
  shivering.
  5:47 a.m. Admitted to Plantation General Hospital. Nurses suggested
  that he be bathed before the examination, since he hadn't for 10 days.
  Admitted with pains in stomach. Pain in chest when breathing, Blood in
  urnine, Pain in lower back, Ulcer on sacrum open and bleeding
  (pictures taken).

*Page 2*

- **2/26/99 - Discharged** from hospital with two prescriptions. (urinary track infection and Potassium pills) They suggest he take antiacids for his stomach and chest pains. They said to immeadiately start his pancreous medicine because the enzime level was high. No one mentioned his wound care. A nurse did come and clean and dress his wound. She stated that he needed a wound care doctor.

**Details of ignored orders:**

- Medication        5 prescribtions - Pain medication as needed
- Cathersation      every 5 to 6 hours - only allowed material for twice a day - wrong size of tubing with no lubrication
- Bedding           Special air mattress (Ulcer on sacrum)
- Diapers               Not trained since the paralysis

**Names:**

- **Deputy Yanoski**
- **Deputy Haines**
- **Nurse Peggy**
- **Charlie Shift**
- **Alpha Shift** - 11:30 p.m.- 4:30 a.m. Slept through their shift

**Inmates:**

- Bob Burke 954-942-7965
- Mike (??) Cast on his right leg

**Disciplinary Hearing:**

- Held by three officers telling Scott what he did wrong. They recommended 40 days isolation if he had a longer term.

*Sunday Janurary 24, 1999*

*Your Honor,*

*I am Patricia White, Scott's mother. I wanted to let you know a few things if Scott has to go to jail. I have really struggled for the last 10 months to try and help Scott to be able to take care of himself. I finally got him into Health South Rehab. I hope that he can continue to go for thearpy on Tuesdays and Thursdays from 1:00 to 3:00 p.m. He also is not potty trained yet and has a ulcer on his secrum. He has a nurse that attends to him daily for the ulcer and another to come and clean him. There is a lot of equipment and medical meterial that he uses. Will this be provided? What do we need to bring for him besides clothes? I am new to these kinds of tatics so I don't know what to expect. It just seems to me that a man in Scott's condition can not be any harm to anyone since he's paralized. For the last 10 months he has never ventured out. He will always need some one to help him in and out of places. He is still learning how to deal with his handicap. He also is on zoloft which is a anti-depressent drug. He needs to take three every day. There are more prescriptions that I can list for whomever will be caring for him.*
*I wish that there was a way that you could place him in my custody instead of jail.*

*Thank you in advance,*

*Patricia White*

February 21, 1999

Judge Lisa G. Trachman

Your Honor,
I Beg You!  Please read this!!!!
Urgent!!!

My son, Scott Earley was admitted to the Broward County Jail System
on 2/16/99. He is paralyzed from the waist down and needs assistance on
getting dressed and diapers changed. He spent the first two days in the
holding cell downtown without being treated or changed. He was then
transferred to the infirmary at Pompano. His doctor faxed instructions 3
different times for wound care and medication. Twice before he arrived and
the third time on Saturday. (Dr. Arlene Richards). The orders have been
ignored. He has not received any of his medication, which is vital. They only
allow him to catheterize himself twice a day when he should be doing it every
5 hours. He already has blood in his urine. I was allowed to see him on
Sunday and could not believe the condition of his feet. Since he has no
circulation in his legs he must wear teds (special stockings). The blood has
rushed down to his toes and they are bleeding. He was barefooted.

For nine months the hospitals and doctors have worked on getting him
better since the accident and now we will have to start all over again. Scott
did not kill anyone. He does not deserve this treatment. He was put in
isolation for complaining that he was too cold. I've seen the guards there
walking around with jackets. He is in short sleeves. He has two rods in his
spine and gets colder then the normal person.

Since he has been paralyzed I feel that his punishment is enough. He hurt
no one but himself and he'll have to pay for it for the rest of his life. This
inhumane treatment is uncalled for. I beg you to get him out of this
detention center before the damages are irreversible.

Thank you in advance for considering my plea of early release of this
situation.

Patricia White


Work #305-817-4843
Home #954-584-7810